# EXHIBIT 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------x

4   AGCS MARINE INSURANCE

5   COMPANY,

6                      Plaintiff/

7       Counterclaim Defendant,

8      vs.               No. 14-CV-5902

9   WORLD FUEL SERVICES, INC.,     (PAE)(SN)

10   And WORLD FUEL SERVICES

11   EUROPE, LTD.,

12                    Defendants/

13       Counterclaim Plaintiffs.

14   -------------------------------x

15                May 20, 2015

16                9:33 a.m.

17     Videotaped Deposition of NOREEN

18   BROSNAN, taken by Defendants/Counterclaim

19   Plaintiffs, at the offices of COVINGTON &

20   BURLING LLP, 620 Eighth Avenue, New York,

21   New York, before Frank J. Bas, a

22   Registered Professional Reporter,

23   Certified Realtime Reporter and Notary

24   Public within and for the State of New

25   York.

N. BROSNAN

2  A.  Yes.

3  Q.  Did you have any role in
4 creating this?

5  A.  Yes.

6  Q.  You said a long time ago in one
7 of your answers, so I take it this is
8 something you generated at one point but
9 you haven't routinely updated? Or what is
10 this -- what's your relationship with your
11 LinkedIn profile?

12  A.  Correct. I don't go into it on
13 a day-to-day basis. Even though I get
14 e-mails every day.

15  Q.  Looking at the content, is all
16 of the content on this profile true and
17 correct?

18    And let me limit that just to
19 say at least with regard to education,
20 experience, and the information under
21 "Noreen Brosnan" on the first page in the
22 upper left. I don't expect you to know
23 who viewed you, in the right-hand column.

24  A.  Yes, with respect to the
25 education and experience.

N. BROSNAN

2  Q.  So it appears you started out
3 doing marine cargo underwriting at Royal?

4  A.  Yes.

5  Q.  That was your first role after
6 school?

7  A.  Yes.

8  Q.  Or during and after school?

9  A.  (Nodding head.)

10  Q.  Is it true that that's pretty
11 much what you've done for the last
12 twenty-five years?

13  A.  Yes.

14  Q.  Have you ever had any position
15 specifically involving the handling of
16 marine cargo claims?

17  A.  No.

18  Q.  Have you ever had any training
19 or -- either at St. John's or outside of
20 St. John's, on the handling of marine
21 cargo claims?

22  MR. NICOLETTI: Objection as to
23 form.

24  A.  No.

25  Q.  You gave us a quick overview of

N. BROSNAN

2 your employment history before. Have your
3 duties and responsibilities in connection
4 with marine cargo underwriting changed
5 over the time that you've been in the
6 industry, or have they been more or less
7 the same?

8  MR. NICOLETTI: Objection as to
9 form.

10  You can answer.

11  A.  More or less the same.

12  Q.  Have there been any changes in
13 terms of the volume of business you're
14 doing, the types of clients with whom
15 you're working, or any other significant
16 changes over the course of your career?

17  MR. NICOLETTI: Objection as to
18 form.

19  You can answer.

20  A.  As a trainee I obviously
21 handled smaller accounts. As I've had
22 more experience, I handle larger clients.

23  Q.  Why is it that you left
24 Travelers and joined Fireman's Fund?

25  A.  At the time my -- actually the

N. BROSNAN

2 only reason I went to Travelers, my father
3 had passed away and my mother was by
4 herself, so they had given me a part-time
5 position there. I went to Fireman's Fund
6 because it was a better opportunity.

7  Q.  A better opportunity in what
8 sense?

9  A.  Travelers was not a company
10 that I felt that I could do well at.
11 Let's put it that way. A nice way.

12  Q.  Why is that?

13  A.  It just -- it wasn't -- I was
14 used to handling larger accounts and
15 Travelers is more an agent-based company.

16  Q.  When you say "handling larger
17 accounts," what exactly does that mean?

18  A.  Global multi-national accounts.
19 Large premiums.

20  Q.  Throughout your career has it
21 been generally true that your compensation
22 tends to be linked to, in some way or
23 another, the volume of premium generated
24 on accounts you handle?

25  MR. NICOLETTI: Objection as to

5 (Pages 14 - 17)

N. BROSNAN

2 form.
3     You can answer.
4   A.   In an ideal world, yes.
5   Q.   I am trying to get at the
6 general relationship.
7     So in an ideal world that's the
8 way it's supposed to work?
9   A.   Mm-hmm.  Yes.
10   Q.   I should have said when I was
11 going over ground rules with you that
12 phrases like "uh-huh" and "mm-hmm" tend
13 not to show up very clearly in the record,
14 so it's important that you try to avoid
15 them.  Will you do that?
16   A.   Understood.
17   Q.   So in an ideal world your
18 compensation would essentially be based on
19 the premium volume you're generating?
20     MR. NICOLETTI:  Objection as to
21 form.
22     You can answer.
23   A.   Yes.
24   Q.   Have you lived in that ideal
25 world since you joined Fireman's Fund,

N. BROSNAN

2 which became Allianz?
3     MR. NICOLETTI:  The same
4 objection.
5     You can answer.
6   A.   Yes.  They've also given me an
7 opportunity to work remotely.
8   Q.   So yes, your compensation is
9 linked to premium volume, and they've also
10 let you work remotely?
11     MR. NICOLETTI:  The same
12 objection.
13     You can answer.
14   A.   Can you say that again?
15   Q.   Yeah.
16     The first thing I was trying to
17 ascertain is:  Since you joined Fireman's
18 Fund, which became Allianz, has it been
19 true that your compensation is generally
20 linked to the premium volume that you're
21 generating?
22     MR. NICOLETTI:  Objection as to
23 form.
24     You can answer.
25   A.   It's compensation -- the reason

N. BROSNAN

1 I moved to Fireman's Fund was it was an
2 opportunity, it was flexibility, and
3 compensation.
4
5   Q.   Is it true in your industry
6 that underwriters' compensation also
7 depends, in part, on loss history on the
8 accounts the underwriter is generating?
9     MR. NICOLETTI:  Objection as to
10 form.
11     You can answer.
12   A.   I can't speak to that.
13   Q.   So do the claims, if they
14 impact the policyholders whose business
15 you have underwritten, have any impact at
16 all on your compensation?
17     MR. NICOLETTI:  Objection as to
18 form.
19   Q.   And this is at AGCS/Allianz.
20     MR. NICOLETTI:  Objection as to
21 form.  Asked and answered.
22     You can answer again.
23   A.   Could you say that again?
24   Q.   Do you need the question read
25 back?

N. BROSNAN

2   A.   Yes.
3     (The reporter read back as
4 follows:
5     "Question:  So do the claims,
6 if they impact the policyholders whose
7 business you have underwritten, have any
8 impact at all on your compensation?")
9   A.   Not that I'm aware of, no.
10   Q.   You live in Delaware and work
11 remotely.  How long has that been your
12 situation?
13   A.   I was working Mondays and
14 Fridays remotely from Delaware, and I've
15 gone full-time remote just recently,
16 probably the past year.
17   Q.   So until the past year you were
18 in Manhattan for three days a week and
19 then otherwise working from home?
20   A.   Correct.
21   Q.   How long had you been doing
22 that?
23   A.   Since I was hired.
24   Q.   By Fireman's Fund?
25   A.   By Fireman's Fund.

6 (Pages 18 - 21)

1          N. BROSNAN
2          MR. NICOLETTI:  The same
3 objection.
4          You can answer.
5     A.    With respect to my book?
6     Q.    Yeah.
7     A.    Can you say the question -- can
8 you repeat the question?
9          (The reporter read back as
10 follows:
11          "Question:  Do you have any way
12 of estimating for us how much of the
13 business you, yourself, underwrite that
14 comes to Allianz/AGCS from the group you
15 just identified?
16          "Answer:  No.
17          "Question:  Is it more than
18 half?")
19     A.    Yes.
20     Q.    More than three-quarters?
21     A.    My -- my book is generally
22 alphabet house, those producers I just
23 mentioned, which I said in the beginning.
24     Q.    Got it.  So vast majority, if
25 not in some years all, of the business

1          N. BROSNAN
2 you, yourself, underwrite comes from them?
3     A.    Marsh, Willis and Aon.
4     Q.    And of those three do you have
5 any way of estimating how much of it is
6 Willis business?
7     A.    (No response.)
8     Q.    And if it differs by year,
9 fine.  I'm simply looking for an estimate
10 over the time period involved.
11          MR. NICOLETTI:  Objection as to
12 form.
13     A.    Probably at least a quarter.
14     Q.    And of that quarter any way of
15 differentiating between Bob and -- is it
16 Steve?
17     A.    Steve Sozansky, yes.
18     Q.    Yeah.
19     A.    I would say primarily Bob.
20     Q.    Had you worked with Bob or
21 Steve to underwrite business prior to the
22 time you joined Fireman's Fund?
23     A.    Yes.
24     Q.    How long have you been working
25 with those guys?

1          N. BROSNAN
2          MR. NICOLETTI:  Objection as to
3 form.
4          You can answer.
5     A.    Since I was probably in the
6 business.
7     Q.    So going all the way back to
8 Royal?
9     A.    Yeah.  I would say so, yeah.
10 Royal/CIGNA.
11          Again, Royal I was a trainee.
12     Q.    Are there particular types of
13 accounts or industries that come to you
14 more frequently through Mr. Bartsch and
15 Willis?
16     A.    No.
17     Q.    So it could be anything?
18     A.    Yes.
19          MR. MYERS:  I am going to ask
20 our court reporter to mark as Exhibit 2
21 AGCS -- it's a bunch of different Bates
22 numbers.  We marked this at a prior
23 deposition.  However -- this is O'Connor
24 Exhibit 2, however the version marked as
25 O'Connor Exhibit 2, because of the

1          N. BROSNAN
2 recopying formatting, is essentially
3 illegible.  So I'm going to just mark a
4 new one, the same Bates numbers.
5          MR. NICOLETTI:  And what are
6 the Bates numbers, so we can have them on
7 the record?
8          MR. MYERS:  Sure.  They're in
9 the document, so I don't think there's
10 any --
11          MR. NICOLETTI:  I think both
12 our paralegal staffs would appreciate it
13 if you identify the Bates numbers.
14          MR. MYERS:  442, 443, 438.
15          ---
16          (Brosnan Exhibit 2, AGCS org
17 charts, Bates AGCS 000442, 443 and 438 was
18 marked for identification)
19          ---
20 BY MR. MYERS:
21     Q.    Have you seen org charts like
22 this before at AGCS?
23     A.    Yes.
24     Q.    On the first page and second
25 page, and third page, you'll see your

N. BROSNAN

2 name?
3    A.    Mm-hmm.  Yes.
4    Q.    Did these -- do these reflect
5 the organization, to your understanding,
6 of underwriting at AGCS marine northeast
7 region?
8          MR. NICOLETTI:  Objection as to
9 form.
10         You can answer.
11   A.    Yes.
12   Q.    On the first page it shows a
13 direct line between you and
14 Mr. McClintock.
15         Is Mr. McClintock your manager?
16   A.    Yes.
17   Q.    Has he been your manager
18 throughout the time you've been with
19 Fireman's Fund/AGCS/Allianz?
20   A.    Yes.
21   Q.    Have you ever had a different
22 manager?
23   A.    No.
24   Q.    So you report directly to
25 Brian, yes?

