# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
AGCS MARINE INSURANCE COMPANY,

Plaintiff, :

- against -

WORLD FUEL SERVICES, INC. and WORLD FUEL SERVICES EUROPE, LTD.,

Defendants. :
----------------------------------------x

88 Pine Street
New York, New York
July 15, 2015
10:15 a.m.

EXAMINATION BEFORE TRIAL of ROBERT BARTSCH, a Non-Party Witness herein, taken by the Plaintiff and Defendant, pursuant to Court Order, held at the above-mentioned time and place, before Michelle Lemberger, a Notary Public of the State of New York.

Bartsch

**Q. And what is your residential address?**

A. It's 20 Indian Run, Watchung, New Jersey, 07069.

**Q. And by whom are you currently employed?**

A. Willis.

**Q. Is that Willis of New York?**

A. Willis of New York.

**Q. And what is the address of the office that you work out of?**

A. It's 200 Liberty Street, New York, New York 10281.

**Q. Mr. Bartsch, have you ever testified in a deposition before?**

A. Yes.

**Q. On how many occasions?**

A. Once.

**Q. How long ago?**

A. 30 years.

**Q. What was the subject matter of that deposition?**

MR. MYERS: You must have been five years old.

[Page 6]

Bartsch

A. It was a claim, yes.

**Q. A marine cargo claim?**

A. Marine stock through put claim.

**Q. What was the issue in that litigation?**

A. It was regarding whether the claim should be payable under which section of the policy.

**Q. What sections were involved?**

A. Strikes, riots and civil commotions or the inventory section of the policy.

**Q. Was that policy in the nature of all risk insurance contract?**

A. Yes.

**Q. Because your deposition was taken that long ago, I am going to review with you some of the rules that we follow in taking depositions, which helps present a more, let's say a clearer record.**

**The first rule is, as you can tell, this matter is being transcribed by a court reporter. The effect of the transcription is that the court reporter can only record one speaker at a time. So I ask you to await the**

[Page 7]

**Bartsch**

**finish of my question before answering. Do you understand that instruction?**

A. Yes.

**Q. Are you represented by counsel today?**

A. Yes.

**Q. You are free to have a conference with your counsel at any time during these proceedings, however, I request that any kind of conference does not take place between my question and your response. Do you understand that request?**

A. Yes.

**Q. Again, because this matter is being transcribed, the court reporter cannot take down any responses which are not oral or verbal. Do you understand that?**

A. Yes.

**Q. Do you also understand that words like um-hum and the like cannot always be interpreted accurately, so we ask that you answer with a yes or no or more suitable verbal by word response. Do you understand that instruction?**

[Page 8]

**Bartsch**

A. Yes.

**Q. To the extent that you do not understand any of my questions, whether because of a word, phrase or entire inquiry, which is possible, I would like you to direct my attention to that part of the question that causes you any kind of confusion, so that we can come to a common comprehension of that question and your answer will be deemed responsive; do you understand that instruction?**

A. Yes.

**Q. Did you do anything to prepare for today's deposition?**

A. Yes.

**Q. What did you do?**

A. Just visited counsel.

**Q. And for what period of time did you visit counsel?**

A. Three hours yesterday.

**Q. And at that time did you review any documents?**

A. Yes.

**Q. Did those documents assist you in**

[Page 9]

Bartsch

refreshing your recollection concerning the events surrounding this policy?

A. Yes.

**Q. Can you identify the documents that you reviewed?**

A. One was the policy.

**Q. Anything else?**

A. Just a few e-mails.

**Q. Do you recall by whom -- with whom or by whom those e-mails were sent or received?**

A. Various e-mails.

**Q. I understand they are various. Can you be more specific, if you can?**

A. E-mails from myself.

**Q. All right. And to whom were those e-mails addressed, if you recall?**

A. I can't recall.

**Q. Were those e-mails addressed to World Fuels?**

A. Yes.

**Q. Did those e-mails take place in time before the claim arose?**

MR. MYERS: Objection. Form.

Bartsch

A. No.

**Q. Did those e-mails -- did those e-mails take place subsequent to the claim arising?**

MR. MYERS: Same objection. Form.

MR. SATNICK: You could answer.

A. Oh, I could answer?

**Q. Oh, yes.**

A. I've always e-mailed the client prior to and after.

**Q. But I'm focusing your attention on the e-mails you reviewed in preparation for this deposition.**

A. Yes.

**Q. Let me rephrase it this way.**

**Did you send a first notice of claim involving the loss of the fuel oil?**

A. No.

**Q. Is that by Mr. Frandsen?**

A. Yes.

**Q. Did you have knowledge of that notice of claim at the time it was being sent out?**

Bartsch

A. Yes.

**Q. Do you recall the date the notice was sent?**

A. No.

**Q. Your communications that you reviewed, did they take place before or after the notice of claim was sent to AGCS?**

A. After.

**Q. Can you recall the subject matter of those e-mails?**

A. No. I mean -- various.

**Q. All right. We will get into more detail.**

**What is your current position at Willis?**

A. Senior vice president cargo division.

**Q. Is that a marketing title or are you actually a corporate officer of Willis New York?**

A. Marketing, marketing placing broker.

**Q. Did you hold that position, same position with Willis in 2013?**

A. Yes.

Bartsch

**Q. For what period of time have you been employed by Willis?**

A. Since 1998.

**Q. That would be to the present, 2015?**

A. Yes.

**Q. Now, before we go any further into your employment, past employment, can you outline for me your educational background, starting with college. I don't need to go back to your high school days.**

A. Wagner College, Staten Island. And degree in business and an MBA in business. Same school.

**Q. What year did you get your undergraduate degree from Wagner College?**

A. 1976.

**Q. And during what period of time did you study for your MBA?**

A. Finished in '79.

**Q. Did any of your formal education involve any courses or disciplines in insurance?**

A. Not specifically.

**Q. Attorneys hate the words not**

Bartsch

**specifically. It means there might be something unspecific. In general, did any of these courses touch on insurance?**

A. I can't recall.

**Q. And what was your first insurance-related employment after graduation from Wagner?**

A. At W.J. Roberts Insurance Company.

**Q. Was W.J. Roberts an insurance company or managing general agent?**

A. Managing agent.

**Q. And for which insurance company?**

MR. SATNICK: Wait until he finishes his question before you answer.

THE WITNESS: Sorry.

A. Albany Insurance Company.

**Q. And for what period of time did you work at W.J. Roberts?**

A. 1981 to 1983.

**Q. And what position did you hold?**

A. Underwriter trainee.

**Q. Any other position while at W.J. Roberts?**

[Page 14]

Bartsch

A. No.

**Q. You were never given an underwriting designation?**

A. No.

**Q. Did you ever have any underwriting authority to bind and issue policies on behalf of Albany via W.J. Roberts?**

A. No.

**Q. What line of insurance business were you being trained in?**

A. Cargo.

**Q. Did you have any formal training?**

A. No.

**Q. Was all of your training what we describe -- what we call on-the-job training, working with more senior underwriters?**

A. Yes.

MR. SATNICK: Mind if I grab a cup of coffee?

MR. NICOLETTI: Not a problem.

MR. MYERS: While we are waiting, occasionally you will be asked questions and if I can just ask for the opportunity to object to the

[Page 15]

Bartsch

question, so if you would just pause before answering.

MR. NICOLETTI: Let me remind you, the only person you should be taking instructions from is your attorney.

BY MR. NICOLETTI:

**Q. Did there come a time when you leave W.J. Roberts; is that correct?**

A. Yes.

**Q. Where did you go?**

A. Fred S. James.

**Q. And for what -- why did you go to Fred S. James?**

A. More money.

**Q. It's always a good reason. I always tell the witness that.**

A. The only reason.

**Q. What kind of business did Fred S. James conduct?**

A. They were all lines insurance broker.

**Q. And what is an insurance broker?**

A. An intermediary between the actual

[Page 16]

Bartsch

insured and the insurance community.

**Q. Do you have any understanding who the insurance broker represents as the intermediary?**

A. Yes.

**Q. Who does he represent?**

A. The insured.

**Q. For what period of time did you work at Fred S. James?**

A. 1981 to 1998.

**Q. And what positions did you hold at Fred S. James, starting with the earliest and if it changes, give me the date it changed and the new title or position?**

A. Just to let you know, the company was purchased by Sedgwick sometime in that time frame.

**Q. Okay. So Fred S. James becomes Sedgwick?**

A. Yes.

**Q. And Sedgwick is also an insurance broker?**

A. Same thing.

**Q. And they perform the same services**

[Page 17]

Bartsch

**for the insured?**

A. Yes. Same personnel. I was vice president at Fred S. James, became senior vice president through Sedgwick until I left.

**Q. For what period of time were you vice president?**

A. I don't recall. About ten years.

**Q. And then you were promoted to senior vice president?**

A. Yes.

**Q. After the merge -- after the acquisition by Sedgwick --**

A. Yes.

**Q. -- of the Fred S. James operation?**

A. Yes.

**Q. Did your duties and responsibilities change at all when you changed title from vice president to senior vice president?**

A. No.

**Q. That makes it easier.**

**Can you tell me what your duties and responsibilities were while you worked at the Fred S. James operation which ultimately was purchased by Sedgwick?**

[Page 18]

Bartsch

A. Any client's need for marine cargo insurance.

**Q. Is your sole area of business operation the marine cargo area?**

A. Yes.

**Q. You have never done anything in the way of hull or P&I insurance; is that correct?**

A. Correct.

**Q. While at Sedgwick, did they give you any training to assist you in performing your job as the intermediary for the insured?**

A. No.

**Q. Explain for me what your duties and responsibilities were while you were at Sedgwick, Fred S. James and then Sedgwick.**

A. Working with insureds, clients of Fred S. James, Sedgwick to determine their needs of insurance for cargo and to find the best possible policy to cover those needs for cargo insurance.

