UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

AGCS MARINE INSURANCE COMPANY,

                     Plaintiff,

          -v-

WORLD FUEL SERVICES, INC. and
WORLD FUEL SERVICES EUROPE, LTD.,

                   Defendants.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/17/16

14 Civ. 5902 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case involves an insurance dispute arising from a sophisticated fraud carried out on the high seas. Defendants World Fuel Services, Inc. ("World Fuel Inc.") and World Fuel Services Europe, Ltd. ("WFSE Ltd.") (together, "World Fuel") are suppliers of fuel oil. They were the victims of an impostor purporting to work for the U.S. Government, who contracted with them to purchase a supply of marine gasoil ("MGO") worth about $17 million. After receiving the fuel via a ship-to-ship transfer, the impostor absconded with it. World Fuel, upon realizing that it had been duped, filed a claim with its insurer, plaintiff AGCS Marine Insurance Company ("AGCS"), seeking to recover under, *inter alia*, an "all-risk" clause in its policy. AGCS denied the claim. It then filed this action seeking a declaratory judgment that the loss was not covered.

      After discovery, the parties cross-moved for summary judgment—World Fuel seeking a declaratory judgment that its loss was covered, AGCS seeking a declaratory judgment that it was not. For the following reasons, the Court grants summary judgment for World Fuel.

I.       **Background**

A.       **Facts**[1]

The material facts are undisputed.  *See* Tr. 2.

AGCS is an insurer organized under the laws of the state of Illinois with its principal

place of business in Illinois.  JSF ¶ 11.  World Fuel Inc. is a company organized under the laws

of the state of Texas with its principal place of business in Miami, Florida.  *Id.* ¶ 1.  WFSE Ltd.

is a company organized under the laws of England and Wales with its principal place of business

in London, England.  *Id.* ¶ 2.  World Fuel is an international supplier of fuel oil.  *Id.* ¶ 7.

**1.       The Theft of Fuel from World Fuel**

On October 28, 2013, a World Fuel representative received an email solicitation from an

individual identifying himself as "James Battell," seeking to purchase significant quantities of

MGO.  *Id.* ¶ 38; JSF Ex. 7.  "Battell" represented that he was employed by the Defense Logistics

Agency ("DLA"), which supplies the U.S. Government with fuel and is a regular customer of

World Fuel.  *See* JSF ¶¶ 39, 31.  "Battell," however, was an impostor and, ultimately, a thief.  *Id.*

¶ 40.

Unaware of the fraud, World Fuel reached out to its suppliers, including Monjasa A/S

("Monjasa").  *Id.* ¶ 44.  On November 18, 2013, Monjasa sent World Fuel an offer to sell 17,000

metric tons of MGO (in other words, to supply MGO to World Fuel's customer).  *Id.* ¶ 47.  The

---

[1] The following summary is mostly derived from the parties' Joint Stipulation of Facts, Dkt. 60, Ex. 1 ("JSF"), and attached exhibits, Dkt 63 ("JSF Ex.").  The Court also relies on (1) the parties' Local Rule 56.1 Statements of Facts, Dkt. 71 ("World Fuel 56.1"); Dkt. 77 ("AGCS 56.1 Response"); Dkt. 80 ("AGCS 56.1"); Dkt. 83 ("World Fuel 56.1 Reply"); Dkt. 87 ("World Fuel 56.1 Response"); (2) the declarations of Mari K. Bonthuis, Dkt. 72 ("Bonthuis Decl."); Dkt. 88 ("Bonthuis Supp. Decl."), in support of World Fuel's motion for summary judgment, and attached exhibits; and (3) the declarations of Nooshin Namazi, Dkt. 78 ("Namazi Decl."); Dkt. 92 ("Namazi Supp. Decl."), in support of AGCS's motion for summary judgment, and attached exhibits.  "Tr." refers to the transcript of the March 10, 2016 oral argument.  Dkt. 94.

same day, World Fuel submitted a corresponding offer to "Battell." *Id.* ¶ 49. "Battell," still posing as a DLA representative, accepted World Fuel's offer to sell 17,000 metric tons of MGO. *Id.* ¶ 50. Ultimately, on November 21, 2013, World Fuel signed a contract to provide this quantity of MGO, worth an estimated $17,284,750, to "Battell"/"DLA." *See* JSF Ex. 13 ("Contract"); JSF ¶ 56. The payment terms were net 30 days (*i.e.*, payment was due within 30 days after delivery). *See* Contract. The delivery terms were "F.O.B. destination" (*i.e.*, the buyer would take title only upon delivery).[2] World Fuel, effectively acting as a broker while Monjasa physically supplied the MGO, would have title to the cargo on a "flash title" basis.[3] AGCS 56.1 ¶ 4; World Fuel 56.1 ¶ 18; World Fuel 56.1 Response ¶ 4.

On November 22, 2013, the day after executing the Contract with "Battell," World Fuel accepted Monjasa's offer to sell approximately 17,000 metric tons of MGO. JSF ¶ 57. Delivery was to be effected by ship-to-ship transfers from two Monjasa supply vessels, the "Marida Marigold" and the "Montauk," although ultimately the "African Leader" was substituted for the "Montauk." *Id.* ¶¶ 48, 51, 60. "Battell" nominated, supposedly on behalf of the DLA, the "Ocean Pearl" as the receiving vessel for the MGO. *Id.* ¶ 58.

---

[2] The Contract itself is not perfectly clear on this point. It provides that delivery is "for FOB destination unless block is marked," and then there is a check box (which is checked) reading "see schedule." The attached schedule, however, does not appear to contain any further provisions on this issue. Helpfully, the parties appear to agree that the delivery terms were F.O.B. destination (the destination being the ship nominated by the buyer). *See* World Fuel 56.1 ¶ 20; AGCS 56.1 ¶ 6; AGCS 56.1 Response ¶ 20; *see also* AGCS Br. 4–5.

[3] The parties dispute—although the Court finds the issue non-dispositive—whether, in a flash title transaction, World Fuel "possesses title to the marine fuel only for [a] brief moment as the marine fuel is transferred from the supply vessel to the receiving vessel," World Fuel 56.1 ¶ 18, or whether World Fuel in fact "obtained and transferred title to the MGO *at the same moment*," *i.e.*, "the instant the MGO was loaded into the receiving vessel," AGCS 56.1 ¶ 4–5 (emphasis added).

Between December 7 and 9, 2013, off the coast of Lome, Togo, the Marida Marigold transferred approximately 11,756 metric tons of MGO to the Ocean Pearl.  *Id.* ¶¶ 59, 61.  On December 10, 2013, Monjasa sent World Fuel a Bunker Delivery Receipt ("BDR"), documenting this delivery and bearing the signature of the Ocean Pearl's Captain.  *Id.* ¶ 62; JSF Ex. 18.  Between December 10 and 11, 2013, the African Leader transferred an additional approximately 5,262 metric tons of MGO to the Ocean Pearl.  JSF ¶ 63.  On December 12, 2013, Monjasa sent World Fuel the BDR for this transfer.  *Id.* ¶ 64; JSF Ex. 19.

On December 20, 2013, World Fuel sent "Battell" an invoice for $17,910,833.28 via email.  *Id.* ¶ 68; JSF Ex. 21.  On January 6, 2014, World Fuel wired Monjasa the sum of $17,061,968.73 in satisfaction of their contract.  JSF ¶ 67; JSF Ex. 20.  During about a two-week period in January 2014, World Fuel communicated with various (legitimate) DLA personnel regarding the status of its invoice.  *See* JSF ¶¶ 69–70.  On or about January 28, 2014, a World Fuel employee spoke with an FBI agent, who informed her that "James Battell" was not a DLA employee and that World Fuel had been defrauded.  *Id.* ¶ 71.  This was the first time World Fuel learned that "Battell" was an impostor.  *Id.* ¶ 72.  To date, the World Fuel invoice to "Battell" has not been paid; none of the MGO has been recovered; and the location of the MGO remains unknown.  *Id.* ¶ 75–77.

Shortly after the FBI contacted World Fuel in early 2014, World Fuel submitted a claim to its insurer, AGCS.  *See id.* ¶ 80.  On or about July 17, 2014, AGCS denied the claim.  *Id.* ¶ 82.

### 2.    The Insurance Policy

AGCS issued an insurance policy to World Fuel effective October 1, 2013—less than a month before "Battell" contacted World Fuel.  *Id.* ¶ 26; *see* JSF Ex. 6 ("Policy").  The Policy contains three provisions relevant to this dispute.  These are described in turn.