N. BROSNAN

2    A.    Yes.
3    Q.    Do you have any other indirect
4 people or people to whom you report
5 indirectly?
6          MR. NICOLETTI:  Objection as to
7 form.
8          You can answer.
9    A.    No.
10   Q.    Do you have any reporting
11 relationship or reasons to interface with
12 Ryan O'Connor?
13   A.    Yes.
14   Q.    Please describe what the matrix
15 reporting relationship or reasons for
16 interface are?
17   A.    In the event the account or
18 policy that we're working on exceeds
19 Brian's underwriting authority, there may
20 be a time when I would be called into a
21 meeting to discuss with Brian first, and
22 then Ryan.
23   Q.    Does Ryan have any role, to
24 your knowledge, in your performance
25 management plan?

N. BROSNAN

2    A.    That I don't know.
3    Q.    Somebody -- he may be on here,
4 I haven't studied it, it's not so clear a
5 document for me to figure it out, but
6 there's somebody named William Frohne
7 [Fro-nee] or Frohne [Froen].
8          Is that name familiar to you?
9    A.    Yes.
10   Q.    Who is he?
11   A.    He handles the -- I don't know
12 his exact title but I believe he handles
13 the IIP business, which is -- sorry -- is
14 international placement business, and it's
15 primarily dealing with the South America
16 regions.
17   Q.    Your job involves underwriting
18 for marine cargo risks throughout the
19 world, correct?
20   A.    That's correct.
21   Q.    Do you ever need to or get
22 input from -- forgive me if I'm not
23 pronouncing his name right -- Mr. Frohne
24 [Fro-nee] --
25   A.    Frohne [Froen].

N. BROSNAN

2    Q.    -- Frohne [Froen] for specific
3 accounts, and if so, why?
4    A.    Yes.  With respect to Brazil he
5 is in charge of that area and the growth
6 opportunities there, and so he would be
7 managing that region, so anything that we
8 would write on an admitted basis would
9 fall under his -- he would be in charge of
10 the underwriters in that area.
11   Q.    When you say "on an admitted
12 basis" you mean for business that requires
13 locally admitted policies in Brazil, he's
14 the man?
15   A.    Yes.
16   Q.    Are there people either shown
17 or not shown on these org charts you would
18 interface with in a similar capacity for
19 other parts of the world?  For example, is
20 there, you know, a Baltic guy or gal?  You
21 know what's the -- if so, who are they,
22 and please describe them?
23   A.    There are.  But we primarily go
24 through Danielle Rivera, who is in charge
25 of the IIP, again, international

11 (Pages 38 - 41)

N. BROSNAN

1
2 placements. And she discusses with the
3 overseas offices.
4     Q.    Do you know -- it's Danielle --
5     A.    Danielle.
6     Q.    Where is Danielle located?
7     A.    In New York.
8     Q.    So she's your first stop to
9 figure out who you need for other admitted
10 jurisdictions, or do you just know?
11    A.    When the submission comes in,
12 if there's an issue, or sales in certain
13 countries, we'll send it to Danielle and
14 her team, and they will advise whether or
15 not an admitted policy is required.
16    Q.    Somebody else shown in the
17 charts on Exhibit 2 is Thomas Stubler.
18 Who is he, and do you have any reporting
19 relationship, matrix or otherwise, with
20 him?
21    A.    Tom is the marine cargo manager
22 for the northeast branch, and I have no
23 direct reporting relationship to him.
24    Q.    How do the responsibilities
25 of the people reporting to him differ

N. BROSNAN

1
2 from yours?
3     A.    It depends on each individual
4 person and the level of experience. But
5 they don't really differ. We're all doing
6 underwriting.
7     Q.    That's what I am trying to
8 figure out, why there's a clump of people
9 in the same region under him and you
10 report directly into Brian.
11    A.    I had -- Brian hired me and I
12 had reported to Brian from the beginning.
13 And given the complexity of my accounts
14 and the large book of business that I
15 have, it was decided there was no sense
16 in -- Thomas had a lot of people under him
17 already.
18    Q.    So it just made sense to have
19 you continue to report to Brian?
20    A.    Right.
21    Q.    Had you had any relationship
22 with Brian prior to joining Fireman's
23 Fund?
24    A.    Yes.
25    Q.    Please describe it.

N. BROSNAN

1
2     A.    I worked with Brian when he was
3 a broker at Marsh, I don't know the dates,
4 and then Brian also reported to me when I
5 was at Zurich as a branch manager.
6     Q.    Was he instrumental in your
7 decision to go to Fireman's Fund?
8         MR. NICOLETTI: Objection as to
9 form.
10        You can answer.
11    A.    Part of it.
12    Q.    Is he how the job came to your
13 attention?
14    A.    Yes.
15    Q.    So one day Brian called and
16 said hey, you ought to join Fireman's
17 Fund, blah, blah, blah, blah, here's why?
18    A.    Correct.
19    Q.    You mentioned the size of your
20 book of business. What is that?
21    A.    The number, or --
22    Q.    Yeah.
23    A.    -- or the amount?
24    Q.    However you meant it.
25 Including the number.

N. BROSNAN

1
2     A.    Well -- yeah, it's just a -- my
3 accounts are larger premium accounts with
4 admitted policies and global, so they're a
5 little more complex than the normal,
6 everyday policy.
7     Q.    And what is the dollar -- what
8 are the dollars attached, or the euros
9 attached, or whatever currency you wish to
10 use, to that book?
11    A.    I believe it's 10 million, give
12 or take.
13    Q.    Do you know how that compares
14 to the other people shown in the charts in
15 Exhibit 2 who report to Tom or who also
16 report to Brian?
17    A.    No.
18    Q.    So you have no idea what the
19 books of business of your fellow
20 underwriters are?
21    A.    Not in dollars and cents, no.
22    Q.    How about just in terms of
23 general pecking order?
24        MR. NICOLETTI: Objection as to
25 form.

12 (Pages 42 - 45)

N. BROSNAN

1
2      You can answer.
3      A.     Complexity of accounts.  I
4  guess I could say that obviously there are
5  younger trainees here, so they are not
6  handling seven-figure global
7  multi-national accounts.
8      Q.     Sure.  Are there others who are
9  handling seven-figure global
10 multi-national accounts who have books of
11 business comparable to or larger than
12 yours?
13     MR. NICOLETTI:  Objection as to
14 form.
15     You can answer.
16 A.     I don't know.
17 Q.     Do you ever have to report into
18 or do you have occasion to interface with
19 Kevin Wolfe?
20 A.     No.
21 Q.     How about John Barnwell?
22 A.     On a reporting
23 relationship, no.
24 Q.     If you interface with them on
25 any matters that don't relate to a

N. BROSNAN

1
2  specific reporting relationship, please
3  describe them?
4      MR. NICOLETTI:  Objection as to
5  form.
6      You can answer.
7      A.     I've been in attendance when
8  he's given meetings.
9      Q.     What would such meetings
10 involve?
11 A.     It could be changes within the
12 organization.
13 Q.     So I understand, there was a
14 relatively recent realignment with changes
15 at Fireman's Fund, so meetings held
16 because of that type of situation?
17 A.     Yes.
18 Q.     Any other aspects or reasons
19 that you would participate or you would
20 interface with Mr. Barnwell?
21 A.     No.
22 Q.     Are you familiar with any
23 underwriting manuals or guidelines or
24 standards that AGCS maintains that are
25 applicable to the work you do?

N. BROSNAN

1
2      A.     We have IWins, which is a
3  reference guide more so than guidelines.
4      Q.     When you say "IWins," for the
5  sake of our judge and jury, what exactly
6  are you referring to?
7      A.     That's a, I believe, a Lotus
8  Notes database.
9      Q.     And it contains such
10 underwriting guidance?
11     MR. NICOLETTI:  Objection as to
12 form.  Mischaracterization.
13     You can answer.
14 A.     It contains things like a
15 clause library.  I believe there are some
16 broker forms on there.  Cat guidelines.
17 Cat management, catastrophe; earthquake.
18 Wind.
19 Q.     Do you ever in the course of
20 underwriting on accounts have reason to
21 consult IWins for anything?
22 A.     If I need a clause reference,
23 perhaps.
24 Q.     Any other circumstances where
25 you reference the IWins underwriting

N. BROSNAN

1
2  guidance?
3      MR. NICOLETTI:  Objection as to
4  form.
5      You can answer.
6      A.     Not often.
7      Q.     Can you remember any time that
8  you did for something other than trying to
9  find a clause?
10 A.     Perhaps a cat guideline.
11 Again, earthquake limits.
12 Q.     And again for the sake of our
13 judge and jury, when you say "cat" you're
14 not referring to something that says
15 "meow," you're referring to catastrophic
16 exposures?
17 A.     Catastrophic exposures.
18 Earthquake, wind, flood.
19 Q.     You also referenced a "clause
20 library."  What exactly is that?
21 A.     I believe it's AGCS Marine
22 Insurance clauses that are -- that go into
23 an AGCS-prepared policy.
24 Q.     So in other words, those are
25 clauses that are preauthorized by AGCS to

13 (Pages 46 - 49)

1          N. BROSNAN
2  flip into a policy you are going to
3  underwrite?
4          MR. NICOLETTI:  Objection as to
5  form.
6          You can answer.
7      A.     Yes.
8      Q.     Another thing you referenced
9  were broker forms.  What do you mean by
10 broker forms?
11     A.     Broker forms are prepared by
12 the broker.
13     Q.     Your experience in dealing with
14 the alphabet houses over the last
15 twenty-five years or so is that they tend
16 to have forms that they've developed that
17 they often attempt to use on accounts
18 you're asked to underwrite?
19     A.     Yes.
20     Q.     Do you need to obtain any
21 specific approvals from Brian or from
22 anybody to underwrite within your
23 authority on one of the broker forms?
24     A.     If it's not in the IWins
25 system, and/or if there's any manuscript

1          N. BROSNAN
2  wording.
3      Q.     What do you do in those
4  circumstances?
5      A.     I send the policy to Brian for
6  approval.
7      Q.     Any other steps you take?
8      A.     No.
9      Q.     Over your -- the course of your
10 career in cargo underwriting have you
11 become familiar with the forms used by the
12 different alphabet houses?
13         MR. NICOLETTI:  Objection as to
14 form.
15         You can answer.
16     A.     Yes.
17     Q.     Are you aware as you sit here
18 now of any specific differences between
19 the forms used by the alphabet houses; for
20 example, you could say oh, yeah, Marsh has
21 got an awesome deductible DIC clause, or
22 anything like that?
23     A.     I have to be careful about
24 that, because each -- each office has a
25 different policy form, so I like to look