**Q. In performing the first function, determining the need of your client, the insured, how do you go about that?**

[Page 19]

Bartsch

A. Request information from the insured about their general exposures for transit.

**Q. You used the word transit. What relationship does the word transit have to cargo insurance?**

A. Transit insurance is just an aspect of cargo insurance.

**Q. And what other aspects of cargo insurance are there other than transit?**

A. There is inventory insurance, there's domestic transit, there's international transit.

**Q. Any other aspects?**

A. No.

**Q. When you say inventory, is that all for -- is that sometimes called warehouse insurance?**

A. Yes.

**Q. Or warehouse coverage?**

A. Yes.

**Q. Now, I gather there comes a time when you leave Sedgwick?**

A. Yes.

**Q. Why did you leave Sedgwick?**

[Page 20]

Bartsch

A. Better opportunity at Willis.

**Q. More money again?**

A. Yes.

**Q. I gather you worked at Willis from 1998 to the present time; is that correct?**

A. Yes.

**Q. And what title or titles did you have while at Willis?**

A. Same title, senior vice president.

**Q. What areas of insurance did you specialize in, if any?**

A. Cargo.

**Q. When you use the term cargo, are you referencing marine cargo insurance or other types of cargo insurance?**

A. All types of cargo insurance.

**Q. That would also be airline, air traffic and the like?**

A. Yes.

**Q. Trucking?**

A. Trucking, yes.

**Q. Anything else?**

A. Well, additionally warehouse insurance.

[Page 21]

Bartsch

**risk, marine insurance?**

A. Depending on the type of commodity, yes.

**Q. Can you explain the different insurances which may be purchased between what you have testified as the most limited, which is FPA or free particular average, and the guaranteed outturn of all risk fields?**

A. We have bulk oil clauses FP 13C, which is similar to FPA, but it refers mostly to bulk liquids. And you have all-risk insurance, and I'm referring to bulk liquids. All-risk insurance including contamination from an external course. And then you have guaranteed outturn, which is all risk extended to include shortage, leakage, howsoever arising.

**Q. I believe most of your answers seem to refer to bulk liquid insurance. Do you specialize in that?**

A. No.

**Q. Putting aside bulk liquids for the moment, are there any insurances available between free and particular average for all**

[Page 26]

Bartsch

**risk for other commodities?**

A. Yes, but they are all extensions of all risk. There is also with average coverage.

**Q. Are some policies written on terms which are broader than FPA but less than all risk?**

A. Yes.

**Q. Are you familiar with the term of -- the term company form policy?**

A. Yes.

**Q. And what does that mean to you?**

A. Policy form issued by the actual insurance company used in their paper.

**Q. And to be clear, in other words, it is the terms and conditions are proposed on a particular form which has been authored by the insurance company?**

A. Yes.

**Q. Have you heard the term broker form?**

A. Yes.

**Q. And can you give me what you understand to be the meaning of a broker form policy?**

[Page 27]

Bartsch

A. It's a policy form designed by the insurance broker and acceptable to the insurance market.

**Q. When you say designed, what do you mean by designed?**

A. Policy form that's written based on the collective knowledge of the marine staff.

**Q. At the brokerage house; is that correct?**

A. Right.

**Q. And to put it another way, the terms and conditions are either authored or proposed by the broker in its own broker form; is that correct?**

A. Yes.

**Q. Did Willis have a broker form policy?**

MR. MYERS: Objection. Form.

MR. NICOLETTI: Strike that. Let's phrase it this way.

**Q. Does Willis have a broker form policy?**

MR. MYERS: Same objection.

A. Yes.

[Page 28]

Bartsch

**Q. When did it first have a broker form policy?**

A. I don't recall.

**Q. Do you know who at Willis were responsible for authoring the Willis broker form?**

A. Not the initial broker form, no.

**Q. Let's talk about the form, the broker form which was issued for the World Fuels account.**

**Are you familiar with that Willis broker form?**

A. Yes.

**Q. Who authored that Willis broker form?**

A. Various brokers.

**Q. Various --**

A. Within Willis.

**Q. And who were the various brokers at Willis who authored the broker form which formed the basis of the World Fuels policy?**

A. I don't recall. It was six years, seven years ago.

**Q. Were you one of the people who**

[Page 29]

Bartsch

**authored that form?**

A. Yes.

**Q. Are any of the current brokers at Willis part of the group that authored the policy form other than yourself?**

A. Yes.

**Q. And who were they or are they?**

A. Steve Suzanski.

**Q. Figures. Who else?**

A. Jim Delou.

**Q. Who else?**

A. I don't recall anyone else that's still at Willis.

**Q. Anybody who has left Willis in the interim that you recall who was part of this group that created the Willis broker form?**

A. I'm sure there were, but I can't recall. There's been several departures.

**Q. Well, if you recall the departures, do you know who of those departed worked with the group to create the Willis broker form?**

A. I would say three or four that have departed were involved.

**Q. And who are they?**

[Page 30]

Bartsch

A. Joe Sheridan.

**Q. Anyone else?**

A. Steve Ferran.

**Q. Anyone else?**

A. I can't recall.

**Q. Okay. Did you work -- did you, yourself, work on any particular sections of the Willis broker form?**

A. No.

**Q. Did you work on the entire policy form?**

A. In general, yes.

**Q. In creating this broker form, did Willis compile materials from which it drew terms and conditions which it included in the broker's form?**

A. Yes.

**Q. Did anyone maintain notes or drafts concerning the changes to be made from the source materials which eventually found their way into the broker's form?**

A. Not myself.

**Q. Anyone else?**

A. I don't recall at all.

[Page 31]

Bartsch

**Q. Is there a file at Willis which contains all the materials that led up to and included the newly-issued broker's form?**

A. I don't believe so.

**Q. Do you recall the source materials which were used to create the Willis broker form?**

A. In general.

**Q. Then give it to me.**

A. Verbally?

**Q. Yes. That's the only way we work in this place.**

MR. SATNICK: When you said give it to me, he thought you meant the documents themselves.

MR. NICOLETTI: I'm sorry.

MR. MYERS: That would be a big briefcase.

A. In general, we review other brokers' forms, we review underwriting company forms, and we look for the most favorable clauses from that collection, but also being fair to the insurance market.

**Q. Can you identify which brokers'**

[Page 32]

Bartsch

**forms you at least reviewed as a source for the ultimate form which became the Willis broker form which formed the basis of the World Fuel policy?**

A. Marsh AI.

**Q. Anybody else on the broker's side?**

A. I don't believe so.

**Q. And on the company side, which forms did you look at to draw source material?**

A. Yeah, I don't recall. It was quite a few years ago.

**Q. Now, is there one Willis broker form or are there various versions of that Willis broker form?**

A. At this time there is one.

**Q. At the time the World Fuel's policy was issued, was there one or more than one Willis broker form?**

A. One.

**Q. The reason I ask that question, was there a time that you would modify the Willis broker form on a company-by-company basis?**

A. Yes.

**Q. This particular form is not one of**

[Page 33]

Bartsch

**those, what I'll call specialized forms for particular companies' use; is that correct?**

A. We do tailor to World Fuel's needs.

**Q. I understand that, but insofar as presenting it to other insurers, you don't have any other form but the Willis broker form?**

A. Correct.

**Q. It's not tailored per underwriter; is that correct?**

A. Correct.

**Q. In creating the broker's form which is at issue here, in creating the form itself, not the particular count that it was issued for, did Willis liaison with any insurance company for their input?**

A. Yes.

**Q. Who did Willis liaison with?**

A. I don't recall, but it was at least three or four carriers.

**Q. Do you recall which carriers?**

A. No.

**Q. Was one of those carriers you liaisoned with, would that have been AIG?**

[Page 34]

Bartsch

A. I just don't recall.

**Q. Would one of those have been AGCS?**

A. Again, I don't recall.

**Q. Now, when a company agreed to issue a policy on the Willis broker form who takes responsibility, Willis or the insurance company, for assembling and compiling the terms and conditions into an insurance policy?**

A. Willis.

**Q. And does Willis have the authority to issue that policy?**

MR. MYERS: Objection. Form.

MR. NICOLETTI: You can answer.

**Q. Do you know what the term issue means?**

A. Yes.

**Q. What is your understanding of the term issue?**

A. Have authority to sign it.

**Q. Does Willis have the authority to sign its marine cargo broker forms that it assembles for issuance by the underwriter?**

A. No.

[Page 35]

Bartsch

MR. MYERS: Objection. Form.

**Q. Do you understand the term binding authority?**

A. Yes.

**Q. And what is your understanding of that term?**

A. When insurance carriers give the broker the authority to issue a policy and sign and authorize the policy.

**Q. In the marine insurance area, does Willis have any underwriters' authority to bind coverage?**

A. No.

**Q. So once the terms and conditions are agreed to in the Willis cargo form, and it's assembled and put together by Willis, what is the next step in the process to have that policy take effect?**

MR. MYERS: Objection. Form.

A. Provide it to the insurance carrier for their review.

**Q. And if they agree with the term -- with the way Willis assembles the policy, it is then signed by the underwriter; is that**

[Page 36]

Bartsch

**the process?**

MR. MYERS: Same objection.

MR. NICOLETTI: You can answer.