### i.      All-Risk Clause

The Policy's default coverage for all "bulk liquid vessel" shipments protects World Fuel "[a]gainst all risks of physical loss or damage from any external cause . . . from time of leaving tanks at port of shipment and while in transit and/or awaiting transit and until safely delivered in tanks at destination."  Policy ¶ 11(D) ("All-Risk Clause").  As to any particular shipment, coverage attaches under the All-Risk Clause at the time the cargo commences transit and ends upon delivery.  *Id.* ¶ 14.  The parties agree that, in light of these provisions, the Policy is an "all-risk" insurance policy.  *See* AGCS 56.1 Response ¶ 10.

### ii.      Fraudulent Bills of Lading Clause

Another provision covers physical loss incurred "through the acceptance by [World Fuel], its Agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents."  Policy ¶ 37 ("F.B.O.L. Clause").  The Policy does not define the term "shipping documents."

### iii.      F.O.B. Clause

The Policy also covers goods "sold by [World Fuel] on F.O.B., F.A.S., Cost and Freight or similar terms whereby [World Fuel] is not obligated to furnish marine insurance."  Policy ¶ 69 ("F.O.B. Clause").  The F.O.B. Clause "attaches subject to its terms and conditions and continues until the goods . . . are loaded onto the primary conveyance or until [World Fuel's] interest ceases."  *Id.*

### B.      Procedural History

On July 30, 2014, AGCS filed the Complaint, seeking a declaratory judgment that the MGO loss is not covered under the Policy.  Dkt. 1 ("Compl.").  On November 26, 2014, World

Fuel Inc. answered and raised two counterclaims, one for a declaratory judgment of coverage and another for breach of contract.  Dkt. 4 ("Ans.").[4]

After discovery, the Court set a briefing schedule for the parties' summary judgment cross-motions.  Dkt. 55.  On November 23, 2015, at the Court's suggestion, the parties submitted a Joint Stipulation of Facts.  *See* JSF.  On December 18, 2015, World Fuel moved for summary judgment on its claim for declaratory relief, Dkt. 64, filing a memorandum of law, Dkt. 70 ("World Fuel Br."), the World Fuel 56.1, and the Bonthuis Declaration and attached exhibits. On January 15, 2016, AGCS filed a memorandum of law in opposition to World Fuel's motion and in support of its cross-motion for summary judgment, Dkt. 76 ("AGCS Br."), along with the AGCS 56.1, the AGCS 56.1 Response, and the Namazi Declaration and attached exhibits.  On January 29, 2016, World Fuel filed a memorandum of law in reply, Dkt. 82 ("World Fuel Reply Br."), along with the World Fuel 56.1 Reply, the World Fuel 56.1 Response, the Bonthuis Supplemental Declaration, and attached exhibits.  On February 12, 2016, AGCS filed a reply memorandum of law, Dkt. 91 ("AGCS Reply Br."), and the Namazi Supplemental Declaration and attached exhibits.  On March 10, 2016, the Court heard argument.

## II.    Applicable Legal Standards

### A.    Summary Judgment Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] WFSE Ltd. answered on December 22, 2014.  Dkt. 18.

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

### B.    Choice of Law

The question of which law should apply—federal maritime law or New York state law— is of merely theoretical importance, because the two sources of law are not "materially different" in this area.  *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 429 (5th Cir. 1980). Moreover, "[a]bsent a specific federal rule, federal courts look to state law for principles

governing maritime insurance policies," and there is no such federal rule "governing construction of maritime insurance contracts." *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999).

Under federal maritime choice-of-law rules, which apply to maritime contract disputes, *see Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1080 (2d Cir. 1993), courts "determine which state law to use by ascertaining and valuing points of contact between the transaction giving rise to the cause of action and the states or governments whose competing laws are involved." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998) (alterations and internal quotation marks omitted). This analysis "should include an assessment of the following contacts: (1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.*

As to these factors, New York has the most significant points of contact. Although neither World Fuel nor AGCS is organized under New York law or has a principal place of business in this state, *see* JSF ¶¶ 1, 2, 11, both have significant New York connections, as does this dispute. AGCS has a New York office and does business in the state, and the AGCS employees who handled this matter are based in New York. *See id.* ¶¶ 12–15. Robert Bartsch, the broker who handled World Fuel's account and helped draft "the base form of the [World Fuel] Policy," works in New York, *id.* ¶ 16; *see* JSF Ex. 1, as does AGCS's underwriter, Noreen Brosnan, with whom he negotiated. *See* JSF Ex. 2; JSF ¶ 23. Significantly, neither party advocates applying the law of any state other than New York. *See* Tr. 31 (acknowledging that the parties agree that the state law to which the Court should look in the absence of federal

maritime law is New York's).  Therefore, the Court will look to New York law except where the parties point to a specific federal rule.

### C.        Principles for Interpreting Insurance Policies Under New York Law

"The construction of an insurance contract is ordinarily a matter of law to be determined by the court."  *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 89 N.Y.2d 308, 316 (1996)).  In resolving a summary judgment motion involving contract interpretation, "a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish."  *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

When contract language is unambiguous, "the district court [may] construe it as a matter of law and grant summary judgment accordingly."  *Id.*  However, if policy language is ambiguous, New York law provides that such ambiguities must be construed in favor of the insured and against the insurer.  *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101 (1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.").

Whether a contract is ambiguous is a threshold question of law for the court.  *Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).  "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning."  *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998).  The Second Circuit has explained that "ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

If the language in an insurance policy is ambiguous, the court should examine the language "from the vantage point of the reasonable expectations and purposes of the ordinary person." *Haber*, 137 F.3d at 695 (alterations and internal quotation marks omitted). The court should also "consider extrinsic evidence submitted by the parties to assist in determining their actual intent." *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir. 1994). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured." *Id.*

## III.   Discussion

World Fuel makes three independent arguments for summary judgment in its favor, grounded in the three separate provisions described above.[5] First, it argues that the loss of the MGO was a fortuitous loss of covered property during a time period covered by an all-risk insurance policy, and that AGCS has failed to establish any exception to or exclusion from coverage. Second, World Fuel argues that the loss is covered by the F.B.O.L. Clause because the loss was caused by the acceptance of fraudulent "shipping documents." Third, World Fuel argues that the F.O.B. Clause covers the loss because (1) the shipment was made under F.O.B.

---

[5] Although the parties cross-moved for summary judgment, and while AGCS is technically the plaintiff here, the Court frames its analysis around World Fuel's arguments because it, as the party suffering a loss, is the natural plaintiff in this case. AGCS's counterarguments against coverage will be addressed in the appropriate sections.

terms, and (2) World Fuel's "interest" in the cargo has not, to this day, ceased, because it has not been paid.  The Court addresses these asserted bases for recovery in turn.

### A.     All-Risk Clause

As described above, the Policy's All-Risk Clause protects World Fuel "[a]gainst all risks of physical loss or damage from any external cause . . . from time of leaving tanks at port of shipment and while in transit and/or awaiting transit and until safely delivered in tanks at destination."  World Fuel argues that it has established a prima facie case for recovery by showing a fortuitous loss of covered property under an all-risk policy, and that AGCS has not established an applicable exception or exclusion.  AGCS does not dispute that this is an all-risk policy.  Its defense is that the loss occurred outside the temporal limits of—*i.e.*, either before, or after, but not during—such coverage.

### 1.     Legal Standards and Burdens

#### a.   Test for a Prima Facie Claim

All-risk policies, like World Fuel's Policy with AGCS, "provide broad coverage for shippers."  *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 308 (2d Cir. 1987). "Under an all-risk policy, losses caused by *any* fortuitous peril not specifically excluded under the policy will be covered."  *Parks Real Estate*, 472 F.3d at 41 (internal quotation marks omitted).  Consistent with this broad coverage, the insured's burden for establishing a prima facie case for recovery under an all-risk policy is "relatively light."  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).

The insured meets this burden by showing: "(1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property."  *Id.* (internal quotation mark omitted).  "A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured."

*Ingersoll*, 829 F.2d at 307.  An insured "need not explain the precise cause of the loss."  *Int'l Multifoods*, 309 F.3d at 84.

Once the insured has met its prima facie burden, the burden shifts to the insurer to establish that an exclusion or exception to coverage applies.  *See Channel Fabrics, Inc. v. Hartford Fire Ins. Co.*, No. 11 Civ. 3483 (JPO), 2012 WL 3283484, at *6 (S.D.N.Y. Aug. 13, 2012).  The insurer's burden is a "heavy one."  *Parks Real Estate*, 472 F.2d at 42 (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S.2d 142, 144 (2d Dep't 2004)).  To "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon."  *Id.* (quoting *Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 671 N.Y.S.2d 66, 69 (1st Dep't 1998)) (alteration and internal quotation marks omitted).