1          N. BROSNAN
2  at -- I'm not a policy wording expert.  I
3  like to look at each policy and clause
4  individually.
5      Q.     When you say each office has
6  its own form, what exactly do you mean?
7      A.     I'm sorry.  Each Marsh, Aon San
8  Francisco, Aon New York, Aon Chicago, can
9  have three different policy forms.
10     Q.     Got it.
11         In your dealings with Willis
12 have you dealt with different versions of
13 the Willis form?
14     A.     I believe -- yes.  Yes.
15     Q.     Describe for us, if you can,
16 what the differences are between the
17 different Willis forms you've dealt with?
18     A.     I can't go into details on
19 them.  I don't -- again, I don't profess
20 to be a policy wording expert.  But there
21 is a small account program form, which I
22 believe is for premiums under a hundred
23 thousand dollars.  And then they have a
24 Willis form.
25         They probably also have, but

1          N. BROSNAN
2  again, I'm making assumptions --
3          MR. NICOLETTI:  Please do not
4  assume.
5          THE WITNESS:  Okay.
6  BY MR. MYERS:
7      Q.     What assumption were you about
8  to make?  Describe it for us.
9      A.     That there -- also had
10 different office forms; i.e., Chicago,
11 New York.
12     Q.     But you've never attempted to
13 look at each and study the differences?
14     A.     No, I don't have to, because
15 management approves the form, and if it
16 doesn't -- if it doesn't fit that, it goes
17 to management again to approve.  So it's
18 taken out of my hands.
19     Q.     Of the business you underwrite
20 generally, how much of it is on approved
21 broker forms, as opposed to an AGCS form?
22     A.     99 percent.
23     Q.     So I take it you don't have
24 much occasion to look at the cargo clause
25 library or go to IWins to try to pull

N. BROSNAN

1          N. BROSNAN
2 something out for an AGCS form?
3     A.    Yes. That's correct.
4     Q.    Have you ever had occasion to
5 study differences between the AGCS form
6 and any of the Willis approved forms that
7 you use?
8     A.    No.
9     Q.    So if I were to show you an
10 example of the AGCS ocean marine cargo
11 policy forms and ask you specific
12 questions about how they might or might
13 not differ from a Willis form, you
14 wouldn't have much to tell me?
15     A.    Correct.
16     Q.    We'll dispense with that.
17        MR. NICOLETTI: This is not a
18 torture test. If you need a break to use
19 the ladies' room or something, you should
20 let us know.
21        THE WITNESS: Okay. Thank you.
22        MR. MYERS: We'll ask our court
23 reporter to mark as Exhibit 3 the cargo
24 clause library. Or a document that says
25 "Cargo Clause Library."

1          N. BROSNAN
2        ---
3        (Brosnan Exhibit 3, Cargo
4 Clause Library, Bates AGCS 001080 through
5 1138 was marked for identification)
6        ---
7 BY MR. MYERS:
8     Q.    I won't ask you to read this
9 whole thing. My general question is:
10 If you needed to find a clause,
11 is this a printout of the place on IWins
12 where you would look?
13     A.    Yes.
14     Q.    Do you remember ever having
15 done that?
16     A.    No.
17     Q.    And we're here, as you know,
18 about World Fuel Service. I take it you
19 never consulted the cargo clause library
20 in connection with anything relating to
21 World Fuel Service?
22     A.    That's correct.
23     Q.    I would ask you to take a look
24 at a document Bates-stamped AGCS BMH
25 00040.

1          N. BROSNAN
2        ---
3        (Brosnan Exhibit 4, One-page
4 handwritten document, Bates AGCS BMH 00040
5 was marked for identification)
6        ---
7        MR. NICOLETTI: And that's
8 Brosnan 4?
9        THE REPORTER: Yes.
10 BY MR. MYERS:
11     Q.    Do you recognize the
12 handwriting on this?
13     A.    Yes.
14     Q.    Whose is it?
15     A.    Brian McClintock.
16     Q.    This appears, in the upper
17 left, to have a date 08-15-12.
18        Did you have any involvement in
19 connection with any underwriting or
20 submission or meeting with people
21 regarding a potential World Fuel account
22 in 2012?
23     A.    No.
24     Q.    So if I asked you a bunch of
25 stuff about these notes, other than

1          N. BROSNAN
2 potentially being able to read them
3 because you know Mr. McClintock, would you
4 have any information about any meeting
5 that occurred August 15, 2012?
6     A.    No.
7     Q.    Did you ever talk with
8 Mr. McClintock when the World Fuel account
9 came on the horizon in 2013 about prior
10 discussions he had had with World Fuel or
11 Mr. Bartsch or somebody about potentially
12 underwriting a World Fuel account?
13     A.    Yes. I told him that the
14 account was coming back in the door.
15     Q.    "Back in the door."
16        So describe --
17     A.    Oh, I'm sorry.
18     Q.    Describe in 2013 how it is the
19 account had come back in the door?
20     A.    I believe it was out to market
21 again, and I believe that both Brian and
22 possibly Tom Stubler and/or Ryan attended
23 a meeting, I think World Fuel had
24 requested to visit with markets, and that
25 was prior to the submission actually

N. BROSNAN

1
2    A.    She works in the home office
3  out of Chicago, and she was responsible
4  for letting us know if there were
5  additional lines of insurance associated
6  with an account coming in.  With -- among
7  other duties.
8    Q.    When you say, again for the
9  benefit of his Honor and the ladies and
10 gentlemen of the jury, when you say "other
11 lines," you mean one of the things she's
12 responsible for is determining whether an
13 Allianz company -- whoops.  Sorry about
14 that.
15         (Telephonic interruption.)
16         MR. MYERS:  That means there's
17 a phone call I need to make.
18         Can we go off the record for
19 approximately four or five minutes so I
20 can conduct this call, and then we'll go
21 right back on?
22         MR. NICOLETTI:  Not a problem.
23         MR. MYERS:  Thank you.
24         THE VIDEOGRAPHER:  This ends
25 UNIT 2.  We're going off the record at

N. BROSNAN

1
2  10:55.
3         ---
4    (Recess from 10:55 to 11:02.)
5         ---
6         THE VIDEOGRAPHER:  This begins
7  Unit 3 of the deposition of Noreen
8  Brosnan.  We're on the record at 11:02.
9  BY MR. MYERS:
10   Q.    We were looking at Exhibit 7
11 when we paused.  On the second page of
12 Exhibit 7, which is 7943, there's an
13 e-mail from you to Michelle at the top,
14 where you say, "When you get a chance, can
15 you run this through salesforce so we have
16 an idea of current existing AGCS
17 relationships."
18         Do you see that?
19   A.    Yes.
20   Q.    What is that a reference to?
21   A.    The World Fuel submission.
22   Q.    Right.  So this is how you go
23 about figuring out whether there are other
24 lines of coverage that AGCS handles for
25 World Fuel?

N. BROSNAN

1
2    A.    Yes.
3    Q.    Is there anything else you
4  would use such as salesforce run to
5  determine?
6    A.    No.
7    Q.    Is the salesforce run shown at
8  7945 through 51?
9    A.    Yes.
10   Q.    Did you learn that there were
11 some other lines written by AGCS?
12   A.    It appears -- it appears no.
13   Q.    Back on the first page of
14 Exhibit 7, the e-mail from Michelle to
15 you, she refers to "their 2012 Inland
16 (UW - Shane Kula)."
17         Do you know what that's a
18 reference to?
19   A.    An inland marine, it could be
20 submission or policy.
21   Q.    Based on this, did you know
22 which?  That is, submission or policy?
23   A.    It's says submissions at the
24 end of it.  Submissions.  But it doesn't
25 look like we bound.

N. BROSNAN

1
2    Q.    Meaning, for the benefit of
3  judge and jury, that you didn't end up
4  issuing a policy?
5    A.    Yes.
6    Q.    Who is Shane Kula, do you know?
7    A.    An inland marine underwriter.
8    Q.    Do you have occasion in your
9  account underwriting to interface with
10 Mr. Kula?
11   A.    Not on a daily basis.
12   Q.    Describe, if you can, the
13 circumstances under which you interface
14 with Mr. Kula?
15   A.    If I have an inland type of
16 business, he's in the inland marine
17 department, so I would give it to him, and
18 that would be it.
19         MR. MYERS:  Let me ask our
20 court reporter to mark as Exhibit 8 NBH
21 117 through 126.
22         ---
23    (Brosnan Exhibit 8, Submission,
24 Bates AGCS NBH 00117 through 126 was
25 marked for identification)

18 (Pages 66 - 69)

1          N. BROSNAN
2            ---
3 BY MR. MYERS:
4     Q.    Have you seen Exhibit 8 before?
5     A.    I don't recall, but it
6 refreshes my memory, with the exhibit,
7 yeah.
8     Q.    Well, this is a document
9 produced to us from your files by AGCS,
10 which says "Submission, World Fuel
11 Services Inc." at the top.
12          Do you recognize anything about
13 this document?
14    A.    It appears like it's the
15 submission and inserted is the 2012
16 variances, or additional information.
17    Q.    How did this submission get to
18 you?
19    A.    Bob Bartsch, I believe,
20 submitted.
21    Q.    So this is a document, to your
22 understanding, prepared by Mr. Bartsch as
23 a submission and forwarded to you and
24 potentially others at AGCS?
25    A.    I don't believe he prepared all

1          N. BROSNAN
2 of the information as respects to the
3 2012. That was my pointing out to
4 management the variances.
5     Q.    When you say "my pointing out
6 to management the variances," did you take
7 the submission document as received from
8 Mr. Bartsch and edit and insert and do
9 other stuff with it?
10    A.    Yes.
11    Q.    Okay. And is 8 the version
12 that you took and edited?
13    A.    It appears that way.
14    Q.    You don't have any reason to
15 doubt this is that submission --
16    A.    No.
17    Q.    -- as edited by you?
18    A.    (Shaking head.)
19    Q.    What specific things, if any,
20 did you wish to point out to management
21 concerning the 2012 submission?
22    A.    This appears to be merely a
23 comparison document.
24    Q.    Did you have any conversations
25 or communications with Mr. Bartsch about

1          N. BROSNAN
2 this account prior to getting a copy of
3 the submission?
4     A.    Not that I recall.
5     Q.    So could be, but you just don't
6 remember any?
7     A.    Correct.
8     Q.    On the page marked NBH 121, and
9 going over to 122, there's a section that
10 says "Conditions of Coverage."
11          Do you see that?
12    A.    Yes.
13    Q.    And after "Conditions of
14 Coverage" it says "All Risk." What does
15 that mean?
16          MR. NICOLETTI: Objection as to
17 form.
18          You can answer.
19    A.    It was what Bob had put on the
20 submission, I believe.
21    Q.    Have you ever heard the phrase
22 "all risk" in your capacity as an ocean
23 cargo underwriter?
24    A.    Yes.
25    Q.    What's your understanding of

1          N. BROSNAN
2 that phrase?
3     A.    It's the conditions of
4 coverage, that all risk, physical loss or
5 damage caused by an external cause.
6     Q.    By "external cause" there, what
7 does that mean? As you used it.
8     A.    External has to be -- could be
9 handling. It could be packaging.
10    Q.    It could be theft?
11    A.    It could be -- it could be
12 theft.
13    Q.    It could be fraud?
14    A.    Yes. Unless it's specifically
15 excluded.
16          THE REPORTER: I'm sorry?
17          THE WITNESS: Unless it's
18 specifically excluded, yes.
19 BY MR. MYERS:
20    Q.    On page 124 of Exhibit 8, under
21 "2013 Renewal Information" there are
22 various categories, one of which is
23 "Marine."
24          Do you see it?
25    A.    Yes.