A. Yes.

**Q. Is that the procedure that was followed with the World Fuels' policy at issue here?**

A. Yes.

**Q. There is no perfect world here, but how long -- what is the usual time period between the underwriter's agreement to issue the policy and Willis's assembly of that policy to be sent to the underwriter?**

A. About 30 days.

**Q. And what document stands, if any, stands in place of the policy until it's assembled by Willis and actually signed and issued by the insurance company?**

A. The insurance carrier's binder.

**Q. Is that sometimes also called a confirmation of insurance?**

A. Yes.

**Q. In the case of World Fuel, did it take 30 days for Willis to assemble the**

[Page 37]

Bartsch

**clauses do you rely upon in providing that answer?**

A. Buyers' and sellers' interest clause 16, FOB clause 69.

**Q. Anything else?**

A. Unpaid vendors insurance clause 71.

**Q. Anything else?**

A. And the sellers' interest clause, I believe 74.

**Q. So it is your understanding then that those four clauses modify the first paragraph of the bulk oil clause; is that correct?**

A. I would say they are in conjunction with.

**Q. Okay.**

A. Yes.

MR. SATNICK: Whenever you get a good moment, I would ask for a biological break.

MR. NICOLETTI: Not a problem. Let's go off the record, please.

VIDEOGRAPHER: Stand by, please. The time right now is 11:35

[Page 74]

Bartsch

a m. and we are off the record.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: This marks the beginning of videotape number two. The time right now is 11:49 a.m. and we are back on the record.

BY MR. NICOLETTI:

**Q. Mr. Bartsch, I don't want to misstate your testimony. So let me know if I understand you correctly.**

**In order to look for the final destination, destination as stated in the bulk oil clauses, I have to read that clause in conjunction with other clauses in the policy. And one of the clauses you picked out was the buyers' and sellers' interest clause, clause 16; is that correct?**

A. Yes.

**Q. Okay. And I believe you told me that that clause would extend the coverage until such time as World Fuels no longer had an insurable interest; do you recall that?**

MR. MYERS: Objection. Form.

[Page 75]

Bartsch

It's not what he testified exactly.

**Q. Is that your testimony?**

A. That in addition to some other clauses.

**Q. Yes, but you picked out certain clauses.**

A. That was one of them.

**Q. Okay. Now, this clause reads, regardless of the terms of purchase by the assured from suppliers.**

MR. MYERS: Which clause are you in?

MR. NICOLETTI: 16.

**Q. Or the terms of sale by the assured for their customer, this policy subject to all of its terms and conditions, attaches and fully covers the goods and/or merchandise and/or property continuously from warehouse to warehouse; do you see that?**

A. Yes.

**Q. Is there anything in that clause that extends the coverage beyond warehouse to warehouse?**

A. Not in that specific wording.

[Page 76]

Bartsch

**Q. Well, any wording in that clause?**

A. No.

**Q. So if I look at clause 16 then, the temporal period of coverage is warehouse to warehouse, correct?**

A. Correct.

**Q. Whether or not the insured has an insurable interest beyond the final warehouse, this coverage terminates at the warehouse; isn't that correct?**

MR. MYERS: Objection. Form.

**Q. Based on this clause?**

MR. MYERS: Same objection.

A. By this clause, this clause alone, I would say, yes, but, all clauses are taken in conjunction with each other.

**Q. I'm just focusing on one clause at a time. All right?**

**Now, you say, is it your position that coverage continues for World Fuels' shipment until World Fuels is paid?**

A. And/or their interest ceases.

**Q. Well, if they are not paid for it, how does their interest cease?**

[Page 77]

Bartsch

MR. MYERS: Objection. Form.
A. If the other party takes over the insurable interest.
**Q. Well, if they haven't paid for it, if the customer hasn't paid for it, how do they take over the insurable interest?**
A. They don't.
**Q. Okay, fine. So, therefore, World Fuels' coverage under this policy, based on your testimony, continues until their customer pays them; is that correct?**
MR. SATNICK: Objection to the form. Asked and answered.
A. No.
**Q. When does it end?**
A. It ends when the actual product reaches final destination.
**Q. And how do we define final destination for purposes of World Fuels' temporal period of coverage?**
MR. MYERS: Same objection. Asked and answered.
A. The final destination --
**Q. And how --**

[Page 78]

Bartsch

A. -- is the ultimate customer.
**Q. So when the ultimate customer gets the product, that's the final destination?**
A. Yes.
**Q. And the ultimate customer is the person that purchased the fuel from World Fuels?**
MR. MYERS: Objection. Form.
A. That could be one of them.
**Q. What's the other?**
A. It could be intercompany shipment.
**Q. Putting aside intercompany shipments.**
MR. MYERS: Is there a question pending?
MR. NICOLETTI: Yes.
A. In general terms, the ultimate customer is final destination.
**Q. And for purposes of this particular claim, the ultimate customer is supposed to be the Department of Logistics, correct?**
MR. MYERS: Objection. Form.
MR. SATNICK: I'm sorry, can I have the question read back?

[Page 79]

Bartsch

**Q. For purposes of the pending claim, the shipment for the pending claim, the ultimate customer was to be the Department of Logistics; as far as World Fuels knew?**
MR. MYERS: Objection. Form.
A. I don't believe so.
**Q. Who was the ultimate customer, if not the Department of Logistics, based on World Fuels' knowledge?**
A. It was a contract with the DLA.
**Q. Right.**
A. To deliver fuel to customers along the west coast to Africa.
**Q. Well the Department of Logistics is the customer; is it not?**
A. Yes.
**Q. And they purchased the fuel which is then given to various military installations; is that correct?**
A. Yes.
**Q. So the customer is the Department of Logistics?**
MR. MYERS: Objection. Form.
**Q. Is that correct?**

[Page 80]

Bartsch

A. Correct.
MR. SATNICK: Or was supposed to be.
MR. NICOLETTI: Was supposed to be, I agree with you on that.
**Q. So as far as World Fuels knew and intended under this purported contract, the ultimate destination was delivery to the Department of Logistics; isn't that correct?**
MR. MYERS: Same objection.
MR. NICOLETTI: You can answer.
A. Yes, to the final port or ports in this case.
**Q. Well or the final place which the DOL designates?**
A. Correct.
**Q. And in this case, the DOL or the impostor, as we will call it, designated -- didn't designate a port, did they?**
MR. MYERS: Objection. Form. Foundation.
MR. NICOLETTI: You can answer.
A. I don't know.
**Q. Isn't it true they designated the**

[Page 81]

Bartsch

**Ocean Pearl as the place of delivery?**

MR. MYERS: Same objection. Form. Foundation.

MR. NICOLETTI: You can answer.

A. Again, I didn't read the claim documents, so --

**Q. I understand. I will represent to you that the Ocean Pearl was designated as the delivery point. That's the delivery point that's the ultimate destination.**

MR. MYERS: Objection. Form.

MR. NICOLETTI: You can answer.

MR. MYERS: Objection. Form. Foundation.

MR. SATNICK: Wait until they're done with their little colloquy dance here.

THE WITNESS: I'm sorry.

MR. SATNICK: And wait when it's all done. The only one who can instruct you is me. So even though counsel is well intentioned in saying you can answer, it's only instructions you receive from me.

[Page 82]

Bartsch

So when they're done chattering, which seems to be going on a lot lately, look over at me and I will give you a nod to say you may answer.

MR. NICOLETTI: Let's move on for a moment and we will get back to that.

MR. SATNICK: I thought you guys liked each other.

MR. NICOLETTI: We don't.

MR. MYERS: Oh, I like you, John.

MR. NICOLETTI: Speak for yourself.

MR. SATNICK: What have I drawn into here?

MR. NICOLETTI: Nothing.

BY MR. NICOLETTI:

**Q. Let me direct your attention now to clause 37. It says fraudulent bills of lading?**

A. Yes.

**Q. It says, this policy also covers**

[Page 83]

Bartsch

**physical loss. Do you see that?**

A. Um-hum.

**Q. What is your understanding of the words in this policy?**

A. This contract of coverage.

**Q. The entire Willis form?**

A. Correct.

**Q. And is that clause subject to all the terms and condition of the open cargo policy?**

MR. MYERS: Objection. Form.

MR. NICOLETTI: You can answer.

MR. MYERS: Foundation.

A. Yes.

**Q. It says this policy also covers physical loss incurred by the insured to the acceptance by the insured, its agents or shipper, fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents.**

**Do you see that?**

A. Yes.

**Q. As the author of this contract or one of the authors, do you have any**

[Page 84]

Bartsch

**understanding of what the term other shipping documents mean?**

A. Yes.

**Q. What is that understanding?**

A. Any other documentation to supply and ship product to the ultimate customer.

**Q. Those documents are related to the -- are those documents necessary for the actual transit of the coverage, transit of the product?**

MR. MYERS: Objection. Form.

MR. NICOLETTI: You can answer.

MR. SATNICK: You could answer.

MR. NICOLETTI: I'm trying to speed this along.

MR. SATNICK: What's that?

MR. NICOLETTI: I'm just trying to speed this along.

MR. SATNICK: I understand that but you're taking my job away.

THE WITNESS: Now I forgot the question. Sorry.

BY MR. NICOLETTI:

**Q. Are the documents which you classify**

[Page 85]

Bartsch

**as other shipping documents, are those documents necessary for the actual carriage of the goods?**

MR. MYERS: Objection. Form.

A. Yes.

**Q. Is a purchase order a shipping document?**

A. It can be.

**Q. Under what circumstances?**

A. Well, it forms the value of the cargo that's being shipped.

**Q. I understand it forms the value. Other than the value, does it have any purpose as a shipping document?**

A. It shows the purchaser and the seller.

**Q. I understand that. But is that necessary for the carriage of the goods by the common carrier?**

A. Well, you would need that to facilitate other shipping documents.

**Q. Right, but the purchase order itself is not a shipping document; is it?**

A. No.

[Page 86]

Bartsch

MR. MYERS: Objection. Form.