### b.  Burden of Showing Loss During Period of Coverage

AGCS does not challenge any of the three elements—an all-risk policy, insurable interest, and fortuitous loss—identified by the Second Circuit as giving rise to a prima facie case for recovery.  Instead, AGCS argues that the loss occurred outside the temporal limits of the Policy's All-Risk Clause.  As described below, it alternatively argues (1) that the loss *post*dated the coverage period, because it assertedly postdated the "delivery" of the MGO; and (2) that the loss *pre*dated the coverage period, because it flowed from pre-attachment events, specifically, the fraudulent contract that World Fuel entered into with "Battell."

As an initial matter, the parties dispute whether the burden is on World Fuel or on AGCS to show a fortuitous loss *during the period of coverage*.  The Court holds that this burden, like the other three elements of a prima facie claim, falls on the insured party, World Fuel.

To be sure, World Fuel correctly notes that the Second Circuit's decision in *International Multifoods*, which recited these elements, did not itself specify a temporal element. *See* World Fuel Reply Br. 11 (calling this a "fictitious final element"). But the Second Circuit *has* clearly held that the insured "satisfies its burden of proving that its loss resulted from an insured peril if the cargo was damaged *while the policy was in force* and the loss was fortuitous." *Ingersoll*, 829 F.2d at 307 (emphasis added); *see also Int'l Multifoods*, 309 F.3d at 83 (quoting *Ingersoll*); *Channel Fabrics*, 2012 WL 3283484, at *6 (same); *Goodwear Shoe Co. v. Am. Motorist Ins. Co.*, No. 94 Civ. 6730 (AGS), 1996 WL 169345, at *4 (S.D.N.Y. Apr. 10, 1996) ("[A]n insured must show that the loss occurred while the policy was in force, in order to satisfy its burden of proving coverage under the policy."). It logically follows that the burden is the insured's to establish that the fortuitous loss occurred during the coverage period.

Challenging this, World Fuel argues that the Fifth Circuit—applying maritime law "not 'materially different' from New York law"—imposed the burden on the insurer to show that the loss occurred outside the period of coverage. World Fuel Reply Br. 21 (quoting *Morrison Grain*, 632 F.2d at 429). But *Morrison Grain* does not contradict the Second Circuit's placement of this burden on the insured. *Morrison Grain* addressed *not* the burden of showing when the loss occurred, but the burden of showing when "the event *producing* the loss" occurred. 632 F.2d at 429 (emphasis added). The Fifth Circuit held that the *latter* burden should be on the insurer. *See id.* at 429, 431.

Therefore, the Court holds, the burden is on the insured—World Fuel—to show that the loss occurred during the period of coverage.

## 2.      Was There a Loss Within the Period of Coverage?

The only one of the above-mentioned elements that the parties contest is the temporal one: whether a "physical loss" of MGO occurred during the period of coverage. As noted, the

coverage period under the All-Risk Clause is "from time of leaving tanks at port of shipment and while in transit and/or awaiting transit and until safely delivered in tanks at destination."  AGCS primarily takes the position that the loss occurred *after* the MGO was safely delivered in tanks at destination.[6]  World Fuel takes the position that the loss occurred before that point, or—what amounts to the same thing—that the coverage-ending condition of safe delivery never actually occurred.

Analysis properly starts with the plain meaning of "physical loss."  *See Palmieri*, 445 F.3d at 187.  The "absence of possession and control falls within the plain meaning of 'loss.'" *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 76 (3d Cir. 1989); *see also Int'l Multifoods*, 309 F.3d at 84 ("[F]rom the perspective of the insured, the real 'loss'—if never remedied—is the loss of control that occurs upon a dispossession."); *Ins. Co. of N. Am. v. Newtowne Mfg. Co.*, 187 F.2d 675, 684 (1st Cir. 1951) (holding that insured, who was shipping goods by truck, "lost the goods when the driver drove away from the factory and disappeared").  Consistent with this common-sense definition, the parties jointly stipulate to the fact that "[t]he MGO was physically lost."  JSF ¶ 78.

The ultimate question is thus one of timing: whether this loss occurred while the MGO was still "in transit" and thus covered by the All-Risk Clause, or whether it occurred after the MGO had been "safely delivered."  Although the Court has unsurprisingly found no case involving the precise factual scenario presented here, it is well established that, under New York law, "delivery" to a thief is not delivery at all.  *See Underwood v. Globe Indem. Co.*, 245 N.Y. 111 (1927); *Hanson v. Nat'l Surety Co.*, 257 N.Y. 216 (1931).  Alternatively phrased, when

---

[6] AGCS's alternative temporal argument—that the loss predated the coverage period, because it arose from pre-attachment events—is addressed *infra* at Section III(A)(3).

"delivery or diversion from transit is brought about by falsification, misrepresentation or like factor in the course of the perpetration of a theft, robbery or other criminal scheme," the loss that results is still a loss "in transit." *See Ore & Chem. Corp. v. Eagle Star Ins. Co.*, 489 F.2d 455, 460 (2d Cir. 1973) (Anderson, J., concurring).

The above-cited cases and their progeny merit close review, as they frame the parties' debate over whether the loss occurred during the coverage period and the Court's resolution of that issue.

### a.   Applicable Law: Underwood, Hanson, and Related Cases

The relevant doctrine begins a pair with early 20th-century New York Court of Appeals decisions, *Underwood* and *Hanson*, and continues through more recent Second Circuit precedents.

In *Underwood*, stockbrokers took out a policy insuring against losses through theft while their property was in transit. *See* 245 N.Y. at 113.  A purported purchaser, Dunn, conveyed an order to the brokers for $2,500 worth of bonds and 100 shares of stock. *See id.*  The brokers' salesman delivered the bonds to Dunn, "receiving in return a check which he supposed to be certified, but which in fact was merely stamped as certified, being unsigned." *Id.* at 114.  Dunn then "skipped with the bonds." *Id.*

The New York Court of Appeals held that "in transit" means "while going to make delivery to a customer," and that the bonds had never been delivered to a customer because Dunn "was no more a customer than he would have been if he had grabbed [the salesman] by the throat and taken the bonds from his custody." *Id.* at 114–15.  The Court of Appeals rejected the lower courts' holding that the bonds "ceased to be in transit when the messenger had arrived at Dunn's

rooms or in Dunn's presence to make delivery"; it held instead that delivery "in the legal sense of that word" means delivery to a bona fide customer.  *Id.* at 115.

*Hanson* is factually quite similar to *Underwood*, save that the fraud was perpetrated on the principals, rather than their messenger.  In *Hanson*, the messenger delivered stock certificates on the condition that "title to the certificates should remain in the [sellers] until payment should have been made therefor."  257 N.Y. at 218.  The purported purchaser then disappeared with the stock certificates without paying.

The insurer argued that "the complaint fails to show that the larceny occurred while the securities were in transit and before the transit risk was terminated by 'delivery thereof at destination.'"  *Id.* at 219.  The New York Court of Appeals, relying on *Underwood*, disagreed.  It held it irrelevant that the insured had delivered the certificates under a reservation of title:  "Even at common law, 'if a party fraudulently obtains possession of goods from the owner, with intent at the time to convert them to his own use, and the owner does not part with the title, the offense is larceny.'"  *Id.* at 220 (quoting *Commonwealth v. Lannan*, 153 Mass. 287, 289 (1891) (Holmes, J.)).  "It cannot be said," the Court of Appeals reasoned, "that the larceny occurred after the messenger had ended the transit risk by delivery at destination, when that delivery was itself the consummation of a scheme to obtain possession with larcenous intent."  *Id.*

The Second Circuit's first meaningful encounter with this line of authority came in *Sutro Bros. & Co. v. Indemnity Insurance Co. of North America*, 386 F.2d 798 (2d Cir. 1967).  There, the insured's—Sutro's—losses were sustained when a longtime customer, who had been allowed to take possession of securities in exchange for uncertified checks that took as long as four days to clear, stopped payment on certain checks.  *See id.* at 800.  In this context, the Second Circuit held, *Underwood* and *Hanson* did not apply.  It distinguished *Underwood* and *Hanson* on the

ground that the insured's "loss was not occasioned by the *taking* of the delivered securities . . .
but by the subsequent non-payment of the checks which Sutro was satisfied to accept at the
time." *Id.* at 802 (emphasis added).  In other words, what distinguished *Underwood* and *Hanson*
from *Sutro* was that, in the latter case, because of the "accepted business practice" between the
seller and buyer, the seller's "loss" did not truly occur until after delivery, when the buyer
stopped payment. *Id.*  Unlike in *Underwood* and *Hanson*, the buyer's preexisting larcenous
intent could not be "imputed . . . by hindsight." *Id.*

    Several years later, the Second Circuit decided *Ore & Chemical Corp. v. Eagle Star
Insurance Co.*, 489 F.2d 455 (2d Cir. 1973).  There, it helpfully articulated the broad parameters
of the *Underwood*/*Hanson* doctrine.  Important here, it synthesized *Underwood* and *Hanson* as
reflecting an exception to the rule that "transit" ends upon delivery at destination "where such
delivery or diversion from transit is brought about by falsification, misrepresentation or like
factor in the course of the perpetration of a theft, robbery or other criminal scheme."  489 F.2d at
458 (concurring opinion of Judge Anderson).