N. BROSNAN

2  Q.   There's a reference there to
3  "'flash title' sales."
4      Did you, in the fall of 2013,
5  or any time afterward, have an
6  understanding of what a flash title
7  sale is?
8  A.   I learned through my inquiries,
9  yes, once I got the submission.
10  Q.   So this was the first account
11  where you had encountered an account which
12  engaged in flash title sales, to your
13  recollection?
14  A.   Yes.
15  Q.   What do you understand that
16  means?
17  A.   As it's stated, instantaneous
18  title transfer. Where there's actually no
19  product being moved, but the title
20  transfers from the buyer to the seller.
21  Q.   Did the fact that the World
22  Fuel account on marine involved flash
23  title play any specific role in how you
24  went about underwriting it?
25  A.   We did charge a lower premium

N. BROSNAN

2  in our rating, considering it was less
3  risk, in our minds.
4  Q.   Less risk because?
5  A.   Because it was an instantaneous
6  transfer.
7  Q.   In underwriting the policy for
8  2013 did you have any understanding as to
9  whether World Fuel had the U.S. Government
10  as a client of its -- on its accounts for
11  various products?
12  A.   No.
13  Q.   So on that same page we were
14  just looking at there's a number 5 under
15  questions and answers -- actually, before
16  I ask that, did you review the questions
17  and answers here when you reviewed and
18  edited this submission?
19  A.   Yes.
20  Q.   So you understood, as in number
21  5, that there were at least some
22  government sales done by World Fuel?
23  A.   Yes.
24  Q.   And in that number 5, was that
25  something submitted by Mr. Bartsch or is

N. BROSNAN

2  this something you had edited in?
3  A.   From Bob Bartsch.
4  Q.   The last sentence there says:
5  "In some cases, title transfers from
6  Supplier to WFS before transport; in other
7  cases, the Supplier retains title and risk
8  of loss during conveyance."
9      Actually that's the
10  second-to-last sentence.
11      The last sentence says:
12  "However, title and risk of loss only
13  transfers to DLA/NATO when the fuel is
14  delivered to the airport/base."
15      So you saw that question and
16  answer in the process of underwriting?
17  A.   I believe so.
18  Q.   Did you know what "DLA" was, as
19  referenced there?
20      MR. NICOLETTI: Objection as to
21  form.
22      You can answer.
23  A.   Maybe not.
24  Q.   Did you make any inquiries
25  about that?

N. BROSNAN

2  A.   No.
3  Q.   Do you know what "NATO" was
4  when you read this?
5  A.   Maybe not, no.
6  Q.   Did you assume it was the North
7  Atlantic Treaty Organization, or have you
8  ever heard of --
9  A.   Yes, I have.
10  Q.   -- NATO?
11  A.   Mm-hmm.
12  Q.   So did you just assume that was
13  NATO, the North Atlantic Treaty
14  Organization, referenced there?
15  A.   Yes.
16  Q.   But you didn't make any
17  inquiries about "DLA"?
18  A.   No.
19  Q.   Do you know what "DLA" stands
20  for here?
21      MR. NICOLETTI: Objection as to
22  form.
23      You can answer.
24  A.   I can't remember right now.
25  Q.   Well, in that last sentence it

1          N. BROSNAN
2  says: "Title and risk of loss only
3  transfers to DLA/NATO when the fuel is
4  delivered to the airport/base."
5          What was your understanding of
6  that?
7      A.    I don't specifically remember
8  emphasizing this particular point.
9      Q.    So it didn't catch your
10 attention at the time, but you don't have
11 any doubt that you looked at it?
12     A.    I'm assuming I read the entire
13 submission.
14     Q.    Did you ever have any
15 discussions at any time with anyone
16 concerning when risk of loss transferred
17 on World Fuel's business with the Defense
18 Logistics Agency?
19     A.    No.
20     Q.    That never came up either in
21 the context of underwriting or in
22 connection with claims made under the
23 policy?
24     A.    No.
25     Q.    After you got and reviewed this

1          N. BROSNAN
2  submission and edited it do you remember
3  what the next thing you did in connection
4  with the World Fuel account was?
5      A.    I believe we had a meeting with
6  management, Danielle Rivera, Will Frohne,
7  because we analyzed the submission and
8  realized there were a number of factors
9  that had to be considered, it was above my
10 authority and we had a short time frame.
11         So in order to get everyone
12 here, it's back in again from 2012, we
13 quoted it, short time frame.  Do we want
14 to go after it again.  Do we want to quote
15 it.  Do we want to analyze the risk and
16 move forward or do we want to just, you
17 know, decline it right now.
18     Q.    Was this a face-to-face meeting
19 or a telephonic meeting?
20     A.    Face-to-face.
21     Q.    Where?
22     A.    New York.
23         MR. MYERS:  I am going to ask
24 our court reporter to mark as Exhibit 9
25 AGCS BMF 1 and 2.

1          N. BROSNAN
2          ---
3          (Brosnan Exhibit 9, two-page
4  document, handwritten notes, Bates AGCS
5  BMF 00001 through 00002 was marked for
6  identification)
7          ---
8  BY MR. MYERS:
9      Q.    Do you recognize the
10 handwriting in Exhibit 9?
11     A.    Yes.
12     Q.    Whose is it?
13     A.    Brian McClintock's.
14     Q.    There are two pages here, of
15 course, and I'm not sure the handwriting
16 is the same on both, or that they even
17 reflect the same thing.
18         Do you recognize the
19 handwriting on the second page?
20     A.    Yes.
21     Q.    And whose is that?
22     A.    Brian McClintock.
23     Q.    Do you, yourself, have any
24 custom or practice in connection with
25 accounts you're underwriting or about to

1          N. BROSNAN
2  underwrite of taking handwritten notes of
3  any meetings or even just your own
4  thoughts about an account?
5      A.    No.
6      Q.    Did you take any handwritten
7  notes of any meetings or conversations or
8  discussions concerning the World Fuel
9  account either in the underwriting or with
10 respect to claims?
11     A.    Can you repeat that again?
12         MR. MYERS:  I'll have him read
13 it back.
14         (The reporter read back as
15 follows:
16         "Question:  Did you take any
17 handwritten notes of any meetings or
18 conversations or discussions concerning
19 the World Fuel account either in the
20 underwriting or with respect to claims?")
21         MR. NICOLETTI:  Objection as to
22 form.
23         You can answer.
24     A.    Everything is in the
25 underwriting referral.  I may have marked

21 (Pages 78 - 81)

N. BROSNAN

1   up the submission during our discussions.
2   Q.   The submission being number 8;
3   Exhibit 8 we were looking at?
4   A.   Or the original submission.
5   Yes.
6   Q.   If you were to have taken some
7   notes on it, or scratched some stuff on
8   it, what would you have done with it after
9   that?
10  A.   Probably could be trashed or I
11  could have scanned it to -- or typed it up
12  into a format.
13  Q.   Do you remember actually doing
14  that, or is this just based on your custom
15  and practice you might have?
16  A.   This is just custom and
17  practice.
18  Q.   So could have, you just don't
19  remember doing that?
20  A.   I don't remember.
21  Q.   On the first page of Exhibit 9
22  there -- these are Mr. McClintock's notes.
23  The first one appears to be September 10,
24  2013.

N. BROSNAN

1   Do you recognize, either based
2   on the content, the date or the people,
3   this being the meeting you referenced to
4   talk about the account?
5   A.   I can't say specifically, but
6   probably.
7   Q.   Does looking at the substance
8   of what's here on this first page refresh
9   any recollection of what happened on that
10  call?
11  MR. NICOLETTI:   Call?
12  Q.   I'm sorry.   In that meeting.
13  Sorry.
14  A.   Yeah, well, actually from -- I
15  think that says Danielle Rivera -- it's
16  hard to read his handwriting -- that would
17  be probably the first meeting that we had,
18  again, that I spoke to earlier.   And it
19  specifically addresses some of the issues
20  that we were concerned with, given the
21  timeline.
22  Q.   Those issues being local policy
23  in Brazil?
24  A.   Correct.

N. BROSNAN

1   Q.   Pipeline coverage?
2   A.   Correct.
3   Q.   Any other specific things that
4   pop out to you, having looked at this?
5   A.   The cat sub limits.   And the
6   extra expense.
7   And these are Brian's notes, so
8   I really can't speak to them.
9   Q.   Well, having attended the
10  meeting does it refresh your recollection
11  of what got discussed on any of those
12  topics?
13  A.   My recollection is that we were
14  primarily based on Brazil and the timing
15  issues.
16  Q.   In the lower right there's a
17  reference to bulk oil clauses.
18  Can you read what he wrote
19  there?
20  A.   It looks like the asterisk,
21  "Bulk oil clauses" -- "Petro"?   "Petro,"
22  and I don't know what the next --
23  Q.   "Petro China"?
24  A.   Could be.

N. BROSNAN

1   Q.   Any recollection of what was
2   discussed at the meeting on that topic?
3   A.   No.
4   Q.   Do you, yourself, have an
5   understanding of the different varieties
6   of bulk oil clauses that may be used in
7   marine cargo underwriting?
8   MR. NICOLETTI:   Objection as to
9   form.
10  You can answer.
11  A.   Guaranteed outturn, SP-13.
12  Yeah.   It's normal industry wording that's
13  used.
14  Q.   The things you just referenced,
15  "guaranteed outturn," "SP-13C," those are
16  industry wordings for bulk oil clauses?
17  A.   Correct.
18  Q.   Was it your understanding or
19  belief that the World Fuel account would
20  be underwritten to include some form of
21  bulk oil clause?
22  A.   I'm not sure if it was
23  originally presented that way, I would
24  have to look back at the documents, but I

1        N. BROSNAN
2 know that it did become an issue at the
3 end, that Bob requested the wording, and
4 therefore we gave it to him.
5     Q.     Prior to handling the World
6 Fuel underwriting had you underwritten
7 other accounts that involved bulk oil
8 clauses?
9     A.     Not many, if -- if any.
10     Q.     So you don't remember any?
11     A.     Right.
12     Q.     And it could have been one but
13 it's not something that you can even
14 recall now?
15     A.     No, and nothing in AGCS.
16     Q.     So since you've been at AGCS
17 there's been -- you've had no experience
18 underwriting a bulk oil clause?
19        MR. NICOLETTI: Objection as to
20 form.
21        You can answer.
22     A.     Yes.
23     Q.     You've also had no experience
24 underwriting an account involving fuel,
25 correct?

1        N. BROSNAN
2     A.     Correct.
3     Q.     Were there people at AGCS who
4 you turned to or relied on with respect to
5 any nuances or issues that could arise on
6 an account involving bulk liquids?
7     A.     Yes.
8     Q.     Who is that?
9     A.     I spoke with Tom Stubler,
10 because he had written -- or he quoted the
11 previous submission.
12        And we spoke with, I'm not sure
13 of the exact name, but someone regarding
14 pipeline coverage, I think utilizing my
15 energy -- Pete Connors, he gave us some
16 information on the pipeline coverage, so
17 we tried to vet that.
18        And I believe we also tried to
19 get in contact with loss control.
20     Q.     Any other sources of
21 information you attempted to get on
22 underwriting an account that involved bulk
23 liquids?
24     A.     Not that I can recall right
25 now.