**Q. For the pending claim, did you have any discussion with anyone at World Fuels as to whether this claim involved fraudulent shipping documents?**

A. Yes.

**Q. With whom did you have that discussion?**

A. The risk manager.

**Q. And who is that?**

A. David Hornaday.

**Q. What did you say to Mr. Hornaday on that topic?**

A. I don't recall.

**Q. Isn't it true you told Mr. Hornaday this claim did not involve fraudulent shipping documents?**

MR. MYERS: Objection. Form.

MR. NICOLETTI: You can answer.

MR. SATNICK: Foundation. Again, the only instruction that you can abide by is my instruction. So let's read the question back.

[Page 87]

Bartsch

MR. NICOLETTI: I will restate it.

**Q. Isn't it true you told Mr. Hornaday that the pending claim did not involve fraudulent documents?**

MR. MYERS: Objection. Form.

MR. SATNICK: You may answer.

A. It's -- again, I don't recall. I mean --

**Q. Do you recall what Mr. Hornaday said to you?**

A. No.

**Q. By the way, this policy is an all-risk policy, isn't it?**

MR. MYERS: Objection of form.

**Q. This policy is written on all-risk form, isn't it?**

A. Correct.

**Q. If it's written on all-risk form, why do you need clauses such as the clause of bill of lading clause, the shore perils clause, the Inchmaree clause, the explosion clause?**

A. Some of those clauses are American

[Page 88]

Bartsch

Institute cargo clauses, which are standard in the industry.

**Q. I understand they are standard. But if this is written, if this coverage which was issued by AGCS to World Fuels under clause 11 is written on an alll-risk form, why do you need these other peril clauses?**

A. To further explain the coverage.

**Q. Any other reason?**

A. Some clauses extend coverage of all risk.

**Q. Do any of these clauses extend the all-risk coverage that I've just mentioned?**

A. Which clause are you referring to?

**Q. The explosion clause. Wouldn't an explosion be part of an all risk?**

A. Yes.

**Q. Wouldn't the Inchmaree perils be included in all risk?**

A. Yes.

**Q. Wouldn't the perils clause be included in an all-risk cover?**

MR. MYERS: Objection. Form.

A. The shore perils clause?

[Page 89]

Bartsch

**the claim is being brought under the bulk oil clause guaranteed outcome provisions?**

MR. MYERS: Objection to form and foundation. And asked and answered.

MR. SATNICK: You can answer. Do you have an understanding given the fact that you already said you didn't review the claim materials.

A. I say the claim is brought under the bulk oil clauses guaranteed outturn wording in the policy, subject to the other clauses in conjunction with that term.

**Q. But I believe you testified that if any particular term is contrary to the term set forth in bulk oil clauses, the bulk oil clauses would be the superior clause --**

MR. MYERS: Objection.

**Q. -- and be effective; is that correct?**

MR. MYERS: Objection. Form. Foundation, mischaracterizes the prior testimony.

MR. SATNICK: I will object as

[Page 94]

Bartsch

well since whatever he testified to before he testified to. It's a matter of record.

MR. NICOLETTI: You still have to answer.

A. I continue to say that it's all clauses are taken into conjunction with each other in the policy. Bulk oil clauses, guaranteed outturn coverage.

**Q. If any clause is contrary to a clause in the bulk oil clauses, which takes precedence?**

A. The broader clause.

**Q. The broader clause, not the bulk oil clause?**

A. Whatever the broader coverage is represented in the policy by a clause, that clause prevails.

**Q. And is there any statement or clause in this policy which supports that statement?**

A. There is no definition of that nature in the policy.

**Q. Any words in this policy that say that the broader term applies even where more**

[Page 95]

Bartsch

**specific term applies?**

MR. MYERS: Objection. Form.

A. No.

**Q. Mr. Bartsch, were you involved with the initial communications between Willis and World Fuels where it was discussed that Willis would become the broker of World Fuels for placing insurance?**

A. To some extent, yes.

**Q. And when did that take place?**

A. It was 2013.

**Q. Is that the first time you had any contact with World Fuels?**

A. Yes.

**Q. And who was at the meeting?**

MR. MYERS: Objection. Form.

**Q. Was there a meeting?**

A. Yes.

**Q. And who was at the meeting?**

A. Many people.

**Q. Can you identify those people?**

A. All Willis people.

**Q. I'm sorry?**

A. All Willis people and several oil

[Page 96]

Bartsch

fuel risk management people.

**Q. Let's start with World Fuels risk management people. Was Mr. Hornaday there?**

A. Yes.

**Q. Okay. Who else?**

A. They had a young lady working for them at the time.

**Q. Do you recall her name?**

A. No.

**Q. Anybody else?**

A. I don't recall.

**Q. When did this meeting take place, in the beginning of 2013, middle, end?**

A. I would say in the middle.

**Q. Sometime during the summer of 2013?**

A. Yes.

**Q. And who at Willis attended this meeting?**

A. Myself, Jerry Gallo, Thadd Wallace, and five or six other Willis brokers.

**Q. Who was there for purposes of the marine insurance broker?**

A. Myself and Jerry Gallo.

**Q. Now, how did it come about that**

[Page 97]

Bartsch

me.

**Q. Was it a checklist?**

A. Pretty much.

**Q. Any other documents or information which you and Mr. Frandsen discussed that you considered necessary to present to the AGCS as part of the claims submission?**

MR. MYERS: Objection. Form. Foundation. You are assuming all of that in your prior questions --

MR. NICOLETTI: You don't have to -- we don't need a speaking objection.

MR. MYERS: -- exist in your prior questions.

MR. NICOLETTI: We do not need a speaking objection. You have limited your objection to form. You have stated your objection.

I would ask your counsel to ask you to answer the question.

MR. SATNICK: Can I have the question back? I lost it.

(Whereupon, at this time, the requested

[Page 118]

Bartsch

portion was read by the reporter.)

**Q. For the pending loss.**

MR. MYERS: Same objections.

A. I don't recall.

MR. NICOLETTI: Let's have this next document marked as Bartsch 8. It is W-WF-0003046 through and including 3065.

(Whereupon, at this time, the reporter marked the above-mentioned presentation to brokers as Bartsch Exhibit 8 for identification.)

BY MR. NICOLETTI:

**Q. Can you identify that document, Mr. Bartsch?**

A. This is a World Fuel presentation to the brokers.

**Q. So was it part of the initial process of obtaining the broker of record letter?**

MR. MYERS: Objection. Form. Foundation and speculation.

A. I would say no.

**Q. I'm trying to figure -- I'm trying**

[Page 119]

**Bartsch**

**to understand what purpose this document served, if any.**

A. This was intended to give us a presentation for the underwriters.

**Q. Now, in presenting -- was this for the marine policy?**

A. I think --

**Q. Bartsch 8?**

A. Yes.

**Q. Was any of the information contained in Bartsch 8 sent to the underwriters as part of the policy negotiations or solicitation?**

MR. SATNICK: Or submission?

MR. NICOLETTI: Solicitation or submission. Submission is a technical term for these people. That's why I use the word solicitation.

A. I don't recall if this specific document went to the market.

**Q. Did you draw -- were you the person who was responsible at Willis for soliciting quotes from the underwriters for the marine cargo policy?**

[Page 120]

**Bartsch**

A. Yes.

**Q. Did you use any or all of the information contained in Bartsch 8 as part of that solicitation?**

A. Again, I don't recall.

MR. NICOLETTI: Let me have this next document marked as 9. It bears production numbers W-WF-0002954 through and including 2959.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail submission to Allianz as Bartsch Exhibit 9 for identification.)

BY MR. NICOLETTI:

**Q. I'd like you to review that document, Mr. Bartsch.**

**(Witness peruses document.)**

**Q. My first question is, can you identify the first page of Bartsch number 9?**

A. Yes.

**Q. What is that?**

A. An e-mail submission to Noreen at Allianz.

[Page 121]

Bartsch

**Q. And what part of this document is this submission itself? What part of Bartsch 9? Is it everything that follows the cover page?**
A. Yes.
**Q. At the time that you took this account over, who underwrote the cargo policy for World Fuels?**
A. AIG.
**Q. Did you attempt to renew the policy with AIG?**
A. I believe so.
**Q. And who else did you solicit, which other underwriters?**
A. Katlyn.
**Q. Anybody else? Was that Katlyn U.S. or Katlyn London?**
A. U.S.
**Q. Anybody else?**
A. The London market.
**Q. When you say London market, who at the London market were you soliciting?**
A. Well, via Willis London. So --
**Q. So it could have been more than one**

[Page 122]

**Bartsch**

**underwriting group in London; is that correct?**
A. Correct.
**Q. Do you recall which underwriting groups -- London underwriting groups were approached by your London office?**
A. No.
**Q. Now, as we go into this document, on Bartsch 9, on W-WF-2957 there is a caption which says, questions and answers towards the bottom.**
A. Yes.
**Q. Who posed those questions?**
MR. MYERS: Objection to form.
**Q. If anyone.**
A. I don't recall. It was not me.
**Q. Do you know where the source of this question and answer section -- what is the source of the question and answer section which appears in your submission?**
A. Who asked the questions?
**Q. Where did you get the information under question and answers that you submitted to the markets?**

[Page 123]

**Bartsch**

A. Questions came from, the market answers came from World Fuel.
**Q. Do you know which underwriter asked what question or did you just put everything together in one big submission?**
A. Everything was consolidated into one.
**Q. The first question says transit.**
**Do you see that?**
A. Yes.
**Q. It says who is responsible for transit in the flash title sales. What was meant by responsible for transit?**
MR. MYERS: Objection. Form.
**Q. If you know.**
A. Who was shipping the cargo.
**Q. Who was shipping the cargo? What do you mean by who was shipping the cargo?**
A. The party that was shipping the cargo.
**Q. Is it that the buyer; is that the seller?**
A. That's what was meant by transit.
**Q. I know, but you say who was shipping**

[Page 124]

**Bartsch**

**the cargo. I'm trying to figure out who the who is. Is that the buyer, is that the seller, is that World Fuels?**
A. I mean, it says who is responsible for transit.
**Q. Right.**
A. In flash title sales.
**Q. Right.**
A. And the response is the supplier or the customer, depending on the transaction.
**Q. Am I to understand then in a flash title transaction, World Fuels is responsible for neither of the -- is not responsible for the transit?**
MR. MYERS: Objection to form. Foundation.
A. I disagree.
**Q. I'm just trying to understand what you're telling me.**
A. Right. It could be either.
**Q. It could be either what?**
A. It could be either the customer, the supplier or World Fuel.
**Q. Right, but in this document, it**

[Page 125]

Bartsch

MR. NICOLETTI: Let's have this next document marked as Bartsch number 10. It bears production numbers W-WF002942 and 2943.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail correspondence regarding quotes as Bartsch Exhibit 10 for identification.)