    In *Ore & Chemical*, the insured's agent, the Keystone Company, received a call from a
prospective purchaser, Stodder, who expressed interest in purchasing a significant lot of placer
gold, following inspection.  *See id.* at 456 (majority opinion).  At Stodder's insistence, the goods
were to be inspected and sold in Sheridan, Wyoming.  *Id.*  Upon their arrival at a Sheridan motel,
the Keystone agents met with Stodder, but they did not reach a final agreement and arranged to
meet the next morning.  *See id.*  The next morning, Stodder and two accomplices robbed the
agents of the gold at gunpoint.  *Id.*

    The Second Circuit majority—Judge Mansfield writing, joined by Judge Friendly—
concluded that the insured was covered by an all-risk transit policy because transit had merely

been interrupted at the time of the robbery; it had not ceased.  *See id.* at 457.  Judge Anderson disagreed with this reasoning, but concurred on the ground that *Underwood* controlled.  *See id.* at 460.  Notably for present purposes, the majority expressly agreed with Judge Anderson's reading of *Underwood* "as pointing to an alternative construction that calls for the same result in the present case because Keystone was induced by fraud on Stodder's part to transport the gold to the Sheridan Motel and thus unwittingly provided him with the opportunity to commit the robbery."  *Id.* at 458–59.  Thus, in *Ore & Chemical*, the panel unanimously read *Underwood* to protect the insured under an all-risk transit policy when the insured is induced by fraud into providing a thief with the opportunity to steal.  As Judge Anderson put the point, "there was never any *lawful* delivery to premises at a *legitimate* business destination, even though the Keystone officers thought it was."  *Id.* at 460 (emphasis added).

The Second Circuit most recently engaged with the *Underwood*/*Hanson* line of cases in *Zurich American Insurance Co. v. Felipe Grimberg Fine Art*, 324 F. App'x 117 (2d Cir. 2009) (summary order) ("*Grimberg II*").  There, the insured, Grimberg, sold a Botero painting to another art dealer, Cohen, with whom he had had informal and theretofore successful dealings over many years.  *See Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, No. 04 Civ. 763 (RLE), 2008 WL 394808, at *2 (S.D.N.Y. Feb. 13, 2008) ("*Grimberg I*").  When Cohen failed to pay for the Botero using the proceeds from the sale of other paintings, Grimberg argued that the transfer was voidable "because it was procured through larceny by false promise," relying on *Underwood* and *Hanson*.  *Grimberg II*, at 119.  Holding otherwise, the Second Circuit, like the district court whose ruling for the insurer was summarily affirmed, distinguished *Underwood* and *Hanson* on the ground that "Cohen had long been a customer of Grimberg's at the time of the alleged

larceny, and Cohen did not abscond with the Botero through any conduct akin to use of a forged check." *Id.* at 120.[7]

Synthesizing these and other precedents,[8] the relevant doctrinal line emerges as between cases involving fraud from the outset (*e.g.*, *Underwood*, *Hanson*, *Ore & Chemical*) and cases involving long-running customers who were, at the time of delivery, bona fide but who later failed to pay (*e.g.*, *Sutro*, *Grimberg*).[9]

---

[7] The district court similarly emphasized Cohen's and Grimberg's long course of successful dealings prior to the events at issue. It found *Sutro* the most apposite precedent. "The delivery service that delivered [the Botero] was not deceived or tricked out of possession of it, but surrendered the painting at a place and in a manner in accordance with the custom established between Grimberg and Cohen in their many years of doing business with each other." *Grimberg I*, at *6. And Cohen was, *at the time of delivery*, a "bona fide customer." *Id.* (quoting *Sutro Bros. & Co. v. Indem. Ins. Co. of N. Am.*, 264 F. Supp. 273, 284 (S.D.N.Y. 1967)) (internal quotation marks omitted). Cohen's allegedly fraudulent intent only developed later, after delivery, when he sold other paintings but failed to give Grimberg the proceeds. *See id.*

[8] Also instructive is *Great Northern Insurance Co. v. Dayco Corp.*, 620 F. Supp. 346 (S.D.N.Y. 1985). There, Dayco manufactured and shipped goods that were purchased by Soviet Union state-owned enterprises. The goods were shipped to West Germany and picked up, but Dayco never received full payment. Although the policy at issue was not a transit policy, the district court rejected several arguments by the insurer that echo here. First, the court held that, absent an "express exclusion" in the policy, "a theft by trick or false pretense" is covered by an all-risk policy. *Id.* at 351. Second, it rejected the argument that the loss was not covered because it occurred after Dayco turned the goods over for shipment, relinquishing title to the buyer and losing its insurable interest in the goods. *See id.* at 352. That argument, the court explained, would logically mean that theft by false pretenses could never be covered by an all-risk policy because, in such cases, the loss occurs when the insured "voluntarily parts with title to the property as a result of false pretense or trick." *Id.* Third, the court rejected the notion that Dayco suffered a mere "credit loss," not a covered physical loss—an argument that AGCS also advances, *see* AGCS Br. 13–14, and the Court also rejects. *See* 620 F. Supp. at 351 ("[The insured] physically lost the goods in that it no longer has control over them and has received no compensation for them. Its loss is not merely a credit loss."). Thus, *Dayco* is consistent with the principal distinction that emerges from *Underwood* and its progeny: between theft (a "physical" loss that occurs upon dispossession) and non-payment (a "credit" loss that occurs after delivery).

[9] An even finer distinction could be drawn: between cases involving fraud as to the identity of the customer, and cases involving deceit as to intent to pay. Judge Gardephe recently recognized this distinction in a case interpreting the policy term "entrusted" rather than the term "delivered":

This distinction has a solid logical basis.  The risk of loss properly falls on the seller of goods when the seller has developed, *à la* Sutro and Grimberg, an informal course of dealing that foreseeably results in a loss when the buyer fails to pay.  But where the loss is, for all intents and purposes, unforeseeable and unavoidable, and was caused by a malicious fraud, the risk of loss properly falls on an all-risk insurer, absent, of course, an on-point policy exclusion.

### b.  Application to this Case

The Court now applies these precedents and principles.  These point to the conclusion that the MGO was lost during the period of coverage.  Critically important, it is undisputed that World Fuel was the victim of a fraud that began when "James Battell" sent a solicitation to World Fuel personnel and continued through delivery of the MGO, culminating in the non-payment of World Fuel's invoice.  There is no claim that "Battell" ever intended to pay for the MGO or was ever a bona fide customer; that World Fuel had any reason to suspect "Battell" was a fraudster; that World Fuel failed to take any precautionary measures; or that the all-risk policy here excludes losses caused by fraud or theft.  The fact that "Battell" executed his scheme through a fraudulent contract—rather than a bad check (as in *Underwood*) or an insincere invitation to deal (as in *Ore & Chemical*)—is immaterial.  His fraudulent scheme, evidenced by

---

An entrustment exclusion in an insurance policy applies to persons whose status is created or accepted by the assured as the result of a consensual relationship between the parties.  New York courts have found such a relationship to exist—despite a recipient's fraudulent intent—where the parties have had a *course of dealing* or the insured had *reason to trust* the recipient *independent* of the recipient's own representations.  An entrustment exclusion does not apply, however, where a property recipient's status is solely self-generated.  Accordingly, an insured has not 'entrusted' property to a recipient where there is deceit from the outset, not only as to intent, but as to identification of the recipient.

*United Specialty Ins. Co. v. Barry Inn Realty Inc.*, No. 14 Civ. 4892 (PGG), 130 F. Supp. 3d 834, 839–40 (S.D.N.Y. Sept. 8, 2015) (emphasis added) (citations, alterations, and internal quotation marks omitted).  Applied here, this distinction would further favor World Fuel's position, as "Battell" deceived World Fuel not merely as to his intent to pay but as to his very identity.

his feigned affiliation with DLA, was in place from the very outset of his dealings with World Fuel.  Therefore, the Court holds that "delivery" had not been effected, and "transit" had not ceased, when World Fuel lost the MGO.  The MGO was therefore lost within, not after, the period of coverage.

AGCS attempts to distinguish *Underwood* and *Hanson*, but its proposed distinctions do not carry the day.