1        N. BROSNAN
2     Q.     The second page of Exhibit 9,
3 based on a wild guess by me, it appears to
4 be Mr. McClintock's notes of September
5 25 -- and can you tell if that's '13 or
6 '14 in the date?
7     A.     It looks like 9-25-14.
8        MR. MYERS: I'll ask our court
9 reporter to mark as Exhibit 10 a document
10 Bates-stamped AGCS NBH 159 through 168.
11        ---
12        (Brosnan Exhibit 10, World Fuel
13 Services, et al., Ocean Cargo Insurance
14 Program, Quotation for Marine Insurance,
15 Bates AGCS NBH 00159 through 168 was
16 marked for identification)
17        ---
18        MR. MYERS: I'm sorry. Is
19 this -- oh, this is 10.
20        MR. NICOLETTI: It's 10.
21 BY MR. MYERS:
22     Q.     Do you recognize this one?
23     A.     This is the previous quote.
24     Q.     So this is the quote that AGCS
25 had submitted in 2012?

1        N. BROSNAN
2     A.     Yes.
3     Q.     You received a copy of this?
4     A.     It was in the underwriting
5 referral database.
6     Q.     When you refer to the
7 "underwriting referral database," what are
8 you talking about?
9     A.     That's the vehicle that I
10 use to put all my notes on a submission,
11 quote -- and, you know, draft quote,
12 perhaps, or something like that, that I
13 will send up to management to get approval
14 and further discussions.
15        MR. MYERS: I'll ask the
16 reporter to mark as Exhibit 11 AGCS RRD 2
17 through 41.
18        ---
19        (Brosnan Exhibit 11, Ocean
20 Cargo Risk Summary and Referral Sheet,
21 Bates AGCS RRD 00002 through 00041 was
22 marked for identification)
23        ---
24 BY MR. MYERS:
25     Q.     Do you recognize Exhibit 11?

1          N. BROSNAN
2      (Reporter clarification)
3     A.    -- the broadest coverage, and
4  SP-13C, which is the least broad.
5     Q.    When you talk about the breadth
6  of those provisions, what do you mean?
7     A.    I would have to look at the
8  wording to...
9     Q.    Well, as you sit here, without
10  going through -- if you want to, the
11  wording is all right in there.  At least
12  for a couple of them.
13     A.    Right.
14     Q.    More generically, what do you
15  mean, "broader"?
16          MR. NICOLETTI:  Objection as to
17  form.  The documents speak for themselves.
18  You can answer.
19     A.    Some include leakage,
20  contamination.  Some don't.
21     Q.    Is it your understanding that
22  the guaranteed outturn includes those
23  elements but the others don't?
24          MR. NICOLETTI:  The same
25  objection.

1          N. BROSNAN
2          You can answer.
3     A.    Yes.
4     Q.    Another thing in the first page
5  of Exhibit 13 that Mr. Stubler says is
6  "You will have to update to provide
7  coverage for surveys conducted by the
8  Assured's employees, etc."
9          What does that mean?
10     A.    I went back to him, I believe,
11  to ask for clarification on what exactly
12  does he -- you know, are we changing.
13          Because again, policy wording
14  is something that we have preapproved.
15  Anything that we're doing outside the
16  approved forms have to be approved by
17  management.
18     Q.    So you understood that
19  "coverage for surveys conducted by
20  Assured's employees, etc.," was something
21  potentially outside of the approved forms
22  that you had to talk to him about?
23     A.    It appears implied there.
24     Q.    What did you learn about
25  "coverage for surveys conducted by the

1          N. BROSNAN
2  Assured's employees, etc."?
3     A.    I don't remember.
4     Q.    So you talked about that topic
5  with Mr. Stubler.  Did you gain an
6  understanding of what he was referring to?
7     A.    No.
8     Q.    So you just don't remember what
9  that means, or how it got resolved, if it
10  got resolved?
11     A.    It would -- it would reflect in
12  the quote if we included it or didn't
13  include it.
14     Q.    The word "surveys" there, do
15  you know what that's a reference to?
16     A.    The surveys, the tank
17  cleanliness surveys.
18     Q.    Tank what?
19     A.    Tank cleanliness surveys, I
20  believe.
21     Q.    Had you previously underwritten
22  an account that involved liquid transfers
23  and surveys in connection with bulk
24  liquids?
25     A.    No.  I said that earlier.

1          N. BROSNAN
2     Q.    And that's one reason you
3  wanted to follow up with Tom?
4     A.    Right.
5          MR. MYERS:  I'll ask our court
6  reporter to mark as Exhibit 14 AGCS EM
7  6890 through 93.
8          ---
9          (Brosnan Exhibit 14, e-mail
10  chain, topmost e-mail dated September 25,
11  2013, from Noreen Brosnan to Robert
12  Bartsch, et al., with attachment, Bates
13  AGCS EM 06890 through 893 was marked for
14  identification)
15          ---
16  BY MR. MYERS:
17     Q.    Do you recognize these as
18  e-mails you got from Bob Bartsch in
19  connection with this account?
20     A.    Yes.
21     Q.    Do you recall Mr. Bartsch
22  comparing the possible AGCS coverage with
23  the incumbent AIG coverage and sending you
24  these e-mails about it?
25     A.    Yes.

27 (Pages 102 - 105)

N. BROSNAN

2 Q. Do you have a specific memory
3 of actually discussing this with him?
4 Because I note at the top he says, left
5 you a voicemail, call me when you have
6 time.
7 A. I believe so.
8 Q. Tell me what was said in that
9 or those conversations.
10 A. I can't speak to all the
11 details, but we discussed, probably, each
12 one of these items. Referenced items.
13 Q. On page 6892 there's a
14 reference to "Premium," which says
15 "Allianz $1,200,000" -- blah, blah,
16 blah -- and then below that it says
17 "London: $1,375,000," blah, blah, blah.
18 Had you, by that time, told
19 Mr. Bartsch the estimated premium that you
20 thought you would be able to quote?
21 A. It appears that way.
22 Q. Did you do that in writing or
23 did you just tell him over the phone where
24 you thought the premium was going to come
25 in, or how did that work?

N. BROSNAN

2 A. I -- I don't remember.
3 Q. Well, in your custom and
4 practice with Mr. Bartsch, who you've
5 known for, what, twenty-five, thirty
6 years --
7 A. Mm-hmm.
8 Q. -- did you have a practice of
9 talking with him about what pricing you
10 anticipated before you actually issued a
11 quote?
12 A. We could, but normally I would
13 say it was an indication of a range.
14 Q. I don't mean to put
15 Mr. Bartsch's words in your mouth, but do
16 you have any reason to doubt that you told
17 him that you thought the indicated range
18 would be about a million-2 as of this
19 point in time?
20 MR. NICOLETTI: Objection as to
21 form.
22 You can answer.
23 A. No.
24 Q. One of the items he notes, also
25 on page 6892, is "The Major Differences

N. BROSNAN

2 That Are Most Important," and part of that
3 is "London offers GO coverage
4 automatically."
5 That was part of your
6 discussion on or near September 25 in
7 connection with these e-mails?
8 A. Yes.
9 Q. Do you remember what was said
10 about GO?
11 And I take it that's a
12 reference to guaranteed outturn on bulk
13 liquids clause?
14 A. Yes, it is guaranteed outturn.
15 We -- we were going to offer it
16 at an increased rate, London was offering
17 it automatically as a default coverage,
18 and in order to be competitive with London
19 we chose to do the same thing.
20 Q. At this point in time you
21 hadn't actually issued a formal quote,
22 correct?
23 A. I'm not sure of the date of the
24 formal quote, but if you say so.
25 Q. That's my question.

N. BROSNAN

2 A. I don't know -- I don't know
3 off the top of my head the actual date of
4 the quote.
5 Q. I'll tell you that we have
6 quotes dated September 29, 2013.
7 Did you issue any actual quote
8 before then?
9 A. Not that I'm aware of.
10 Q. So the conversations you had
11 with Mr. Bartsch about pricing or terms,
12 et cetera, were all based on the risk
13 referral internal conversations you had
14 had at AGCS, et cetera, but not
15 specifically based on a quote you had
16 submitted?
17 A. Yes.
18 MR. MYERS: I'll ask our court
19 reporter to mark as Exhibit 14 AGCS EM
20 11503 through 506.
21 ---
22 (Brosnan Exhibit 15, e-mail
23 chain, topmost e-mail dated September 26,
24 2013, from Robert Bartsch to Noreen
25 Brosnan, Bates AGCS EM 11503 through 506

28 (Pages 106 - 109)

1          N. BROSNAN
2 was marked for identification)
3          ---
4          MR. MYERS: I'm sorry. 15.
5 BY MR. MYERS:
6    Q.    This is an e-mail stream
7 between you and Mr. Bartsch on this
8 account?
9    A.    Yes.
10   Q.    And on page 11506, as of
11 September 26 you had a belief that, based
12 on what you had discussed with
13 Mr. Bartsch, that you might be able to
14 seal the deal at that point and actually
15 underwrite this account?
16         MR. NICOLETTI:  Objection; the
17 document speaks for itself.
18         Over objection, you can answer.
19   A.    We had spoken about variances
20 that were needed based on his comments in
21 your last exhibit, and we were in the
22 final stages of negotiating the price.
23   Q.    And you wanted to seal the
24 deal, you wanted to get this business?
25   A.    Sure.

1          N. BROSNAN
2          MR. NICOLETTI:  Objection as to
3 form.
4 BY MR. MYERS:
5    Q.    And on the first page Bob says
6 "Let's give it a shot."
7          Do you know what he meant by
8 that?
9    A.    I assume he had to discuss with
10 World Fuel their expectations.
11         MR. MYERS: I'm told we have
12 run out of media and need to change a disk
13 or whatever, hard drive or whatever he's
14 using, so let's go off the record.
15         MR. NICOLETTI:  Okay.
16         THE VIDEOGRAPHER:  This ends
17 Unit No. 3.  We're off the record at
18 11:50.
19         ---
20   (Lunch recess taken at 11:50 a.m.)
21
22
23
24
25

1          N. BROSNAN
2   A F T E R N O O N   S E S S I O N
3     (Time Noted: 12:52 p.m.)
4          THE VIDEOGRAPHER:  This begins
5 Unit 4 in the deposition of Noreen
6 Brosnan.  We're on the record at 12:52.
7          _ _ _
8 N O R E E N   B R O S N A N,
9    resumed as a witness, having been
10   previously sworn by the Notary Public,
11   was examined and testified further as
12   follows:
13 CONTINUED EXAMINATION
14 BY MR. MYERS:
15   Q.    Ms. Brosnan, while we were off
16 the record we marked Exhibit 16, which is
17 more e-mail between you and Bob Bartsch?
18   A.    Yes.
19         ---
20         (Brosnan Exhibit 16, e-mail
21 chain, topmost e-mail dated October 1,
22 2013, from Noreen Brosnan to Noreen
23 Brosnan, et al., with attachment, Bates
24 AGCS EM 06649 through 657 was marked for
25 identification)

1          N. BROSNAN
2          ---
3 BY MR. MYERS:
4    Q.    I'm interested in the page
5 6651, which is an e-mail you sent to Bob,
6 copying Brian and Tom Stubler, and on that
7 page you address "GOT only."
8    A.    Guaranteed outturn.
9    Q.    And you say it's your
10 preference to maintain "Broad Form with
11 the GOT option"?
12   A.    (Witness nodded.)
13   Q.    How would that operate in the
14 policy?
15   A.    The assured would have the
16 option, based on the commercial documents,
17 to -- to use either a guaranteed outturn
18 or broad form.
19   Q.    And one of the things you say
20 slightly further down in that paragraph
21 is: "We are also wondering since we
22 duplicated the historical terms and
23 conditions, how often did they report and
24 declare GOT under the terms of the
25 expiring policy."