BY MR. NICOLETTI:

**Q. Mr. Bartsch, during your solicitation for the marine cargo policy in 2013, was any of your solicitation over the phone?**

A. To try and get the account?

**Q. No. To try to place the account.**

A. I'm sure, yes.

**Q. Did you speak -- who at -- I gather you were marketing it to London?**

A. Yes.

**Q. But that was through your London office; is that correct?**

A. Yes.

**Q. Did you have any direct**

[Page 130]

**Bartsch**

**communications with the London market?**

A. No.

**Q. With regard to the Katlyn placement here in the United States, who at Katlyn did you solicit?**

A. In all likelihood Alan Elias (phonetic).

**Q. Do you have any specific recollection of any conversations with Mr. Elias?**

A. No.

**Q. With regard to AIG, who was the contact?**

A. I don't recall actually.

**Q. Do you recall any conversations that you may have had?**

A. No.

**Q. I believe the remaining solicitation went to Allianz; is that correct?**

A. Yes.

**Q. Who at Allianz did you speak with?**

A. Noreen Brosnan.

**Q. Anyone else?**

A. Brian McClintock.

[Page 131]

Bartsch

**Q. Do you recall what you said to Ms. Brosnan?**

A. No.

**Q. Do you recall what you said to Mr. McClintock?**

A. No.

**Q. At any time did you discuss with either Ms. Brosnan or Mr. McClintock any of the specific terms and conditions in the Willis form?**

A. No.

**Q. At any time during your conversations with Ms. Brosnan and Mr. McClintock, did you ever express your understanding of the available coverages under the Willis form?**

A. No.

**Q. At any time during your conversations with Ms. Brosnan or Mr. McClintock, did you ever express your understanding of how the policy attached to each individual shipment?**

A. No.

**Q. At any time you had conversations**

[Page 132]

**Bartsch**

**with Ms. Brosnan or Mr. McClintock, did you ever discuss with them when coverage would end for each particular shipment?**

MR. MYERS: Objection. Form.

A. Yes.

**Q. With whom did you have that conversation?**

A. Probably both.

**Q. And what -- was that conversation in regard to any specific clause?**

A. No.

**Q. Was that conversation -- well, you say you discussed with them when coverage would end for a particular shipment. What was that in relation to if not the policy terms and conditions?**

A. It was in relation to inventory.

**Q. Okay. It's the warehouse endorsement you're talking about?**

A. (Indicating).

**Q. Let me refine my question.**

**Did you have any discussions with either Mr. McClintock or Ms. Brosnan with regard to when coverage would end in regards**

[Page 133]

Bartsch

to a transit coverage for a particular shipment?

MR. MYERS: Objection. Form.

A. No.

Q. Let me direct your attention to Bartsch 10.

Before I go there, did you speak to anyone other than your attorney about your upcoming deposition?

A. Willis attorney.

Q. Other than the Willis --

A. In-house.

Q. Did you speak to anyone at World Fuels about your upcoming deposition?

A. No.

Q. Did you speak to any representative other than the Willis people of World Fuels concerning your upcoming testimony?

A. No.

Q. Let me go back to Bartsch 10.

Can you identify this document?

A. This is from myself to David Hornaday regarding the quotes from Allianz and London.

[Page 134]

Bartsch

Q. And what about AIG?

MR. MYERS: Objection. Form.

Q. Did you have any conversations in connection with this e-mail about the AIG quote?

A. I would say, no.

Q. Did Katlyn ever quote for this marine cargo policy?

A. No. They offered quota share.

Q. In other words, they weren't willing to take 100 percent of the risk, is that correct?

A. Yes.

Q. Was it Willis' desire to place this coverage with a single underwriter for 100 percent participation?

A. No.

Q. Why did you not pursue a quote share interest that Katlyn expressed?

A. Their quote was not a lead quote.

Q. Am I correct -- did any of the other underwriters express any interest of only -- of subscribe to participation or subscription policy as the lead?

[Page 135]

Bartsch

A. No.

Q. Now, during these conversations with Mr. Hornaday, did you ever discuss with him how and when the policy would attach to each of the World Fuel shipments?

MR. MYERS: Objection. Form.

A. No.

Q. Did you ever discuss with Mr. Hornaday or anyone else at World Fuels when coverage would end in regards to these particular shipments for the transit portion of the policy?

A. No.

Q. Did they ever make inquiry of the duration of coverage for each of their shipments?

A. I don't recall.

Q. If you had such conversation, would it be recorded in any writing?

A. Not necessarily.

Q. Am I correct in my understanding your testimony was there were times when you would memorialize a telephone or in-person conference and other times where you would

[Page 136]

Bartsch

not; is that correct?

MR. MYERS: Objection. Form.

A. No. It's not correct.

Q. Okay. How is it not correct?

A. If there was something to do with coverage or the quotations and we spoke about it, it would generally be followed up in writing.

Q. Okay. So with regard to any oral conversations you have had or may have had, it is your practice then if it concerns coverage or premium, you make some form of note or confirming e-mail?

A. Generally, yes.

Q. What are the exceptions? Attorneys hate generally, that's why.

A. I would say it's not a question on the coverage itself, but just a general question with regards to the market and so forth. I would just do it verbally.

Q. Let me see if I understand this correctly. If you have a specific conversation about a quote on coverage, that is something you will always memorialize in

[Page 137]

Bartsch

**warehouse at that time?**

A. No.

**Q. There was no warehouse coverage?**

A. No.

**Q. Under what policy provision was the claim paid, do you know?**

A. Fraudulent bill of lading.

**Q. And it was a document which caused the release of the cargo from the location, correct?**

MR. MYERS: Objection to form.

A. Correct.

MR. NICOLETTI: Let me have this next document marked as Bartsch 12 for identification. It bears production control numbers W-WF-0002812 through and including 002829.

(Whereupon, at this time, the reporter marked the above-mentioned Allianz quote as Bartsch Exhibit 12 for identification.)

BY MR. NICOLETTI:

**Q. Mr. Bartsch, can you identify this,**

[Page 154]

Bartsch

**the top page of this document?**

A. Yes.

**Q. What is it?**

A. Noreen Brosnan's quote from Allianz on World Fuel.

**Q. And the balance of the document is what?**

A. It's the actual quote.

**Q. The actual quote itself?**

A. Yes.

**Q. Now, when you received this quote, did you have any conversations with Ms. Brosnan about insuring flash transactions?**

A. I don't recall.

**Q. Do you recall having any discussions with Ms. Brosnan after receiving her quote?**

A. Yes.

**Q. And what were those conversations?**

A. Again, I don't recall, but more refinement of the policy mostly guaranteed outturn wording.

**Q. What part of the guaranteed outturn wording were you discussing?**

A. Their wording was not as broad as

[Page 155]

Bartsch

guaranteed out there more than we were accustomed to.

**Q. Are the bulk oil clauses basically printed clauses?**

MR. MYERS: Objection. Objection. Form. Go ahead.

MR. NICOLETTI: You can answer.

**Q. You know what I mean by printed clauses?**

A. Bulk oil clauses, SP 13C are printed clauses.

**Q. And what about the guaranteed outturn clauses?**

A. No.

**Q. So you had discussions with Ms. Brosnan and did you -- what did you do as a result of those conversations?**

A. We provided Noreen with the guaranteed outturn wording that we preferred.

**Q. That's what I was getting at. So you -- so when Ms. Brosnan gave you her quote you were not completely satisfied with the AGCS wording for bulk oil coverage guaranteed outturn, and you, Willis, supplied them with**

[Page 156]

**Bartsch**

**your terms and conditions for the bulk liquid or bulk oil clauses; is that correct?**

A. Yes.

**Q. And ultimately did Ms. Brosnan accept those terms?**

A. Yes.

**Q. Now, other than the discussions we just went through, did you have any other discussions with Ms. Brosnan concerning her quote?**

A. Could I refresh my memory?

**Q. That's why I gave you the quote.**

**(Witness peruses document.)**

A. I don't recall specific conversations.

**Q. Do you recall generally what you talked about with Ms. Brosnan --**

A. No.

**Q. -- concerning the AGCS quote?**

A. No.

**Q. Now, if you note, you received a quote from Ms. Brosnan on September 24, around 3:51 p m. in the afternoon. Do you see that?**

[Page 157]

Bartsch

**Q. So during these communications with Mr. Hornaday, did you ever discuss with him a temporal period of coverage for his shipments?**

MR. MYERS: Objection of form.

A. I'm sorry, say that again?

**Q. During your communications with Mr. Hornaday about the quotes, Allianz, London, at any time did you ever discuss with him how the Allianz policy would attach to a particular shipment and for the period the coverage would be in effect?**

A. No.

MR. NICOLETTI: Let's mark these next three documents as Bartsch exhibits.