First, AGCS notes that, in *Underwood*, payment was supposed to precede delivery, whereas here, "payment was deferred because of the 30-day credit terms."  AGCS Br. 14. *Underwood*, however, did not turn on the fact that payment was to precede delivery; it turned instead on the fact that the messenger had been defrauded and the purported customer had committed larceny.  The *Underwood* court's analogy to a violent robbery makes this clear.  *See* 245 N.Y. at 115.  Similarly, AGCS would distinguish *Hanson* on the ground that World Fuel did not make a reservation of title when it delivered the MGO.  *See* AGCS Br. 14.  But *Hanson* did not turn on that factual nicety.  Quite the opposite:  The Court of Appeals suggested that the reservation of title was but another "part[] of a fraudulent device to obtain possession of the securities."  257 N.Y. at 220.[10]

---

[10] The Court acknowledges that, in *Grimberg II*, the Second Circuit distinguished *Hanson* on the ground that Hanson, unlike Grimberg, had reserved title until payment.  324 F. App'x. at 120. Notably, however, *Grimberg II* summarily affirmed a district court ruling that relied on the distinction emphasized here: between, on the one hand, a fraud that existed from the outset, and on the other, a customer's non-payment after delivery.  *See Grimberg I*, at *6.  The weight of the case law, reviewed above, makes this doctrinal distinction of paramount significance.  That said, the Circuit has never been called upon to squarely address the situation presented here, in which that distinction favors the insured while a different distinction about reservation of title appears to favor the insurer.

AGCS separately argues that World Fuel had an insurable interest in the MGO only once it reached the tanks of the Ocean Pearl, *see* Tr. 41, such that the Policy covered only the "very moment the fuel [was] delivered." *Id.* at 42. Such coverage would protect World Fuel against limited risks such as contaminated or fractured tanks. In essence, AGCS contends, the "flash title" nature of the transaction created by World Fuel's arrangement with Monjasa tacitly narrowed the coverage of the AGCS/World Fuel insurance policy, at least as applied to the shipment at issue here. But AGCS's crimped view of its coverage is problematic. It is difficult to square with the policy language providing, broadly, that the Policy "fully covers the goods . . . from warehouse to warehouse" "[r]egardless of the terms of purchase by [World Fuel] from suppliers." Policy ¶ 16. And AGCS does not coherently explain why, under an all-risk policy, a contaminated or fractured tank ought to be treated any differently from a tank under the control of a fraudster who from the outset fakes his identity and intends to steal. In both scenarios, the physical dispossession of the insured occurs or begins when the fuel leaves the control of the supply ship and begins to enter the receiving vessel.[11]

---

[11] In a similar vein, AGCS argues that, while insurance coverage ended on each gallon of fuel as it passed into the Ocean Pearl, *see* Tr. 63, World Fuel's loss did not occur until "*full* delivery, as evidenced by the bunker delivery receipts." *Id.* at 62 (emphasis added). That approach is formalistic, untethered to any policy language, and ultimately unpersuasive. The process of transferring the MGO in full indeed took several days, but as to each drop of fuel, three events were simultaneous: the "flash" transfer of title, World Fuel's purported "delivery," and the fraudster's larceny. It is thus irrelevant whether, as AGCS emphasized at argument, *see* Tr. 49– 50, Monjasa bore the risk of loss *before* the transfer began. *Cf. Fuller v. Home Indem. Co.*, 318 Mass. 37, 42 (1945) (citing *Underwood* and *Hanson*, holding that there was a larceny "in transit" where "the larceny took place *at the time* the [worthless] check was delivered to the [insured's] messenger," notwithstanding the fact that the larceny did not become apparent until later (emphasis added)); *see also Rupp v. Hanover Fire Ins. Co.*, 311 S.W.2d 58, 60 (Mo. Ct. App.) (holding that "gasoline was, in fact, destroyed while it was in the process of being delivered" where a fire broke out while it was being transferred from delivery vehicle to storage tank).

AGCS separately argues that a 1992 unpublished decision from the Northern District of California in favor of an all-risk transit insurer is on "all fours" here.  *See* Tr. 35 (citing *St. Paul Fire & Marine Ins. Co. v. Sun Microsystems, Inc.*, No. 91 Civ. 20470 (RMW), 1992 WL 309923 (N.D. Cal. May 5, 1992) ("*Sun Microsystems*")).  There, a fraudster purported to be a customer of Sun Microsystems and ordered spare parts for delivery to phony places of business, never intending to pay.  *See id.* at *1.  The insurance contract covered goods while "in transit without limitation of time from moment of commencement of transit from, to or between locations Worldwide."  *Id.*  Applying California law,[12] the district court ruled for the insurer, finding no coverage.  Relevant here, it distinguished a California case[13] analogous to *Underwood* and *Hanson* on the narrow ground that that case had interpreted the term "delivery" rather than the term "in transit."  *See id.*

For two reasons, *Sun Microsystems* does not resolve this case.  First, it is distinguished factually.  The All-Risk Clause of the Policy here, unlike in *Sun Microsystems*, used *both* the terms "delivery" and "in transit," so as to cover the MGO "from time of leaving tanks at port of shipment and while *in transit* and/or awaiting transit and until safely *delivered* in tanks at

---

[12] AGCS suggested that *Sun Microsystems* applied federal maritime law, *see* Tr. 32, but the district court there relied on California cases.  In any event, to the extent AGCS urges the Court to rely on federal maritime law, as opposed to New York law and the *Underwood*/*Hanson* doctrine, *see id.* at 31–32, AGCS does not cite any federal law that conflicts with these New York cases.  *See* Tr. 34 (acknowledging inability to identify federal maritime law "in conflict" with *Hanson*).

[13] *See Freedman v. Queen Ins. Co. of Am.*, 56 Cal. 2d 454, 458 (1961) ("[I]t is, at the very least, one tenable construction that there can be no valid 'delivery' or 'entrustment' of property to another where the possession of the property is acquired by means of some fraudulent device. . . . [W]e must accept the tenable construction of the exclusionary clause most favorable to the insured.").

destination."  And, under New York law, including *Underwood* and *Hanson*, the term "safely delivered" does not encompass delivery to a fraudster.

Second, the reasoning in *Sun Microsystems* is quite arguably inconsistent with that in *Underwood* and *Hanson*, which control where New York law is decisive.  The *Sun Microsystems* court stated that the reason that "transit" had not ended in certain unspecified cases was that, "even though the goods had been delivered to the proper addresses, [ ] by the terms of the business transaction, the addressee had to do something more to entitle him or her to possession."  *Id.* at *2.  That reference may have been intended to cover *Hanson*, where the fraudster had been obliged to pay to obtain title to the securities, but never did so.  But it is not tenable to reconceive the New York Court of Appeals' outcome in *Hanson* on this ground. Doing so would eliminate the central distinction that has been drawn under New York law between cases of fraud at the inception and cases of customer non-payment.  An insured's non-paying customer, like a fraudster, almost *always* will have failed to do *something* which he committed to do—pay the insured.  *Sun Microsystems*—which has never been cited since it was issued—therefore cannot bear the weight which AGCS asks it to carry.

AGCS seeks to distinguish *Hanson* by still other means.  For instance, AGCS argues that the insurance policy in *Hanson* temporally covered the period when the fraudster placed his order, setting his scheme in motion, whereas World Fuel's contract with "Battell" was entered before coverage attached to the goods.  *See* Tr. 33.  But the policy in *Hanson* is functionally identical to that here:  Coverage in *Hanson* began "immediately upon receipt of [covered] Property by the transporting employee . . . to end immediately upon delivery thereof at destination."  257 N.Y. at 218.  Thus, contrary to AGCS's premise, at the time the stockbroker in *Hanson* received an order from the fraudster, this transit coverage had not attached.

AGCS next attempts to distinguish *Hanson* by arguing that "[t]he delivery [there] was not pursuant to the terms of the underlying contract."  Tr. 34.  Rather, according to AGCS, the loss was due to an intervening event during the transit period—specifically, the messenger's negligence in leaving the securities with the fraudster without receiving proper documentation.  *See id.*  By contrast, in this case, AGCS argues, the fraud was set in motion from the moment "Battell" signed the fraudulent contract with World Fuel in which he feigned affiliation with DLA, and from that point was on a glide path to success.  But *Hanson* (and its progeny) did not turn on whether the fraudster's efforts were complete before transit began or whether some additional action by the fraudster during transit was needed to hit pay dirt.[14]  Rather, the Court of Appeals in *Hanson* painted with a broader brush:

> Possession was obtained from the plaintiffs by larceny.  It is immaterial whether the fraud was exercised upon the mind of the messenger, or upon the minds of those directing his actions.  In either event the plaintiffs have been deprived of their property by larceny, and that larceny was consummated while the property was in the custody of their messenger, through a delivery obtained fraudulently and with intent to convert the property.  It cannot be said that the larceny occurred after the messenger had ended the transit risk by delivery at destination, when that delivery was itself the consummation of a scheme to obtain possession with larcenous intent.