29 (Pages 110 - 113)

1            N. BROSNAN
2  we have that question and answer read
3  back?
4            (The reporter read back as
5  follows:
6            "Question:  You don't remember
7  one way or the other?
8            "Answer:  No.")
9  BY MR. MYERS:
10    Q.    That is, you don't remember?
11         MR. NICOLETTI:  It was a double
12  negative.  That's why.  He wants you to
13  clarify it.
14    A.    I don't remember.
15    Q.    Do you remember whether at this
16  point in time you were comfortable with
17  what the potential pricing was for this
18  policy?
19         MR. NICOLETTI:  Objection as to
20  form.
21         You can answer.
22    A.    I believe so.
23    Q.    Back in Exhibit 17 you
24  indicated you believed Mr. McClintock was
25  frustrated at this point.  Did you and he

1            N. BROSNAN
2  discuss his frustration?
3         MR. NICOLETTI:  Objection as to
4  form.
5         You can answer.
6    A.    It doesn't appear that we
7  discussed anything further that day.
8    Q.    You don't remember discussing
9  his frustration with him about how the
10  account was being handled by Mr. Bartsch
11  or otherwise at any time prior to binding?
12         MR. NICOLETTI:  The same
13  objection.
14         You can answer.
15    A.    No.
16         MR. MYERS:  I'll ask our court
17  reporter to mark as Exhibit 17 --
18         MR. NICOLETTI:  18.
19         MR. MYERS:  Sorry.
20         -- 18, AGCS EM 1576 through 80.
21         ---
22         (Brosnan Exhibit 18, e-mail
23  chain, topmost e-mail dated September 29,
24  2013, from Noreen Brosnan to Robert
25  Bartsch, Bates AGCS EM 01576 through 1580

1            N. BROSNAN
2  was marked for identification)
3         ---
4  BY MR. MYERS:
5    Q.    So here we are the day before,
6  or a couple of days before this account
7  would have to be either bound or not, and
8  you wrote to Mr. Bartsch in the second
9  paragraph:  "Right now I believe we are
10  $200,000 cheaper than London on the master
11  program.  AGCS:  $1,000,000 net.  London
12  $1.203 [sic] (12.5 percent commission.)"
13         So at this point you had
14  reduced the price that you were going to
15  quote on the policy to a million bucks?
16         MR. NICOLETTI:  Objection as to
17  form.
18         You can answer.
19    A.    Correct.
20    Q.    You and Mr. McClintock were
21  comfortable with that pricing?
22         MR. NICOLETTI:  The same
23  objection.
24         You can answer.
25    A.    Correct.

1            N. BROSNAN
2    Q.    How did you achieve the
3  reduction in pricing?
4    A.    I would have to go back to my
5  pricing spreadsheet.
6    Q.    Your pricing spreadsheet, what
7  is that?
8    A.    It's included in the
9  underwriting referral.
10    Q.    Off the top you don't remember
11  how you got there; what things got reduced
12  or what elements were changed?
13    A.    No.
14    Q.    You wanted to get this account,
15  though, and you were willing to meet or
16  beat London's pricing in order to get it?
17         MR. NICOLETTI:  Objection as to
18  form.
19         You can answer.
20    A.    Correct.
21    Q.    To this point in time had you,
22  yourself, had any communications directly
23  with World Fuel's people, employees, such
24  as David Hornaday?
25    A.    No.

31 (Pages 118 - 121)

N. BROSNAN

1 N. BROSNAN
2 business?
3 A. No. It was 4:18. Bob usually
4 leaves at about 3:30 every day.
5 Q. Yeah, but he didn't call you
6 the day before or something to say, hey,
7 we're going to go with your --
8 A. No.
9 Q. Nothing like that?
10 A. No.
11 Q. And you were pleased that you
12 had landed this account?
13 MR. NICOLETTI: Objection as to
14 form.
15 You can answer.
16 A. Sure.
17 Q. In terms of premium volume, how
18 did this one rank in terms of the other
19 accounts you write?
20 A. I have ones that are over seven
21 figures, so this was just an additional
22 one.
23 Q. Is there any format you could
24 use in the 10 million you referred to
25 earlier as to where this one would rank in

1 N. BROSNAN
2 the hierarchy by numerical volume on the
3 accounts you wrote?
4 A. Probably in my top 30 percent.
5 Q. Do you remember some
6 communications where you and Mr. Bartsch
7 were using terms of affection with each
8 other, like "sweetie" and "pumpkin" --
9 A. Yes.
10 Q. -- and things like that?
11 A. Yes.
12 Q. Is that something you and he
13 did routinely?
14 A. Depending on how angry I got at
15 him, I would usually say "pumpkin" as
16 opposed to something else, yes.
17 Q. Well, when you were angry what
18 did you call him? Unless it was
19 "pumpkin."
20 A. Pumpkin, sweetie. It was
21 just --
22 Q. Got it.
23 So those terms express
24 unhappiness when you --
25 A. No, I can't say. It's relevant

1 N. BROSNAN
2 to whatever conversation I was having.
3 Q. Is that type of repartee
4 something that happens just with Bob
5 Bartsch or is this something that happens
6 on other broker accounts you handle?
7 MR. NICOLETTI: Objection as to
8 form.
9 You can answer.
10 A. I might call my husband that,
11 too, sometimes, but, um... no, it depends
12 on the forwards. It's just general
13 colleagues going back and forth.
14 Q. Do you have family members who
15 are in the insurance industry?
16 A. No.
17 Q. How is it you chose to get into
18 the insurance industry?
19 A. That's a good question.
20 Through The College of
21 Insurance. I was working -- you know, I
22 knew I was going to get a BBA and I heard
23 about The College of Insurance work/study
24 program. I wanted a business degree.
25 Q. Many people who want business

1 N. BROSNAN
2 degrees don't necessarily seek out
3 insurance. I wonder if there was some
4 motivation you had to select a --
5 A. They paid for my education, and
6 they provided me with work experience. I
7 came out with a bachelor of business
8 degree and five years of work experience.
9 Q. So were your managers, bosses,
10 colleagues pleased that you had landed
11 World Fuel?
12 MR. NICOLETTI: Objection as to
13 form.
14 You can answer.
15 A. Sure.
16 Q. Do you remember getting some
17 congratulations from people; Mr. Frohne,
18 for example?
19 A. I don't remember, but I did get
20 congratulations.
21 MR. MYERS: I'll ask our court
22 reporter to mark as Exhibit 24 a document
23 that starts with AGCS NBH 129.
24 ---
25 (Brosnan Exhibit 24, Allianz

35 (Pages 134 - 137)

1        N. BROSNAN
2        You can answer.
3    A.     Corporately this is not a
4 fail-proof system.  It has many -- many
5 flaws, including the amount of segments,
6 and management knows that.  It's -- again,
7 it's a baseline.  We use -- we do not use
8 this -- we don't even have to -- a
9 referral isn't triggered based on A, B, C
10 overall score.  The referrals are based on
11 our ultimate pricing spreadsheet, which is
12 embedded in the underwriting referral.
13    Q.     So the fact that this mechanism
14 at AGCS has ranked this risk as a C is not
15 relevant to whether or not you bind or
16 anything else?
17    A.     That's correct.
18    Q.     Do you know what that scoring
19 is used for, if anything?
20    A.     No.
21        MR. MYERS:  I'll ask our court
22 reporter to mark as Exhibit 25 AGCS EM
23 6658 through 74.
24          ---
25        (Brosnan Exhibit 25, World Fuel

1        N. BROSNAN
2 Services Ocean Cargo Marine Insurance
3 Proposal, Effective October 1, 2013, Bates
4 AGCS EM 06658 through 674 was marked for
5 identification)
6          ---
7 BY MR. MYERS:
8    Q.     And if you could also pull out
9 what we previously marked as 16, that
10 would be useful.
11        And in 16 do you see that there
12 is a subject line in your e-mail --
13 actually, sent to yourself and copied to
14 Bob Bartsch, it says: "Note amended copy
15 attaching [sic] reflecting changes to
16 effective date and revised quote date."
17        Is this, in Exhibit 16, the
18 e-mail you used to send Exhibit 25 to
19 Mr. Bartsch?
20    A.     I don't know if I can tell from
21 the attachment.  Well, the only way I can
22 tell from the attachment is it notes the
23 $1 million premium.
24    Q.     Well, let's look at Exhibit 25
25 for a second.

1        N. BROSNAN
2        Do you see this is a revised
3 quote effective October 1, 2013?
4    A.     Yes.
5    Q.     Exhibit 25 is something you
6 prepared?
7    A.     Yes.
8    Q.     Why did you prepare a revised
9 quote?
10    A.     To reflect changes that were...
11    Q.     Any changes that you recall off
12 the top, other than effective date and
13 premium?
14    A.     No, not off the top.  No.
15    Q.     And at some point, whether it
16 was through Exhibit 16 or otherwise, you
17 sent Exhibit 25 off to Bob Bartsch?
18        MR. NICOLETTI:  Objection as to
19 form.
20    A.     Yes.
21    Q.     Other than what I've asked you
22 about so far, do you remember any
23 specifics of underwriting the World Fuel
24 2013-'14 cargo policy that I haven't asked
25 you about?

1        N. BROSNAN
2        MR. NICOLETTI:  Objection as to
3 form.
4        You can answer.
5    A.     No.
6    Q.     So you don't remember any other
7 things that came up, or issues that
8 developed or strange communications with
9 pumpkin, whomever?
10        MR. NICOLETTI:  Objection;
11 asked and answered.
12        You can answer over the
13 objection.
14    A.     No.
15    Q.     After the policy was bound and
16 invoices were sent out, et cetera, do you
17 remember anything that happened on the
18 World Fuel account in the two to three
19 months after it was first bound?
20        MR. NICOLETTI:  Objection as to
21 form.
22        You can answer.
23    A.     Two to three months after?
24    Q.     Yes.
25    A.     The contamination claim?