MR. SATNICK: 14, 15, and 16.

MR. NICOLETTI: Perfect.

MR. SATNICK: I'm keeping track. I have to do something to stay awake.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail correspondence re coverage for

[Page 162]

Bartsch

storage as Bartsch Exhibit 14 for identification.)

(Whereupon, at this time, the reporter marked the above-mentioned revised quote from Allianz as Bartsch Exhibit 15 for identification.)

(Whereupon, at this time, the reporter marked the above-mentioned e-mail re revised quote as Bartsch Exhibit 16 for identification.)

MR. NICOLETTI: Bartsch 14 will bare production control numbers W-WF-0002786, include and including 2788.

Bartsch 15 will consist of documents bearing Bates numbers W-WF-0002782 through and including 2785.

And Bartsch 16 will be a document bearing Bates numbers W-WF-0002780 and 2781.

(Witness peruses document.)

MR. MYERS: Is 16 this Thursday September 26th e-mail?

[Page 163]

Bartsch

MR. NICOLETTI: That's it.

MR. MYERS: Thank you.

BY MR. NICOLETTI:

**Q. Mr. Bartsch, let me go one at a time. Let's look at Bartsch 14. Can you identify that document?**

A. This is an e-mail from Noreen at Allianz discussing coverage for storage and Brazil.

**Q. That's the very first e-mail on the exhibit; is that correct? It's an e-mail string?**

A. Yes. That's the first e-mail on top, yes.

**Q. Right. But am I -- are these e-mails the continued negotiations you had with Ms. Brosnan at AGCS leading up to the possible placement of the policy with Allianz?**

A. Yes.

**Q. And the subject matters discussed in this e-mail string are premium; is that correct?**

A. Yes.

[Page 164]

Bartsch

**Q. Storage losses and deductibles?**

MR. SATNICK: Is that a question?

MR. NICOLETTI: Yes.

**Q. Is that also being --**

MR. SATNICK: I just heard you make a statement. I didn't hear a question.

**Q. Is that also being discussed in this e-mail string?**

A. Not necessarily.

**Q. Well, it says on the first page, perhaps, that they are now willing to take a deductible of .05 percent subject to the minimum of 250,000 full storage losses?**

A. Right.

**Q. Does that refresh your recollection that that was a topic being discussed in these e-mails?**

A. Oh, yes. I just wanted to be sure that we weren't talking about actual storage losses.

**Q. I said that, but that's okay.**

**Do you recall discussing any other**

[Page 165]

Bartsch

**items about the potential coverage to be afforded under the Allianz policy other than what's reflected in Bartsch 14?**

A. I don't recall.

**Q. Now, had you had any discussions concerning the bulk oil clauses guaranteed outturn they would have been reflected in this e-mail?**

MR. MYERS: Objection. Form.

A. No.

**Q. Excuse me?**

A. Not in this specific e-mail.

**Q. But it would be recorded in some e-mail, would it not?**

MR. MYERS: Same objection.

A. Yes.

**Q. Let's turn now to Exhibit 15. Can you identify this group of documents which I will represent to you is another e-mail string?**

**(Witness peruses document.)**

A. This is the revised quote from Allianz.

**Q. And what were the revisions to the**

[Page 166]

Bartsch

**original quote?**

A. Premium.

**Q. Okay. Anything else?**

A. Storage deductible.

**Q. Anything else?**

A. And a revised quote for premium on Brazil.

**Q. Do you recall having any other discussions about the policy terms and conditions outlined in the Allianz quote other than what's reflected in Bartsch 15?**

A. Not at this time.

**Q. If there was something else would it be in writing?**

A. Yes.

**Q. Let me turn your attention now to Bartsch 16, which is another e-mail string.**

**Can you identify what this document is?**

A. This is providing David Hornaday at World Fuel the revised quote from Allianz.

**Q. Then you send this out roughly on Thursday, September 26, 2013?**

A. Yes.

[Page 167]

Bartsch

**Q. And this followed on all of your negotiations with Ms. Brosnan about the revised quote; is that correct?**

A. Yes.

**Q. Again, other than what's reflected in this e-mail you sent to Mr. Hornaday, did you have any further -- did you discuss anything further with him about the revised quote or the Allianz quote in general?**

A. I don't recall.

**Q. Did you ever make any phone calls to Mr. Hornaday about the Allianz quote?**

A. Yes.

**Q. When did they take place in reference to these e-mails?**

A. At the same time.

**Q. Do you recall speaking to Mr. Hornaday after you sent him the revised quote as reflected in Bartsch 16?**

A. I don't recall.

**Q. If that conversation with Mr. Hornaday involved any additional requests or explanation of coverage, is that something you would have put in writing?**

[Page 168]

Bartsch

A. Yes.

MR. NICOLETTI: Let's have this next document marked as Bartsch 17. It bears production control numbers W-WF-0002770 through and including 2772.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail to Malcolm Tyler as Bartsch Exhibit 17 for identification.)

BY MR. NICOLETTI:

**Q. Mr. Bartsch, please review Bartsch 17, which I will represent to you is an e-mail from yourself to Tyler, to Malcolm Tyler, and it looks like Rosalind Spittle.**

**Do you see that?**

A. Yes.

**Q. Who is Malcolm Tyler and who is Rosalind Spittle?**

A. Willis marine brokers in London.

**Q. What are you telling them?**

A. I'm giving them an update on the quote between Allianz and London.

**Q. And it says here, I think client**

[Page 169]

**Bartsch**

A. I'm sorry.

**Q. You indicated early on that Ms. Brosnan had sent you a form which you found too limited, correct?**

A. Correct.

**Q. My question is, are these the terms you provided her?**

A. I don't know.

**Q. Okay. We will move on. I think we can clarify that later.**

MR. MYERS: We have gone for about an hour. Should we take a bio break before completing?

MR. NICOLETTI: We can.

VIDEOGRAPHER: Okay. Stand by. The time right now is 3 p m. and we are off the record.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: This marks the beginning of tape number four. The time right now is 3:10 p.m. We are back on the record.

MR. NICOLETTI: Let's have this

[Page 174]

Bartsch

next document marked as Bartsch 20 for identification. It bears production control numbers W-WF-0002275 through and including 2743.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail to David Hornaday as Bartsch Exhibit 20 for identification.)

BY MR. NICOLETTI:

**Q. Can you identify that document, sir, the first two pages?**

**(Witness peruses document.)**

A. It's an e-mail to David Hornaday.

**Q. Okay.**

A. Advising that we bind coverage with Allianz, but we needed his clarification on a couple of questions from Allianz.

**Q. And what were those questions?**

A. I'm reading through.

**Q. Please do.**

**(Witness peruses document.)**

A. One question has to do with funding location limits for inventory insurance to

[Page 175]

Bartsch

get David's approval of the limit.

**Q. Anything else that needed clarification as of October 1, 2013 with regards to the policy that AGCS has agreed to issue?**

A. Whether they -- World Fuel wants to purchase TRIA insurance, terrorism, for an additional premium of 25,000. We also question whether World Fuel would like to include the Brazil local policy effective October 1st. And it was a general question on how often in the past World Fuel used guaranteed outturn insurance.

**Q. The bulk oil clause is guaranteed outturn; is that correct?**

A. Yes.

**Q. Attached to it is the quote you sent on to -- the Allianz quote you sent on to Mr. Hornaday?**

A. Yes. Also asked about local policies in our countries including Canada.

**Q. Under other items it says Allianz's preference would be to maintain the broad form all-risk coverage with the GOT which I**

[Page 176]

**Bartsch**

**assume is guaranteed outturn option?**

A. Yes.

**Q. What did you understand Allianz to be saying there?**

A. They want the primary coverage to be all risk. Not guaranteed outturn.

**Q. And how was that finally resolved?**

A. They agreed to guaranteed outturn coverage as the primary coverage.

**Q. But it would still be on all-risk terms, though?**

A. All risk extended to include shortage leakage, howsoever arising.

**Q. That's the guaranteed outturn portion, is it?**

A. Yes.

MR. NICOLETTI: Let's have this next document marked as Bartsch 21. It bears production control numbers W-WF-0002701 through 2724.

(Whereupon, at this time, the reporter marked the above-mentioned revised quotation as Bartsch Exhibit 21 for identification.)

[Page 177]

Bartsch

BY MR. NICOLETTI:

**Q. Focus on the pages of Bartsch 21, the first page which is 2071 through and including 2707.**

**Can you identify that group of documents?**

**(Witness peruses document.)**

A. This is Noreen at Allianz's revised quotation.

**Q. Well, if you look at Bartsch 20, that's dated October 1, 2013 at 9:59 a.m. and this one is at 10:31 a.m.**

**Is this a revised quotation or is this a revised binder or order?**

A. This is the revised quote based on the agreed changes.

**Q. Okay. Was it your understanding that as of October 1st, Allianz had agreed to issue this policy?**

A. Yes.

**Q. But you're still working out the details?**

A. Yes.

**Q. Again, do you recall having any**

[Page 178]

**Bartsch**

**discussions with Ms. Brosnan during this rapid exchange of negotiations on the final form of the Allianz policy concerning the attachment of coverage to any shipment --**

A. No.

**Q. -- concerning the ending of coverage for any shipment?**

A. No.

**Q. Now, during this period of time where you are having this continuous exchange of discussions through e-mails with Ms. Brosnan about various elements of the policy, are you in constant contact with Mr. Hornaday?**

MR. MYERS: Objection to form.