257 N.Y. at 220.  This analysis covers this case.  It has not been called into question by later cases.  While *Sutro* and *Grimberg* recognize an exception for cases involving long-running commercial relationships and eventual non-payment by the buyer, that exception does not apply here, where a fraudster deceived the seller from the outset as to his very identity.  *See supra* n.9.

AGCS argues, finally, that a loss like the one World Fuel suffered could not *possibly* be covered by a transit insurance policy because, according to AGCS, World Fuel paid an

---

[14] On the contrary, in *Ore & Chemical*, even though Stodder's fraud began before transit coverage attached and the agents "were dancing to his tune" from that point on, the Second Circuit held the goods to be covered by an all-risk transit policy.  489 F.2d at 460 (Anderson, J., concurring).

incremental premium of just $518 to insure this particular $17 million shipment. *See* Tr. 46. But the Policy terms govern, not the wisdom of the insurer's contracting decision. "Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain." *Klauber Bros. v. Russell-Newman, Inc.*, No. 11 Civ. 4985 (PGG), 2013 WL 1245456, at *3 (S.D.N.Y. Mar. 26, 2013) (quoting *Childs v. Levitt*, 543 N.Y.S.2d 51, 54 (1st Dep't 1989) (internal quotation marks omitted), *aff'd*, 557 F. App'x 77 (summary order) (2d Cir. 2014).

Here, the parties to the Policy surely did not contemplate, or factor into their negotiations, the particular costly misfortune that befell the MGO at the hands of the scoundrel "Battell." At the same time, AGCS—like World Fuel a sophisticated market participant—was at liberty to insist on different contract terms. For example, it could have contracted for a provision excluding coverage for losses caused by fraud or theft, or more precisely, caused by dishonest acts of persons to whom cargo was delivered or entrusted. *See, e.g.*, *Abrams v. Great Am. Ins. Co., N.Y.*, 269 N.Y. 90, 91 (1935). AGCS, however, negotiated no such exclusion. *See Farr Man Coffee Inc. v. Chester*, No. 88 Civ. 1692 (DNE), 1993 WL 248799, at *31 (S.D.N.Y. June 28, 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) ("If they intended to exclude from coverage all losses produced by conversion or fraud, the Underwriters certainly could have included such an exclusion in the Policy."); *see also Dayco*, 620 F. Supp. at 351; AGCS Br. 23 (acknowledging that the Policy "insures against theft by fraud"). In the absence of such a fraud exception, AGCS has not articulated a reasonable reading of the Policy that would exclude the loss here. *See U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 572 (2d Cir. 1991) ("[A] provision in an insurance policy is ambiguous when it is *reasonably* susceptible to more than one reading." (emphasis added)).

26

In sum, to qualify for coverage under the All-Risk Clause, World Fuel needed to show only that the MGO was lost between attachment of coverage and delivery to a bona fide customer, *i.e.*, a non-fraudster.  As there can be no dispute that such delivery never occurred and that the MGO was physically lost, the Court holds that World Fuel has made out a prima facie case that the MGO was fortuitously lost while covered under an all-risk insurance policy.

**3.     Was the Loss a *Fait Accompli* Caused by Pre-Attachment Events?**

In its alternative argument for placing the loss here outside of the coverage period, AGCS argues that a loss "caused by an event that takes place prior to the attachment of coverage is not covered under a marine insurance policy."  AGCS Br. 24.  This argument draws upon case law applying a contractual exclusion for losses caused by "inherent vice."  *See* Policy ¶ 15(6) ("This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by [ ] inherent vice or nature of the subject matter insured.").  Under this exception, there is no coverage when a loss is caused by internal defects in cargo that predate shipment.  But the doctrine of inherent vice does not apply where the loss was not endemic to the goods in question, but was caused by an external malefactor, namely here, the impostor or impostors who went by the name of "James Battell."[15]

---

[15] Even if the inherent-vice doctrine applied in cases like this, the burden of proof would be on AGCS.  *See Morrison Grain*, 632 F.2d at 431 ("[W]e deem [inherent vice] to be an exception to coverage the burden of proving which properly lies with the insurer under an 'all risks' policy."); *see also N.H. Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1200 (5th Cir. 1993) ("[I]n *Morrison Grain* the insured bore the burden of proving that the loss first manifested itself during the policy period; then, the burden shifted to the insurer to prove any policy exclusion, such as an inherent vice or defect which may have caused the loss."); *Banco Nacional De Nicaragua v. Argonaut Ins. Co.*, 681 F.2d 1337, 1340 (11th Cir. 1982) ("Rather than being an exception to coverage, *as an inherent vice or defect would be*, proof that a loss occurred within the policy period is a predicate to the application of the policy." (emphasis added)).  The Court's decision on this point does not turn on the placement of the burden of proof, however, because the Court's holding is that the exclusion simply does not apply to a loss caused by outside human malefactors.

The inherent-vice doctrine has been applied in cases where the acceptability of goods prior to shipment—*i.e.*, their condition, quality, or packaging—was at issue.  For instance, in the paradigmatic case of *Greene v. Cheetham*—cited by AGCS—the Second Circuit held that the doctrine encompassed a situation where fish designed for human consumption were contaminated when shipped, because such fish would "inevitably be condemned."  293 F.2d 933, 937 (2d Cir. 1961).  The term "inherent vice" has thus been defined to capture "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time."  *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir. 1977) (quoting *Missouri Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 136 (1964)).

Here, in contrast, AGCS has not claimed that there was a problem endemic to the MGO at all.  AGCS does not assert that any defects or other inherent infirmity caused the oil to be lost or damaged.  The problem was instead that the purported customer was an impostor and a thief. AGCS has cited no case applying the inherent-vice doctrine to such a situation—no precedent involving an external peril caused by human malfeasance, rather than an "indwelling fault." *Greene*, 293 F.2d at 937.  Nor has the Court found one.  And there is good reason for that distinction.  There is nothing inherent or inexorable about a fraud scheme once it is underway. Such a scheme can be—in a host of ways—abandoned, exposed, or frustrated before reaching fruition.  The fraud here, for example, was hardly assured of success once the contract between "Battell" and World Fuel was signed.  To choose an obvious example, had World Fuel touched base earlier with the DLA, the impostor might have come to light before the MGO was transferred to the Ocean Pearl.  A rotten fish, by contrast, cannot be un-rotted.

In rejecting AGCS's bid to extend the narrow doctrine of inherent vice, the Court finds support in a First Circuit case in which an insurer unsuccessfully sought to avoid coverage on the

ground that the malefactor's theft of cargo should be viewed as a *fait accompli* from inception. In *Insurance Company of North America v. Newtowne Manufacturing Co.*, 187 F.2d 675 (1st Cir. 1951), the shipper's goods were insured during transportation, but were lost when an individual, pretending to be an employee of a trucking company that the shipper often used, appeared at its factory, loaded some cargo, and absconded. *See id.* at 678. The insurer defended by arguing that the undisputed facts showed that the apparent thief arrived at the factory predetermined to steal the goods, and that the theft therefore occurred before the goods left the factory, which is when the transit insurance policy attached. *See id.* at 683. The First Circuit rejected this argument. Even accepting the assumption that the thief's larcenous intent predated attachment of the insurance coverage, the First Circuit wrote:

> We do not undertake to say whether the crime was complete when the goods were loaded on to the truck, or when the shipping clerk Lovecchio relinquished control of the goods to the driver upon the latter's signing of the bills of lading, or when the driver began the asportation of the goods in driving away from the factory. The interpretation of the insurance policy does not depend upon the subtleties of the crimes of larceny and embezzlement. . . . Quite apart from when the crime was complete for purposes of the criminal law, from the practical viewpoint of the businessman Newtowne lost the goods when the driver drove away from the factory and disappeared.

*Id.* at 683–84. Similarly here, that the criminal scheme began before coverage attached to the MGO is not dispositive. Like the shipper in *Newtowne*, World Fuel's loss was experienced later, during the period of coverage.[16]

---

[16] The unpublished decision in *Commercial Union Insurance Co. v. Sponholz*, No. C-87-4943 (MHP), 1987 WL 49254 (N.D. Cal. Dec. 16, 1987), does not avail AGCS on this point. There, the Court held that an all-risk policy did not apply where the police confiscated the insured's yacht, which, unbeknownst to the insured, was the stolen property of another. *See id.* at *1. The yacht's defective title can easily be seen as an "indwelling fault," *i.e.*, a defect in the innate quality of the insured property itself. *Greene*, 293 F.2d at 937. And, to the extent *Sponholz* does reflect an expansive view of the inherent-vice exception, the Court is not bound by that view here.