37 (Pages 142 - 145)

1          N. BROSNAN
2          MR. MYERS:  Let's ask Frank,
3  Mr. Court Reporter, to mark as Exhibit 25,
4  AGCS EM 5725.
5          MR. NICOLETTI:  It's Exhibit
6  26.
7          MR. MYERS:  Okay.
8          ---
9          (Brosnan Exhibit 26, e-mail
10 chain, topmost e-mail dated January 10,
11 2014, from Noreen Brosnan to Joseph
12 Mainente, et al., Bates AGCS EM 05725
13 through 726 was marked for identification)
14         ---
15         MR. MYERS:  And it also
16 contains 5726.
17 BY MR. MYERS:
18  Q.    These are some e-mails between
19 you and various others at AGCS concerning
20 the contamination claim that you
21 mentioned?
22  A.    Yes, it appears so.
23  Q.    Tell me what you recall,
24 putting this e-mail aside for a second,
25 about how you heard about a contamination

1          N. BROSNAN
2  claim, what it involved, and what your
3  claims people were doing with it?
4   A.    I don't believe I heard --
5          MR. NICOLETTI:  Objection as to
6  form.  Multiple questions.
7          You can answer as best you can.
8   A.    The only way I've heard about
9  it was from an e-mail from our claims
10 person.
11  Q.    So here Exhibit 26 is the first
12 and only way you heard about it?
13  A.    Correct.
14  Q.    And when you saw that -- strike
15 that.
16         Do you know Joseph Mainente?
17  A.    Mainente.
18  Q.    Thank you.
19         Who is he?
20  A.    Our claims representative.
21  Q.    So to this point you had been
22 at AGCS for some six years -- six, seven
23 years?
24  A.    Yes.
25  Q.    I should have said AGCS or its

1          N. BROSNAN
2  predecessors, to include Fireman's Fund.
3          And you had been in the
4  industry for twenty or so years before
5  that?
6   A.    Yes.
7   Q.    Had you had claims made on
8  accounts you underwrote?
9   A.    Yes.
10  Q.    Did that happen with some
11 frequency over your career?
12         MR. NICOLETTI:  Objection as to
13 form.
14         You can answer.
15  A.    No.
16  Q.    How often did it happen?
17  A.    I can't speak to -- I've had
18 numerous accounts.
19  Q.    So you cannot say with any kind
20 of estimate how frequently claims would
21 come up?
22  A.    Not -- not often.  I mean,
23 with -- no.
24  Q.    So something like once a year,
25 once every couple of years?

1          N. BROSNAN
2   A.    Is the question relative to a
3  $12 million amount?
4   Q.    The question was relative to
5  your career.  I'm going to narrow it if
6  you're not able to give me something more
7  broad.
8   A.    Yeah.
9   Q.    So you can't give us an
10 estimate of how frequently claims came up
11 on your accounts since the days of Royal?
12  A.    Not often.  And my book of
13 business has been profitable.
14  Q.    What does that mean, has been
15 profitable?
16  A.    Overall the accounts that I
17 manage in my portfolio of business has had
18 an acceptable loss ratio, overall.
19  Q.    Does AGCS track the loss ratio
20 on your accounts?
21  A.    You can get -- you can pull a
22 P&L.
23  Q.    And a P&L would reflect loss
24 ratios?
25  A.    Premium and losses, historical

1          N. BROSNAN
2  to each account.
3     Q.    So that data is available to
4  you, if you wish to view it?
5     A.    Yes.
6     Q.    Do you view it?
7     A.    Annual reviews of each policy.
8     Q.    "Annual reviews of each
9  policy." So what does that mean? When a
10 policy comes up for renewal you guys look
11 at the P&L?
12          MR. NICOLETTI: Objection as to
13 form.
14          You can answer.
15    A.    Yes.
16    Q.    To determine how profitable
17 it's been?
18    A.    In conjunction with the new
19 renewal information and exposures that
20 exist.
21    Q.    And as a general matter, the
22 greater the volume and severity of claims,
23 the less profitable the business?
24          MR. NICOLETTI: Objection as to
25 form.

1          N. BROSNAN
2          You can answer.
3     A.    As a general matter.
4     Q.    Since you've been at AGCS can
5  you tell us how frequently claims would
6  come up on policies you underwrote?
7     A.    Not often.
8     Q.    Meaning once every couple of
9  years? There's only been one? Can you
10 give us any further, more detailed
11 information?
12    A.    I can't, no.
13    Q.    Are you aware of any claim
14 actually having been paid by AGCS on any
15 accounts you underwrote?
16          MR. NICOLETTI: Objection as to
17 form.
18          We're now going --
19    A.    Yes.
20          MR. NICOLETTI: -- into
21 argumentative.
22          You can answer.
23    A.    Yes.
24    Q.    Do you remember specific claims
25 and amounts associated with them?

1          N. BROSNAN
2     A.    No.
3     Q.    Can you tell us the largest
4  claim that was paid, in dollars or euros
5  or whatever the currency, by AGCS on any
6  account you underwrote?
7     A.    No.
8     Q.    Was there ever a claim on an
9  account you wrote that was paid and the
10 claim was in excess of $5 million?
11    A.    No.
12    Q.    Was there ever a claim on a
13 policy you underwrote and AGCS paid it on
14 a claim in excess of $2 million?
15    A.    No.
16          I'll take that back.
17          No -- that I wrote? No. That
18 I handled? Possibly.
19    Q.    I see. By "handled" there you
20 mean you worked on or took over an
21 account --
22    A.    Written by a previous
23 underwriter.
24    Q.    Have you ever had a claim over
25 a million bucks that was paid?

1          N. BROSNAN
2     A.    Yes.
3     Q.    How many?
4     A.    I don't know, but less than
5  five.
6     Q.    The last series of questions
7  that I asked you were about claims that
8  were paid.
9          Have you had claims made under
10 policies you've underwritten at AGCS which
11 were denied?
12    A.    Yes.
13    Q.    Other than the World Fuel claim
14 that we're talking about today, how often
15 has that happened?
16          MR. NICOLETTI: Objection as to
17 form.
18          You can answer.
19    A.    Not -- I can't even speak to
20 numbers. But not often. I don't have a
21 lot of claims under my accounts.
22    Q.    Do you remember any claim that
23 was denied where the amount of the claim
24 was asserted to be excess of a million
25 dollars?

39 (Pages 150 - 153)

1      N. BROSNAN
2 the potential loss, yes.
3    Q.    And the only thing you did was
4 to later look at the P&L to see whether
5 anything had been paid?
6        MR. NICOLETTI:  Objection;
7 asked and answered.
8        You can answer it one more
9 time.
10   A.    Yes.  Discussed it, brought it
11 to the attention of my manager.
12   Q.    When you say "discussed," this
13 only reflects a copy of the e-mail.  Did
14 you have any discussions with Brian or any
15 managers at AGCS about this claim?
16   A.    Only to the extent, hey, we
17 just wrote this, there's a $12 million
18 loss.
19        Details, no.
20   Q.    So you can't remember any
21 detail of any such conversation you had
22 with Brian or anybody else?
23   A.    No.
24   Q.    That is:  No, I don't remember?
25   A.    No, I don't remember.

1      N. BROSNAN
2        MR. MYERS:  I'll ask our court
3 reporter to mark as Exhibit 27 AGCS EM
4 9780.
5        ---
6        (Brosnan Exhibit 27, e-mail
7 dated January 12, 2014, from World Fuel
8 Services to Noreen Brosnan, Bates AGCS EM
9 09780 was marked for identification)
10        ---
11 BY MR. MYERS:
12   Q.    So Exhibit 27 is an e-mail you
13 got from World Fuel?
14   A.    For e-mail alerts.
15   Q.    Right.  So you went and signed
16 up on their corporate website to get
17 alerts about the company?
18   A.    Correct.
19   Q.    Why did you do that?
20   A.    It's not unusual to do that on
21 any large accounts so you can know of
22 acquisitions, mergers.
23   Q.    Potential claims?
24        MR. NICOLETTI:  Objection as to
25 form.

1      N. BROSNAN
2        You can answer.
3    A.    I never really think that
4 they're going to put a claim notification
5 on an e-mail website.
6    Q.    Well --
7    A.    Yeah.
8    Q.    You signed up for this one
9 pretty shortly after you got notice of the
10 claim, I think two days later, right?
11   A.    Right.
12   Q.    Did you have a custom and
13 practice of signing up for alerts to
14 receive from other policyholders?
15   A.    I do have other policyholders,
16 yes.  Large accounts.
17   Q.    That you sign up to receive
18 alerts from?
19   A.    Yes.
20        MR. MYERS:  I'll ask our court
21 reporter to mark as Exhibit 28 a complaint
22 that includes some policy information.
23        ---
24        (Brosnan Exhibit 28, Complaint
25 was marked for identification)

1      N. BROSNAN
2        ---
3 BY MR. MYERS:
4    Q.    I'm not going to ask you to
5 read the complaint.  However, if you turn
6 to the last page of the complaint itself,
7 11, and you go on to Exhibit 1 and then 2
8 to the complaint, do you recognize the
9 documents in those two exhibits?
10   A.    Exhibit 1?  I'm not sure I'm
11 looking at the right one.
12   Q.    Yes.
13   A.    And Exhibit 2.
14        I'm sorry.  What page is
15 Exhibit 2 again on?
16   Q.    Well, if --
17        MR. NICOLETTI:  They're not
18 numbered.  You'll see it on the face page.
19 BY MR. MYERS:
20   Q.    After page 12 of Exhibit 1
21 you'll see Exhibit 2.
22   A.    Okay, I've got it.
23   Q.    And I think they've
24 double-sided these, sorry for that, and
25 we'll substitute corrected ones for

1        N. BROSNAN
2  transcript purposes.
3        Do you recognize Exhibits 1
4  and 2?
5    A.    Yes.
6    Q.    They have your initials in the
7  lower right-hand corner?
8    A.    Yes.
9    Q.    And you -- strike that.
10       What are they?
11   A.    My initials?
12   Q.    That's a good question.
13       What are Exhibits 1 and 2?
14   A.    Oh, the confirmation of
15  insurance.  And the actual policy of
16  insurance that was issued.
17   Q.    So this is the confirmation of
18  insurance for the World Fuel policy for
19  2013, or starting with policy period
20  October 1, 2013, and the policy, correct?
21   A.    Correct.
22   Q.    You said several times this
23  morning that you're not a wordings person,
24  or language to that effect.  Do you recall
25  saying that?

1        N. BROSNAN
2    A.    Mm-hmm.  Yes.
3    Q.    If you are interested in
4  figuring out what a particular wording
5  means in one of the policies like the
6  policy here in Exhibit 2 of Exhibit 28,
7  what would you do?
8    A.    Ask a manager.  Google it.
9    Q.    Is there any place at AGCS
10  where you could either look at a hard copy
11  of some documents that would help you
12  figure it out, or enter a term in a search
13  box, or try to find some guidance as to
14  what a particular term, phrase, or word in
15  the policy meant?
16   A.    Not that I'm aware of.
17   Q.    Have you ever come across a
18  situation where you wanted to figure out
19  what a particular policy term or wording
20  meant and you tried to find some material
21  to illuminate that for you?
22   A.    Sure.
23   Q.    Describe circumstances under
24  which you've done that.
25   A.    I mean, in general if I have a

1        N. BROSNAN
2  question on something, with today's, like,
3  Internet, ask colleagues, I mean that's
4  what everyone is there for.
5    Q.    Sure.
6        Can you recall any particular
7  instance where you did that?  For example,
8  if there was a question about a guaranteed
9  outturn clause and whether it contained
10  particular survey language, that's an
11  example.  I'm not pretending that it
12  happened here.  Can you give us examples
13  of when you would go to look for
14  information about what a term, word or
15  provision meant?
16   A.    The policy wording is approved
17  already, so in that particular instance
18  that was something that Tom Stubler had
19  said it appeared like it was a
20  value-added, that there was something
21  unusual to that, so he sent me the
22  wording.  I mean, that's...
23   Q.    Right.  I'm not asking you
24  about that situation.
25   A.    Yeah.