**Q. Are you in contact with Mr. Hornaday?**

A. I don't recall the specific days that I was in contact with him.

**Q. Were there times when you had exchanges with Ms. Brosnan where you would not update Mr. Hornaday immediately?**

A. Yes.

**Q. How did you decide when to contact**

[Page 179]

**Bartsch**

**Mr. Hornaday immediately and when not to?**

MR. MYERS: Objection. Form. Assumes facts not established.

MR. NICOLETTI: You can answer subject to your attorney's comments.

MR. SATNICK: Go right ahead.

A. When the agreement was reached on any changes.

**Q. So during the back and forth until you got something final from AGCS, you would not contact Hornaday; is that correct?**

MR. MYERS: Same objections.

A. Until it was finalized, yes.

MR. NICOLETTI: Let's have this marked as Bartsch Exhibit 22. It bears production control numbers W-WF-0002680 through and including 2700.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail with revised terms as Bartsch Exhibit 22 for identification.)

BY MR. NICOLETTI:

**Q. Can you identify the documents of**

[Page 180]

**Bartsch**

**exhibit Bartsch 22 from W-WF-2680 through 2683? What do these documents represent?**

A. These are revised terms, so to speak, that represented and agreed with World Fuel -- these were revised terms that were agreed with and discussed with World Fuels to the policy.

**Q. And where they did agree they put the words as agreed before each particular items you were discussing?**

A. Yes.

**Q. Again, we have other items, and is Allianz still discussing using the broad form bulk oil clauses as opposed to the bulk oil clauses guaranteed outturn?**

A. Yes.

**Q. So this is still an open issue as of October 1st --**

A. Yes.

**Q. -- at -- 2013 at 10:46?**

A. Yes.

**Q. Again, you had no discussions concerning when coverage would attach to a shipment or when it would not?**

[Page 181]

Bartsch

A. Correct.

**Q. Is that correct?**

A. Correct.

MR. NICOLETTI: Let's mark this last group of documents I have in this folder as Bartsch 23.

MR. SATNICK: What a tease.

MR. NICOLETTI: Let's mark this document, Exhibit 23, bears control numbers W-WF-002676 through and including 0002679.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail correspondence as Bartsch Exhibit 23 for identification.)

BY MR. NICOLETTI:

**Q. Mr. Hornaday, can you identify this document Bartsch 23?**

A. This is an e-mail from Noreen at Allianz to myself asking for which option of coverage World Fuel wishes to bind.

**Q. What were the options?**

A. Basically premium and whether you chose a lower premium or the higher premium

[Page 182]

Bartsch

and one included the profit sharing, one didn't.

**Q. Anything else in this e-mail from Ms. Brosnan to yourself which is dated October 1, 2013 at 12:04 p.m.?**

MR. MYERS: Other than what it says? Objection. Form.

**Q. You understand, anything else being discussed other than those options?**

A. No.

**Q. Look at pricing slash terms applicable to both options.**

A. Right.

**Q. It says, we will agree to GOT cover for vessel shipments.**

**What was your understanding of that statement?**

A. That would be the primary insurance on all bulk liquid shipments, guaranteed outturn.

**Q. So Allianz agreed not to include bulk oil liquids broad form; is that correct?**

A. Well, they included guaranteed outturn as the primary coverage with bulk oil

[Page 183]

Bartsch

clauses SP 13C as the fallback position.

**Q. That's a limited coverage, isn't it?**

A. Be yes.

**Q. The SP 13 form is not guaranteed outturn broad form, that's a separate form, isn't it?**

A. Correct.

**Q. So at this point Allianz has agreed not to include as one of the bulk oil clauses the broad form; is that correct?**

A. What do you mean by broad form?

**Q. No guaranteed outturn.**

A. I'm sorry, guaranteed outturn is the agreed coverage.

**Q. Do you know if there are more than one or two or three bulk oil clause groupings?**

A. I don't know. SP 13C is historically the printed form.

**Q. That's the most limited coverage?**

MR. MYERS: Objection. Form.

**Q. Or more limited than --**

A. More limited than guaranteed outturn, yes.

[Page 184]

Bartsch

**Q. But there is also something called -- also bulk liquid -- bulk oil liquid clauses dash broad form, are there not?**

A. Yes.

**Q. So there are three basic forms?**

A. Yes.

**Q. Right. So Allianz agreed not to use the broad form but agreed to use the GOT or guaranteed outturn; is that correct?**

A. Yes.

**Q. And you -- and Willis supplied them with that form for guaranteed outturn; is that correct?**

A. Yes.

MR. NICOLETTI: Let's mark this next group of documents marked as Bartsch Exhibit 24. It bears production control numbers W-WF-0002629 through and 2636.

(Whereupon, at this time, the reporter marked the above-mentioned e-mail confirmation as Bartsch Exhibit 24 for identification.)

BY MR. NICOLETTI:

[Page 185]

Bartsch

A. It was early on.

**Q. You were trying to help your insured --**

A. Correct.

**Q. -- present a claim that would be payable; isn't that correct?**

A. Correct.

**Q. Part of that process, you are going out to other underwriters to get their views on the fraudulent bill of lading clause; isn't that correct?**

A. Correct.

**Q. And you contacted underwriters, possibly Mr. Lang, possibly Mr. Secora?**

A. Possibly.

**Q. What other underwriting companies do you do a volume of business with or whom you feel comfortable making inquiries?**

A. Travelers.

**Q. Who at Travelers did you contact?**

A. Again, there are numerous underwriters at these carriers and I don't recall specifically who I might have spoke to, and I'm sure they wouldn't remember.

[Page 214]

Bartsch

**Q. Well, some of them do maybe. My question to you is, as you sit here today, you make a statement in your e-mail to your colleague in London, you're checking the market but you can't recall anyone at the market who you actually checked with; is that correct?**

A. Not specifically, no.

**Q. Do you recall what they said to you?**

A. That, I mean, the general feeling is that coverage is provided based on the full extent of the coverage, if they knew it was the Willis form.

**Q. But you specifically asked them about the fraudulent bill of lading clause, did you not?**

A. Correct.

**Q. What did they say to you about the fraudulent bill of lading clause, if you can recall?**

A. Again, I can't recall. It wasn't e-mail written form. It was general discussion over lunch or something.

**Q. Well, did you discuss with them what**

[Page 215]

**Bartsch**

**was meant by other shipping documents, which is the last phrase in the fraudulent bill of lading clause?**

A. Yes.

**Q. Do you recall what they said to you about what would be made up or would be defined as other shipping documents?**

A. In general terms the discussion was based on other shipping documents.

**Q. Right.**

A. And they asked me, what do you have as a shipping document. And I respond, we have a contract which is an agreement to supply and ship gas oil for the DLA.

**Q. So you told them that?**

A. Sure.

**Q. And what did they say, if you can recall?**

A. Based on the contract to ship fuel oil that would be a shipping document.

**Q. And which of the underwriters said that?**

A. Again --

**Q. I'll check with them, don't worry.**

[Page 216]

**Bartsch**

A. I don't recall.

**Q. They are all my friends, I can call. Thank you.**

**Now, you go on to say, we have an alleged phony solicitation for bid which WFS signed. That's the contract you were referring to?**

A. Yes.

**Q. How come you don't say in this e-mail, and we consider that to be a fraudulent document, a fraudulent shipping document, if that's your conclusion?**

A. Again, I'm soliciting resources to get background information on what they feel about the fraudulent bill of lading clause. I'm not presenting a claim for payment until I know the facts and I have all this information I can get from the market.

**Q. Well, you don't present the claim anyway, Mr. Frandsen does that?**

A. Correct.

**Q. So you're trying to help Mr. Frandsen?**

A. I'm trying to help the client, you

[Page 217]

Bartsch

know, and understand what happened at the same time.

**Q. Have you read any textbooks, any professional source material, which defines a sales contract or a purchase order as a shipping document?**

MR. MYERS: Objection. Form.

A. Nothing -- no textbook that I can recall.

**Q. When you talked to these underwriters whose names you can't recall, did any of them reference you to any material which would support the contention that a purchase order or sales contract is a shipping document?**

A. They didn't direct me to any resource.

**Q. Did they --**

A. Their opinion, the shipment would not have occurred without the contract and the purchase order.

**Q. True. But you didn't need the contract to put the cargo in the vessel, did you, for its carriage?**

[Page 218]

**Bartsch**

MR. MYERS: Objection of form.

**Q. Did you?**

MR. MYERS: Foundation.

**Q. Isn't that an independent charter policy or charter contract?**

A. I'm not --

**Q. Are you familiar with shipping documents?**

A. Yes.

**Q. Other than bills of lading, what other shipping documents are you familiar with?**

A. Contract of affreightment.

**Q. Okay. That's a charter party. What else?**

A. A charter.

**Q. Okay.**

A. Of course, bill of ladings. Those are the general shipping documents that form part of the contract that the contract calls for you to arrange for the shipping.

**Q. So is it your understanding that any contract that arranges for shipping is a shipping document?**

[Page 219]

**Bartsch**

A. Yes.

**Q. What's the basis of that understanding?**

A. Without that contract calling for a delivery of the gas oil, you would have no need for shipping documents.

**Q. No need for shipping documents. So --**

A. Which includes the contract, and the purchase order.

**Q. Okay. And --**

A. But if you go to customs or any --

**Q. Do you have any --**

MR. SATNICK: Let him finish the question, please.

**Q. Okay. Keep going, keep going.**

A. If you go to customs on an import, you have to show all the documents with regard to the shipment which includes invoices and purchase orders.