The Court's maintenance of the traditional scope of the inherent-vice doctrine poses no unfairness to AGCS. The solution for an insurer seeking to avoid liability for losses caused by criminal schemes initiated pre-attachment is to contractually exclude such losses from the policy's coverage, and to do so explicitly. *See City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 49 (2d Cir. 2003) (noting broader modern view of insurable "fortuity" and observing that "expanded coverage to the detriment of insurers in all-risk policies . . . give[s] insurers, who presumably have better knowledge of insurance laws than do insureds, a powerful incentive to insert explicit language into policies, thereby informing the insureds as to the precise scope of coverage"). Here, as World Fuel notes, the parties could have excluded losses caused by events preceding attachment. *See* World Fuel Reply Br. 23. But the Policy upon which they agreed "ascribes no temporal relevance to the causative event preceding the covered injury, but rather premises coverage exclusively upon the sustaining of specified injuries during the policy period." *Nat'l Cas. Ins. Co. v. City of Mount Vernon*, 515 N.Y.S.2d 267, 270 (2d Dep't 1987); *see also PECO Energy Co. v. Boden*, 64 F.3d 852, 857 (3d Cir. 1995) ("Under an all risks insurance policy, the Underwriters are liable for all losses which [the insured] suffered during the relevant policy periods, regardless of when the occurrence which triggered those losses took place.").

Therefore, the Court rejects AGCS's argument that losses experienced within the period of coverage, but caused by events predating attachment, are not covered by the Policy.

### 4.    Conclusion

In sum, World Fuel made out a prima facie case for recovery by establishing a fortuitous loss of insured cargo under an all-risk policy during the period of coverage—*i.e.*, before the cargo was lawfully "delivered." The burden shifted to AGCS to establish an applicable exception or exclusion. It attempted to do so by invoking the inherent-vice doctrine, but the

Court has rejected this argument.  World Fuel is, therefore, entitled to summary judgment under the All-Risk Clause.

### B.       Fraudulent Bills of Lading Clause

The foregoing holding is sufficient to support an award of summary judgment to World Fuel.  However, in the interest of completeness and to facilitate anticipated appellate review, the Court also addresses World Fuel's two independent arguments for coverage.

The first is based on the F.B.O.L. Clause.  That provision covers "physical loss incurred . . . through the acceptance by [World Fuel], its Agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents."  Policy ¶ 37.  This provision is an independent and separate grant of coverage.  *Id.* ("This policy *also* covers . . ." (emphasis added)).

Three elements must be established to secure coverage under the F.B.O.L. Clause: that (1) covered property was physically lost; (2) a bill of lading, shipping receipt, messenger receipt, warehouse receipt or other shipping document was fraudulent; and (3) the loss was incurred through, *i.e.*, caused by, the acceptance of that fraudulent document.  *See Centennial Ins. Co. v. Lithotech Sales, LLC*, 29 F. App'x 835, 837 (3d Cir. 2002).  Although the clause "contains no temporal limitation," World Fuel Br. 18, its causal element—that the loss occurred "through" the acceptance of qualifying documents—implies that the acceptance must precede the loss.[17]  *See Aurubis Buffalo, Inc. v. Lombard Gen. Ins. Co. of Can.*, No. 08 Civ. 34 (RJA) (JJM), 2012 WL 7828965, at *3 (W.D.N.Y. Mar. 22, 2012) (if loss occurred before acceptance of fraudulent

---

[17] AGCS argues that the acceptance of the fraudulent document must occur within the temporal limits set out by the All-Risk Clause, *i.e.*, during transit.  *See* AGCS Br. 22–23.  That is incorrect.  The only temporal limitation for coverage under the F.B.O.L. Clause is that provided by the causation requirement.

documents, it could not have occurred "through" that acceptance), *report and recommendation adopted*, 2013 WL 1337305 (W.D.N.Y. Mar. 29, 2013).

Here, World Fuel argues that two sets of documents involved in the MGO loss qualify as "other shipping documents" as to which the elements of coverage under the F.B.O.L. clause are met: (1) the contract between World Fuel and "James Battell" (posing as a DLA representative) and (2) the two bunker delivery receipts that record the separate deliveries of MGO from the Marida Marigold and the African Leader into the tanks of the Ocean Pearl.  The Court addresses these theories in turn.

### 1.    The World Fuel/"Battell" Contract

On or about November 21, 2013, World Fuel signed an agreement with "James Battell" that "was not a genuine contract," JSF ¶ 56, in that "Battell" fraudulently purported to act for the DLA.  The key question is whether this fraudulent contract qualifies as a "shipping document."

The Court must give contract terms "their plain and ordinary meaning," and to do so, it is common to refer to dictionary definitions.  *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011).  World Fuel proffers three dictionary definitions of "shipping documents" that, it argues, encompass contracts:

> (1) "any paper that covers a shipment in trade, such as a bill of lading or letter of credit";
>
> (2) "a set of official papers, such as insurance documents, that are necessary when sending goods from one country to another"; and
>
> (3) "a generic term for the various types of forms required for overseas shipments, such as commercial invoices, transport documents, packing lists, origin certificates, etc."

*See* World Fuel Br. 19.

Notably, although these dictionary definitions add examples of "shipping documents" to those enumerated in the F.B.O.L. Clause itself, none mentions contracts nor, for that matter, any

other document that initiates a commercial relationship resulting in an eventual shipment.  On the contrary, World Fuel's latter two definitions—which appear substantively indistinguishable—seem clearly inapplicable to a contract for the sale of fuel oil.  A sales contract is not "*necessary* when sending goods from one country to another" or "*required* for overseas shipments" just because it may initiate the process leading to an international shipment of goods.  *Id.* (emphasis added).

The other definition offered by World Fuel is "[a]ny paper that covers a shipment in trade, such as a bill of lading or letter of credit."  *Id.*  World Fuel argues that this definition includes any document that is a but-for cause of a shipment.  *See id.* ("[The contract] is a paper covering and necessary to the MGO shipment; the shipping could not have occurred without it.").  But such a broad reading does not follow.  It may be, for example, that the shipment in this case "could not have occurred" without the fraudster's emailed solicitation.  But under no reasonable construction is that email is a "shipping document."  World Fuel's construction would read the term "shipping document" so broadly as to embrace any document in some way connected to the eventual shipment of goods.  The more natural reading would encompass a narrower class of documents, those actually used in and integral to the shipping process.

Relatedly, World Fuel argues that the Contract "expressly sets forth certain significant aspects of the shipment, identifying the product, quantity and where, how and when the STS transfer was to occur."  *Id.*  And, World Fuel notes, its offer—incorporated in the Contract— contained "additional necessary shipping details relating to the supply tankers, the receiving tanker appointment, pumping rates, sampling and surveying and STS checklists."  *Id.* at 20.

However, the mere fact that a contract describes how a shipment is to take place does not make it a *shipping document*.  Rather, in the Court's assessment, the plain and ordinary meaning

33

of the term "shipping document" is a document used in the ordinary course of shipping.  This definition covers all of the specific examples mentioned in the dictionary definitions and in the F.B.O.L. Clause itself.[18]  And it is consistent with the only precedent of which the Court is aware that interpreted the term "other shipping documents" in an identical F.B.O.L. Clause.  *See Aurubis*, 2012 WL 7828965, at *3 ("[The insured] must have sustained a 'physical loss' which was 'incurred through' its acceptance of fraudulent bills of lading or *similar* documents." (emphasis added)).

A contract is not used in the ordinary course of shipping, even though it may initiate and even describe the shipping process.  Therefore, the Court holds, the Contract between World Fuel and "James Battell" is not a "shipping document."  Its acceptance by World Fuel cannot give rise to a claim for coverage under the F.B.O.L. Clause.

### 2.    The Two Bunker Delivery Receipts

The delivery from the Marida Marigold to the Ocean Pearl occurred between December 7 and December 9, 2013.  JSF ¶ 61.  On December 10, Monjasa sent World Fuel the bunker delivery receipt ("BDR") for this transfer, dated December 9.  *See* JSF Ex. 18 ("12/9/13 BDR").  The BDR, in pertinent part, confirms when delivery began and ended, the location of the

---

[18] The principle of *ejusdem generis* would also support this construction.  This canon provides that a general term that follows a series of specific terms is construed to embrace objects in the same class as or similar to the specific terms.  To be sure, the Second Circuit has not addressed whether it is proper to rely on the *ejusdem generis* canon "to make a plain meaning determination" of a contractual provision.  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 118 n.7 (2d Cir. 2010).  To the extent World Fuel claims that this canon has been held unavailable in this context, however, it is wrong.  The case on which World Fuel principally relies—the district court decision in *Lafarge*—does not hold that *ejusdem generis* cannot be used to ascertain plain meaning.  *See* World Fuel Reply Br. 17.  Indeed, it says the opposite.  *See Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, No. 06 Civ. 3123 (CSH), 2008 WL 4449353, at *7 (S.D.N.Y. Sept. 29, 2008) ("Lafarge argues that *ejusdem generis* is available . . . 'only if the Court should deem the [contract] language to be ambiguous.' *I do not agree.*" (emphasis added) (citation omitted)).

delivery, the type of product delivered, and the quantity delivered.  It is signed by the captains of the Marida Marigold and the Ocean Pearl.