1        N. BROSNAN
2    Q.    What I am trying to get at is
3  whether you remember a specific time where
4  you said, huh, I wonder what that does
5  really mean, and you went to try to find
6  out?
7    A.    Not that I can speak to
8  specifically.
9    Q.    On the fourth page of the
10  policy in Exhibit 2 to Exhibit 28 --
11   A.    Yes.
12   Q.    -- do you see there's a
13  "Conditions of Coverage" section 11 that
14  starts there?
15   A.    Yes.
16   Q.    And that first provision,
17  11(A), it's your understanding that
18  applies to cargos that World Fuel had an
19  interest in while this policy was in
20  effect?
21       MR. NICOLETTI:  Objection as to
22  form.
23       You can answer.
24   A.    Except for bulk liquid.
25   Q.    So why is it except for bulk

1        N. BROSNAN
2 clause?
3    A.    I'm not sure if the --
4    THE WITNESS:  Sorry.  I'm not
5 supposed to look at you.
6    A.    -- if the --
7    Q.    I try not to look at him, too.
8    MR. NICOLETTI:  You're killing
9 me, so...
10    A.    The Armenia Coffee case, which
11 I spoke of before, may have involved
12 fraudulent bills of lading.  But it was a
13 warehouse situation, to the best of my
14 knowledge.
15    Q.    So putting aside that one,
16 which is the one you gave a deposition in
17 some twenty years ago --
18    A.    Right.
19    Q.    -- there has been no claim
20 you're aware of on any accounts you've
21 underwritten or taken over that involved a
22 fraudulent bills of lading clause?
23    A.    Correct.
24    Q.    This policy is written on the
25 Willis form?

1        N. BROSNAN
2    A.    Correct.
3    Q.    I take it there was no
4 negotiation or discussion at all in the
5 underwriting process about any
6 modifications to or alternatives for a
7 fraudulent bills of lading clause?
8    A.    Correct.
9    Q.    Have you, yourself, ever
10 studied any of the differences between the
11 AGCS fraudulent bill of lading clause and
12 the Willis form of that clause?
13    MR. NICOLETTI:  Objection as to
14 form.
15    You can answer.
16    A.    No.
17    Q.    Have you ever studied that
18 clause for any reason?
19    A.    No.
20    Q.    Do you have any understanding
21 of what the phrase "other shipping
22 documents" at the end of that clause here
23 on page 16 is?
24    A.    Yes.  It could be, I guess, an
25 airway bill, packing list.  Documents

1        N. BROSNAN
2 which follow the transit of the goods from
3 point A to point B.
4    Q.    Anything else?
5    A.    Not that I'm aware of, no.
6    Q.    Have you ever attempted to
7 figure out or find information about what
8 that phrase, "other shipping documents,"
9 means?
10    A.    Yes.
11    Q.    When did you do that?
12    A.    After I was called into a
13 meeting on the claim -- on the $18 million
14 potential claim, and I was going to be in
15 front of upper management and counsel.
16 And I just didn't want to look like an
17 idiot.
18    Q.    You said on the $18 million --
19    A.    Potential.
20    Q.    -- contamination claim?  Or was
21 this on the claim that brings us here
22 today?
23    A.    The claim that brings us here
24 today.
25    Q.    So the only time you've ever

1        N. BROSNAN
2 looked at what "other shipping documents"
3 means here is getting ready for that
4 meeting?
5    A.    Correct.
6    Q.    What all did you look at?  What
7 did you do?
8    A.    I Googled -- I looked at the
9 two documents that were submitted
10 notifying us of the claim, and just in
11 preparation for the meeting I literally
12 went on and Googled different items that I
13 just wasn't well versed in.
14    Q.    Did you maintain any record
15 other than whatever your browser
16 remembered --
17    A.    Yes.
18    Q.    -- about what you looked at?
19    A.    Yes.
20    Q.    Where did you maintain that?
21    A.    I cut and pasted it into a
22 draft e-mail, and mailed it to myself, so
23 that I had it as a reference to print out.
24    MR. MYERS:  We've been going
25 for over an hour.  A good breaking point.

1        N. BROSNAN
2            ---
3  BY MR. MYERS:
4        Q.    Is this the e-mail to yourself
5  that you testified about earlier that you
6  prepared to get yourself ready for a
7  discussion?
8        A.    Yes.
9        Q.    This -- you sent this to
10  yourself on March 3rd.  Does that indicate
11  anything to you about when the meeting at
12  which you participated occurred?
13        A.    In looking at the calendar
14  invites, I believe it was March 4th.
15        Q.    So the day before you
16  studied up?
17        A.    Correct.
18        Q.    And this reflects your
19  studying up?
20        A.    Yes.
21        Q.    "This" being Exhibit 43?
22        A.    Yes.
23        Q.    This first page up through the
24  "as the nature of the loss" paragraph,
25  where did that come from?  Did you write

1        N. BROSNAN
2  that?
3        A.    Directly from Nancy
4  Zachariades' notice of high potential
5  loss.
6        Q.    So you cut and paste that?
7        A.    Yes.
8        Q.    And if I were to ask you
9  questions about what you meant by "as the
10  nature of the loss would not appear,"
11  blah, blah, blah, you would have to say, I
12  don't know, that was Nancy?
13        A.    Correct.
14        Q.    Where in this is data that you
15  entered yourself?
16        MR. NICOLETTI:  Objection as to
17  form.
18        MR. MYERS:  It was a little
19  awkward, so let me fix it.
20  BY MR. MYERS:
21        Q.    Where here is information that
22  you didn't take from the large loss
23  report?
24        A.    It would be the "Per broker
25  advices:  Fuel was supplied" -- this was

1        N. BROSNAN
2  taken from John Frandsen's report to us,
3  and the contract that was attached.
4        Q.    Okay, "this" being from that
5  point to where?
6        A.    Well, the "Insuring
7  Conditions," "Fraudulent Bills of Lading,"
8  "Shipping Documents," all of those are
9  from the Internet.
10        Q.    So starting with "Insuring
11  Conditions" --
12        A.    Internet.
13        Q.    And "Fraudulent Bills of
14  Lading," Internet?
15        A.    Internet.
16        Q.    "Shipping Documents"?
17        A.    Internet.
18        Q.    Internet?
19        A.    "Crime Insurance."
20        Q.    "Crime Insurance."
21        How about the United States
22  Court of Appeals for the Third Circuit?
23        A.    Internet.
24        Q.    So in doing your own Internet
25  research you found that case?

1        N. BROSNAN
2        A.    Yes.
3        Q.    On AGCS EM 09018, under
4  "Fraudulent Bills of Lading," the second
5  paragraph which says "What is a shipping
6  document," did you type that in?
7        A.    It's from the Internet.
8        Q.    What site?  What place did that
9  come from?
10        A.    I think I just asked "What is a
11  shipping document" so that I could be
12  clear on "other shipping documents" in the
13  fraudulent bills of lading clause.
14        Q.    Sure.
15        When you asked that, presumably
16  you entered it in a search box on some
17  search engine?
18        A.    On Google, probably.
19        Q.    Okay.  What -- from what URL
20  website or place did the answer that you
21  plucked in here come from?
22        A.    I don't know.
23        Q.    So whatever came up you just
24  cut and pasted it in there?
25        A.    Right.

1          N. BROSNAN
2     Q.     Did you, yourself, consider any
3  sources or information other than whatever
4  Google spat out?
5     A.     I'm not clear on what the
6  question is.
7     Q.     Did you look at any other
8  sources, any references, any anything,
9  consult any experts --
10    A.     Oh, no.  No.  Strictly from the
11 Internet.  This was literally a
12 couple-of-hour document, not even that,
13 that I just was getting as a cheat sheet
14 for meeting when I go in with management
15 and counsel.
16    Q.     So you didn't actually attempt
17 to determine what the legal or policy
18 definition of "shipping document" was; you
19 just went to Google, whatever it spat out
20 you plunked down?
21    A.     Correct.
22    Q.     Did you ever consider asking
23 somebody who was an expert?
24    A.     No.
25    Q.     The capitalized "Shipping

1          N. BROSNAN
2  Documents," is that -- what is entered
3  there, and below it?  Where did that
4  information come from?
5     A.     The Internet.
6     Q.     Okay.  So it's the same thing,
7  you put it in Google and pasted whatever
8  it spat out?
9     A.     Correct.
10    Q.     What terms did you enter in
11 doing that search?  For example, there's
12 "Waybill."  When you saw the word
13 "waybill" did you insert "Waybill" and
14 then get a definition of it?
15    A.     No, I believe I just put in
16 "What is a shipping document," I'm not --
17 I don't know, again, this was strictly as
18 point of reference for myself, it wasn't
19 going on a report, thesis, anything where
20 I had to put a footnote or anything like
21 that -- the "Shipping Documents," the --
22 what spit out gave me definitions of each
23 airway bill.
24          They point to what shipping
25 documents are.  Obviously there are those

1          N. BROSNAN
2  noted, they follow with the goods in
3  transit, and then they give a definition
4  of each:  "Air waybill, bill of lading,
5  truck bill of lading."
6     Q.     And one of those is "Commercial
7  Invoice," right, on 9019?
8     A.     Yes.
9     Q.     And the last one is
10 "Documents," which the last phrase there
11 is:  "Other such records required under
12 documentary credit or collection."
13         Do you see that?
14    A.     As long as there's a shipping
15 document, it goes along with the transport
16 of the goods.
17    Q.     I don't see the "as long as
18 it's a shipping document."
19         That just looks like "other
20 such records required under documentary
21 credit or collection," right?
22    A.     Other documents, packing
23 list -- well, it's inferred in that -- if
24 you look at the "Shipping Documents"
25 definition, and you look at each

1          N. BROSNAN
2  subsection after that, it's air waybill,
3  bill of lading, truck bill of lading,
4  commercial invoice, and then it goes "all
5  other documents required to clear customs
6  and take delivery."
7          There's a definition of
8  "Packing List," and then the next thing is
9  "Documents."
10    Q.     You also appear to have entered
11 "Crime Insurance."  Why?
12    A.     Because I had no idea what
13 crime insurance covered in particular.  I
14 know that World Fuel had a policy with
15 Berkeley.
16    Q.     At some point you sat down and
17 looked at the Berkeley policy?
18    A.     No.
19    Q.     Do you know if anybody at AGCS
20 ever did?
21    A.     I would imagine claims, but I'm
22 not sure.
23    Q.     Did you ever talk about any
24 such review, assessment, or determination
25 that anybody at AGCS made?