**Q. Does it include a contract for purchase?**

A. I'm sure it does.

**Q. What's your background in customs?**

[Page 220]

**Bartsch**

A. I have no background in customs.

**Q. Do you know what customs actually requires to clear cargo?**

A. It varies by country.

**Q. In United States?**

A. You need a customs bond.

**Q. Anything else?**

A. Proof that you paid the duty.

**Q. Anything else?**

A. Invoice.

**Q. Anything else?**

A. Invoice.

**Q. The invoice. Contract of sale?**

A. Yes. Invoice.

**Q. You consider an invoice a contract for sale?**

A. Interchangeable.

**Q. Okay.**

MR. SATNICK: It's 4 o'clock, folks.

MR. NICOLETTI: I got one more thing I want to go into with him.

MR. SATNICK: Make it brief.

MR. NICOLETTI: I will.

[Page 221]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

AGCS MARINE INSURANCE COMPANY,

Plaintiff,

-against-

WORLD FUEL SERVICES, INC. and WORLD FUEL SERVICES EUROPE, LTD.,

Defendants.

-------------------------------------X

August 26, 2015

10:08 a.m.

VOLUME II

THE CONTINUED VIDEOTAPED EXAMINATION BEFORE TRIAL of ROBERT BARTSCH, a Non-Party Witness, by John Nicoletti, held at 88 Pine Street, 7th Floor, New York, New York 10005, before a shorthand reporter and Notary Public within and for the State of New York.

R. BARTSCH

**You have before you now Bartsch 34.**

**Have you ever seen this document before?**

A. I don't recall seeing it.

**Q. Okay. Move on.**

**Let's have this next document mark as Bartsch 35. Control W-WF four zeros 2999 through and including 301.**

**Mr. Bartsch, I will take something out of order.**

**Prior to coming here today, have you ever met with any counsel for World Fuels to discuss your deposition?**

A. No.

**Q. Have you ever met anyone from World Fuels counsel office?**

A. No.

**Q. Between your last deposition and today have you discussed this matter with anybody at World Fuels?**

A. No.

**Q. Between your last deposition and today, have you ever discussed this matter with anyone at Willis?**

[Page 266]

R. BARTSCH

A. No.

**Q. Have you ever discussed between your last deposition and today, have you ever discussed this matter with anyone with the exception of your attorney?**

A. No.

MR. SATNICK: That would include me.

A. Still no.

EXAMINATION BY

MR. NICOLETTI:

**Q. Let me hand you what is marked as Bartsch 35.**

**Have you ever seen this document before?**

A. I don't believe so, no.

**Q. Lets have this document marked as Bartsch 36.**

**W-WF four zeros 496 through 499.**

**Mr. Bartsch, handing you what's marked as Bartsch 36.**

**Can you identify this document.**

A. It's e-mail from M. Cantor Willis Crime with to John Frandsen Willis Claims

[Page 267]

R. BARTSCH

on the crime policy.

**Q. Your were copied on this?**

A. Yes.

**Q. And this e-mail is dated June 19, 2014?**

A. Yes.

**Q. Right up through June 19, 2014, was Willis pursuing coverage under a crime policy on behalf of World Fuels?**

A. Willis was exploring all policies for World Fuel.

**Q. What policies were they exploring?**

A. The marine and the crime.

**Q. Were they ever pursuing a claim under the cyber policy?**

MR. MYERS: Objection.

To the form of the question

A. No.

**Q. Did Willis place a cyber policy for World Fuels?**

A. I don't know.

**Q. Who was handling the claim at Willis for the crime policy claim?**

A. I'm not sure, but everything was going

[Page 268]

R. BARTSCH

through Adam Cantor.

**Q. Did you have an understanding what the decision by the crime policy underwriter was with respect to the payment of this claim?**

A. No.

**Q. Do you know if they denied the claim?**

A. I don't know.

**Q. Let's have this next document marked as Bartsch 37.**

**Control W-WF three zeros 2533, 3, through including 2537.**

**With respect to your prior testimony, concerning the fraudulent contract of purchase order to be a shipping document, did you ever discuss that understanding with anyone at AGCS prior to the placement of the policy?**

A. No.

**Q. Did you ever discuss that understanding that you held that you now hold with anyone at AGCS after the claim arose?**

A. I don't think so.

[Page 269]

R. BARTSCH

**Q. Now, regarding Bartsch 37.**
**Can you identify that document.**
A. It is a letter from Tom Curran and Allianz Claims to John Frandsen, Willis Claims on the claim.
**Q. Did you receive a copy of that letter on or around July 17, 2014?**
A. I don't recall.
**Q. Do you recall ever receiving this letter, a copy of the letter?**
A. No.
**Q. Are you aware that Allianz declined this claim by World Fuels?**
A. No.
**Q. Do you have any recollection of ever receiving what is marked as Bartsch 37 prior to today?**
A. I don't recall.
**Q. Do you recall ever reviewing a document which contains the information which is set forth in Bartsch 37?**
A. What was that? Again? Sorry.
**Q. Putting aside whether you received this very document, did you ever receive a**

**R. BARTSCH**

**document on or around July 17, 2014, whose contents were substantively the same as what is set forth in Bartsch 37?**
MR. MYERS: Objection.
To the form of the question.
A. Again, I don't recall.
**Q. Let's have this marked as Bartsch 38.**
**(Whereupon, a document was marked as Bartsch Exhibit Number 38)**
**And control W-WF three zeros 2543 and 2544.**
**Could you identify 38, Bartsch 38?**
A. E-mail from David Hornaday to myself and John Frandsen.
**Q. And below, an e-mail from yourself to Hornaday?**
A. Yes.
**Q. This e-mail is dated July 22, 2014?**
A. Correct.
**Q. Now, and if you look at the first paragraph --**
A. Yeah.
**Q. -- telling Mr. Hornaday:**
**We need to sit down with Adam.**

**R. BARTSCH**

**Is that Cantor?**
A. Yes.
**Q. (Reading.)**
**To determine the best possible slash potential solution now that we have the response from marine and crime.**
**Do you see that?**
A. Yes.
**Q. What response from the marine market are you referring to?**
A. Allianz's reservation of rights letter.
**Q. Not referencing the declination letter of July 17th?**
A. Again, I don't recall.
**Q. You go on to state:**
**I believe what is driving the response from Allianz Marine is that the shipment occurred without fraudulent shipping documents.**
**Do you see that?**
A. Yes.
**Q. Was that accurate when you wrote it?**
A. At the time, yes.

R. BARTSCH

**Q. But now you believe the purchase invoice, the sales invoice, is the fraudulent shipping document --**
MR. MYERS: Objection to the form.
MR. NICOLETTI: Well -- strike that.
EXAMINATION BY
MR. NICOLETTI:
**Q. Let's do it this way.**
**You just said then.**
**What is your position now?**
A. My position is that the contract with the DLA was an order to ship product.
**Q. Which makes it what?**
A. A shipping document.
**Q. Do you have any technical support for that, any treatise, any case law, anybody telling you that?**
A. No.
**Q. So this is solely your own understanding. Without any outside --**
A. There would be no shipping without a contract to ship in the first place.

R. BARTSCH

**policy.**

MR. NICOLETTI: Objection.
To the form of the question.

A. This was when it was moved from Allianz to London.

**Q. I take it you were involved in the negotiations with markets, including Allianz and London, over who would provide the marine cargo?**

A. Yes.

**Q. Did you develop any impressions as to Allianz AGCS's willingness to stay on the risk?**

MR. NICOLETTI: Objection.
To the form of the question.

A. Allianz gave a impression that they would stay on the risk, but at a premium and coverage terms yet to be determined.

**Q. Did you develop any impressions about whether in your view, AGCS Allianz wanted to continue to insure World Fuel?**

MR. NICOLETTI: Objection.
To the form of the question.

[Page 334]

R. BARTSCH

A. My viewpoint was that they -- the terms would not be competitive.

**Q. The terms would not be competitive in terms of pricing? In terms of conditions? In what manner?**

MR. NICOLETTI: Objection.
To the form of the question.

A. The pricing and actually the limited liability. The indication was that they would cut their limit in half.

**Q. Did you make any recommendations to World Fuels as to with whom they should insure cargo losses going forward?**

A. Yes.

MR. NICOLETTI: Objection.
To the form of the question.

**Q. What were your recommendations?**

A. Based on the requirements for limits of liability, we indicated that London would be the best market for the risk.

**Q. When last we were here, for the first session of your deposition, Mr. Nicoletti asked you a bunch of questions about all risk, coverage under marine cargo, and**

[Page 335]

R. BARTSCH

**certain specified peril clauses.**

**Generally, do you recall that you testified on those topics?**

A. Yes.

**Q. Have you ever seen scenarios, in which a loss was covered under both an all risk provision and under separate perils clauses?**

MR. NICOLETTI: Objection.
To the form of the question.

A. Yes.

**Q. Is that unusual?**

MR. NICOLETTI: Objection.
To the form of the question.

A. No.

**Q. So several clauses in any Willis form marine cargo policy could apply to any one particular loss?**

MR. NICOLETTI: Objection.
To the form of the question.

A. Yes.

**Q. Mr. Nicoletti this morning asked you a few questions about exhibit 32.**

**I wanted to follow up on that.**

[Page 336]

R. BARTSCH

**This is an e-mail from you attaching the reservation letter?**

A. Yes.

**Q. And the portion that Mr. Nicoletti focused on that I wanted to ask you about, is:**

**I am surprised they are not talk fraudulent bill of lading clause.**

**In that sentence -- well, strike that.**

**I didn't see in the attached reservation letter, any reference to the fraudulent bill of lading clause in the policy at issue.**

**Did you see one?**

A. No.

**Q. So is what you are talking about there you're surprised that Allianz had not mentioned fraudulent bill of lading clause?**

MR. NICOLETTI: Objection.
To the form of the question.

A. Yes.

**Q. And when you go to say that this was a fraudulent contract, not a fraudulent**

[Page 337]