The delivery from the African Leader to the Ocean Pearl occurred between December 10 and December 11, 2013.  JSF ¶ 63.  On December 12, 2013, Monjasa sent World Fuel the BDR for this transfer, dated December 11.  *See* JSF Ex. 19 ("12/11/13 BDR").  It differs from the earlier BDR, of course, only in the details as to timing, quantity, etc.

World Fuel argues that the two BDRs are "other shipping documents" and that they were "fraudulent" because the signatures of the Ocean Pearl's captain were "fraudulently induced and procured on the BDRs by the perpetrators."  World Fuel Br. 21.  The Court assumes *arguendo*, despite significant doubt, that these contentions are true, establishing the first two elements required for coverage under the F.B.O.L. Clause.

The final element is causation—which World Fuel oddly leaves unaddressed.  This element is not met.  World Fuel's position in this litigation is that the MGO was lost "the moment [it] left the supply vessel and entered the hose on its way to the [Ocean Pearl]."  Tr. 7–8.  That is, the loss occurred, as to the Marida Marigold's MGO, between December 7 and December 9, and, as to the African Leader's MGO, between December 10 and December 11.  The respective BDRs, however, were dated on the last day of each transfer, after the transfer was complete.  Thus, on World Fuel's view, the loss of the MGO necessarily preceded, rather than having been incurred through, acceptance of the BDRs.  *See* AGCS Reply Br. 7.  While the BDRs may well, in some sense, *reflect* or record the loss of the MGO, they did not—under any conceivable test of causation—*cause* it.

Therefore, World Fuel cannot claim coverage under the F.B.O.L. Clause by pointing either to the Contract or to the BDRs.  AGCS would be entitled to summary judgment on the issue of coverage under the F.B.O.L. Clause.

### C.      The F.O.B. Clause

World Fuel, finally, argues that the MGO loss is covered under the F.O.B. Clause.  That provision extends coverage to goods, merchandise, or property "sold by [World Fuel] on F.O.B., F.A.S., Cost and Freight or similar terms whereby [World Fuel] is not obligated to furnish marine insurance."  Policy ¶ 69.  The F.O.B. Clause "attaches subject to its terms and conditions and continues until the goods . . . are loaded onto the primary conveyance or until [World Fuel's] interest ceases."  *Id.*

There is no dispute that the MGO was shipped on F.O.B. or similar terms, pursuant to which World Fuel was not obligated to furnish marine insurance.  Further, while there is some dispute about whether the MGO was actually "sold" given that it was never paid for, the Court assumes *arguendo* that it was.

The parties primarily dispute whether the clause "until [World Fuel's] interest ceases" extends coverage past the point at which the fuel was transferred to the Ocean Pearl.  World Fuel argues that the term "interest" encompasses World Fuel's purely pecuniary interest in, eventually, being paid for the MGO.  If so, then, insofar as World Fuel was never paid, its interest has not ceased, and there is coverage.  If not, there is no coverage, because World Fuel has not articulated any interest besides payment that it had after transfer of the fuel.

The Policy does not define the term "interest."  World Fuel argues that its desire to be paid is an "interest" in the ordinary sense of that word—and that this "interest" obviously has not "ceased."  AGCS counters that the term "interest," in the context of the Policy, must refer to an

"insurable interest," and that World Fuel's only insurable interest created by the Policy was its interest in avoiding physical loss or damage to the MGO during transit.

Reading the Policy as a whole, with due attention to its evident purpose and other provisions, the Court holds with AGCS.

As to its purpose, the Policy was clearly designed to cover risks of loss during transit. Besides the All-Risk Clause, other Policy provisions clearly demarcate this transit-based period of coverage. *See* Policy ¶ 14 ("This insurance attaches from the time the goods . . . leave[] the warehouse and/or store or other location . . . and continues until the goods . . . are delivered to final warehouse store or other location at the destination."); *see also id.* ¶ 16 ("[T]his policy . . . fully covers the goods . . . continuously from warehouse to warehouse.").[19]  World Fuel's interpretation of the F.O.B. Clause would transform the Policy from a guard against physical loss or damage during transit into a guard against non-payment for any reason whatsoever (where the shipment is on F.O.B. or similar terms).  If the buyer decided for any reason not to pay World Fuel following delivery, World Fuel's interpretation of "interest" would support coverage under the F.O.B. Clause.

This interpretation is untenable and unreasonable, for two independent reasons.

First, the Policy has a separate provision addressed to the problem of non-payment:

> This insurance is extended to cover the interest of [World Fuel], as a vendor in a credit transaction, on all shipments made by [World Fuel] on terms under which [World Fuel] is not obliged to furnish transit insurance.  [AGCS] will guarantee to [World Fuel] the prompt collection of losses, damages and expenses otherwise coming within the terms, conditions and warranties of this insurance in connection with shipments for which [World Fuel] has not been paid.  [AGCS] will advance to [World Fuel] the amount of the loss, damage or expense, as a loan without interest. Such advance shall be repayable upon, but subject to and only to the extent of (i)

---

[19] Although the term "warehouse" seems out of place in the context of a ship-to-ship fuel transfer, the clear import is that the Policy insures against transit risks.

the receipt of the purchase price by [World Fuel], or (ii) any recovery received by [World Fuel] from insurance effected by the buyer or otherwise.

Policy ¶ 71 ("Unpaid Vendors Clause"). This provision, like the F.O.B. Clause, applies to shipments made on terms under which World Fuel is not obliged to furnish transit insurance. Under it, AGCS is responsible for unpaid bills "*otherwise coming within the terms, conditions and warranties of this insurance*." *Id.*; *see* Tr. 11 (World Fuel acknowledging that it did not seek coverage under the Unpaid Vendors Clause because "it specifically references back to other policy terms and conditions"). Thus, if the F.O.B. Clause made AGCS responsible for *all* unpaid bills, the Unpaid Vendors Clause would be superfluous. *See Int'l Multifoods*, 309 F.3d at 86 ("We disfavor contract interpretations that render provisions of a contract superfluous."). World Fuel's sole counterpoint—that the plain meaning of the term "interest" includes an interest in being paid, *see* Tr. 11—is not persuasive, because even ordinarily clear terms must be read in light of the contract as an integrated whole. *See Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) ("[T]he court must look to 'all corners of the document' rather than view sentences or clauses in isolation.").

Second, AGCS's reading of "interest" as denoting an "insurable interest" accords with case law and the Policy's evident purpose. An insured party must demonstrate an insurable interest to recover under *any* insurance policy. *Farr Man Coffee*, 1993 WL 248799, at *21. And it is well settled that a "seller's insurable interest in goods usually ends with their delivery to the buyer, for risk of loss passes to the buyer no later than the time of delivery." *Grimberg II*, 324 F. App'x at 120 (quoting *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1102 (2d Cir. 1990)) (internal quotation mark omitted). That is because an "insurable interest" requires "such a relation or connection with, or concern in, [the] subject matter that [the insured] will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage

from its destruction, termination or injury by the happening of the event insured against." *Farr Man Coffee*, 1993 WL 248799, at *21 (quoting *Scarola v. Ins. Co. of N. Am.*, 31 N.Y.2d 411, 413 (1972)).  It is reasonable to assume that, in contracting, World Fuel and AGCS intended that the term "interest" be read in light of this familiar usage.

Reading the Policy as an integrated whole, the Court therefore holds that the "interest" to which the F.O.B. Clause refers does not mean interest in a literal sense, disconnected from the Policy's purpose or other terms.  Instead, the term is given meaning by the risks against which the Policy specifically insures.  AGCS's interpretation of the F.O.B. Clause, so as not to cover non-payment risk in perpetuity, is the only reasonable one.  As to that point, the clause is not ambiguous.

Therefore, the Court holds that World Fuel cannot separately recover under the F.O.B. Clause.  AGCS would be entitled to summary judgment on this issue.

## CONCLUSION

The Court holds that World Fuel's loss is covered under the All-Risk Clause, and therefore World Fuel is entitled to summary judgment.  To the extent that World Fuel advances alternative arguments for summary judgment under the F.B.O.L. Clause and the F.O.B. Clause, however, those arguments lack merit.

The Court respectfully directs the Clerk of Court to close the motions pending at docket numbers 64 and 79.

The Court directs the parties promptly to meet and confer about next steps, if any, in this case, and to submit a joint letter to the Court within two weeks of today.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 17, 2016
      New York, New York