USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/15/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AGCS MARINE INSURANCE COMPANY,

                             Plaintiff,

            -v-

WORLD FUEL SERVICES, INC. and
WORLD FUEL SERVICES EUROPE, LTD.,

                             Defendants.

------------------------------------------------------------------X

14 Civ. 5902 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

       On May 17, 2016, the Court issued a decision resolving cross-motions for summary judgment as to liability in this insurance-coverage lawsuit. *See AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, No. 14 Civ. 5902 (PAE), 2016 WL 2918428 (S.D.N.Y. May 17, 2016) ("May 17 Decision" or "Decision"). This decision resolves the remaining issues in this case, involving the calculation of damages and pre-judgment interest.

### I. Background

#### A. Factual Background

       The Court assumes familiarity with its decision as to liability and sets out here only those facts necessary to understand the outstanding issues.

       This case involves a dispute between an insurer, AGCS Marine Insurance Company ("AGCS"), and its insureds, World Fuel Services, Inc. and World Fuel Services Europe, Ltd. (collectively, "World Fuel"). The dispute involved whether World Fuel's insurance policy with AGCS covered a multi-million dollar loss of marine gas oil ("MGO") by World Fuel. *See* Marine Open Cargo Policy No. OC91524500, Dkt. 63, Ex. 6 (the "Policy"). The loss resulted

from a scam orchestrated by a fraudster, under the assumed name "James Battell," who impersonated the Defense Logistics Agency of the U.S. Government ("DLA"). The fraudster arranged to purchase the MGO through World Fuel, and thereby caused World Fuel to deliver substantial quantities of MGO to the fraudster's ship off the coast of Africa, with which "Battell," posing as DLA, then absconded.

AGCS, invoking admiralty jurisdiction, brought suit in this Court, seeking a declaratory judgment that the loss was not covered. See Dkt. 1. World Fuel, invoking diversity jurisdiction, filed counterclaims for a declaratory judgment that the loss was covered and for damages based on a breach of contract. See Dkts. 4, 18.

In the May 17 Decision, which followed discovery, the Court granted summary judgment for World Fuel on liability. In brief, the Court held that World Fuel's loss fell within the period of coverage of its "all-risk" transit insurance policy because, under New York law, delivery to a fraudster, rather than a *bona fide* customer, does not terminate coverage. Decision at 32–34. The Court directed the parties to submit a joint letter, identifying the remaining issues in the case and proposing a schedule to resolve them. Decision at 39.

### B.   Open Issues

In a May 31, 2016 joint letter, the parties identified three open issues on which each proposed to move for summary judgment. Dkt. 97 ("Letter"). These were: (1) which invoice is to be used as to measure World Fuel's damages?; (2) what rate of prejudgment interest applies?; and (3) is World Fuel entitled to attorneys' fees and/or consequential damages?

On June 22, 2016, World Fuel filed a memorandum of law, Dkt. 105 ("WFS Br."), and supporting declarations, Dkts. 106, 107. On July 13, 2016, AGCS filed its memorandum of law, Dkt. 115 ("AGCS Br."), and a supporting declaration, Dkt. 116. On July 22, 2016, World Fuel filed a reply memorandum, Dkt. 118 ("WFS Rep. Br."), and another declaration, Dkt. 119. On

August 18, 2016, the Court heard argument. *See* Dkt. 141 ("Tr."). At argument, World Fuel withdrew its claims for fees and consequential damages, Tr. 59-60, mooting the third issue.

## II. Legal Standards Governing Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits,

taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince,* 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993)).

### III.     Which Invoice Supplies the Measure of World Fuel's Damages?

Calculating World Fuel's damages requires the Court to apply the Policy's "valuation" clause. In pertinent part, it states that "the goods and/or merchandise and/or property insured under this policy shall be valued . . . [at the] *Invoice value (premium included)*, including all charges in the invoice and including prepaid and/or guaranteed and/or advanced freight, if any plus 10%." Policy at 2 (emphasis added).

The parties dispute which invoice is the proper measure of "[i]nvoice value." *Id.* at 2. World Fuel takes the position that the relevant invoice is the one that it sent to its customer, the fraudster "Battell" posing as DLA, pursuant to their written agreement. That invoice ("the re-sale invoice") was for $17,910,833.28 (the "re-sale invoice"). *See* WFS Br. at 1–5. AGCS, on the other hand, takes the position that the relevant invoice is the one that World Fuel was sent by its fuel supplier, Monjasa, which was for about $17 million (the "supply invoice"). *See* AGCS Br. at 1–3.[1]

Because resolving this dispute requires construing a term within the insurance policy, the Court therefore first reviews the legal principles governing such interpretation.

---

[1] The parties agree that, under the Policy, use of World's Fuel's figure would make its total damages $19,611,962.44. That is arrived at by adding 10% ($1,791,083.33) and subtracting a Policy deductible of 0.5% ($89,954.17). Use of ACGS's figure would make World Fuel's total damages $18,566,242.90. The Policy provides for an alternative mode of valuation based on the lost property's market value, if higher than the invoice value, *see* Policy at 2–3, but there is no occasion to consider that value, because, as all agree, World Fuel's invoice value calculation, which the Court adopts here, exceeds the lost property's market value.

4

A.      **Principles for Interpreting Insurance Policies under New York Law**

"The construction of an insurance contract is ordinarily a matter of law to be determined by the court." *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 89 N.Y.2d 308, 316 (1996)). In resolving a summary judgment motion involving contract interpretation, "a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

When contract language is unambiguous, "the district court [may] construe it as a matter of law and grant summary judgment accordingly." *Id.* But, if policy language is ambiguous, New York law provides that such ambiguities must be construed in favor of the insured and against the insurer. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101 (1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.").

Whether a contract is ambiguous is a threshold question of law for the court. *Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998). "[A]mbiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley*

5

*Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

If the language in an insurance policy is ambiguous, a court should examine the language "from the vantage point of the reasonable expectations and purposes of the ordinary person." *Haber*, 137 F.3d at 695 (alterations and internal quotation marks omitted). The court should also "consider extrinsic evidence submitted by the parties to assist in determining their actual intent." *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir. 1994). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured." *Id.*

### B. Discussion

The issue here is whether the Policy term "Invoice value (premium included)" refers (as AGCS argues) to the invoice which Monjasa issued and on which World Fuel paid for the fuel it ordered or (as World Fuel argues) to the higher invoice which World Fuel issued to "DLA" (behind which lurked the fraudster "James Battell") and on which it expected to be paid for its services.

The Policy does not define the term "[i]nvoice value" or otherwise explicitly address which invoice to value the damaged or lost goods where multiple invoices are implicated. And the relevant case law is sparse. But the one apposite case, from this District, strongly supports World Fuel as to which invoice to use for valuation where the text of the insurance policy does not resolve that issue. It suggests that, where an insured purchased the goods for its own

account, the insured's purchase invoice controls,[2] but where the insured is a seller or re-seller of the goods in a back-to-back transaction, the insured's sales invoice controls. *See* WFS Br. 3 (citing *Groban v. S.S. Pegu*, 331 F. Supp. 883, 890, 896 (S.D.N.Y. 1971), *aff'd sub nom. Groban v. Am. Cas. Co.*, 456 F.2d 685 (2d Cir. 1972)).

At issue in *Groban* was an insurer's purchase for re-sale. There, as here, an insured sought coverage under a "marine open cargo policy." Its claim was for damage caused by rust to a shipment of "caterpillar" tractor parts, which had been shipped to the insured in New York from a supplier in Freetown, Sierra Leone. 331 F. Supp. at 885–888. As to valuation of the insured's claim, the policy in *Groban* contained language essentially identical to the valuation clause in the Policy here: "premium included at invoice value, plus 10%." *Id.* at 896–97 (internal quotation marks omitted).

The district court in *Groban* first noted that "[t]he term 'invoice value' is nowhere defined or limited in any way in the open policy." *Id.* at 897. It then determined that the insurer was liable both to reseller Groban and to Groban's intended purchaser, Union. The court then addressed the insurer's claim that damages should be measured by the lower invoice price governing the sale to Groban (the "supply invoice"), as opposed to the higher invoice governing Groban's sale to Union (the "re-sale invoice"). The court noted that the insurer had "shown nothing to indicate that any such limitation as it suggests could be reasonably imposed." *Id.* And, it noted, both the purchaser, Union, and the re-seller, Groban, had an interest in insuring the higher value: Union must have been "concerned with protecting the goods at the amount it was

---

[2] Examples of cases addressing this scenario—where the insured purchased for its own account, and where its purchase invoice was therefore controlling—are *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 439 (5th Cir. 1980), and *Arkwright Mut Ins. Co. v. Warner-Lambert Co.*, 242 F.3d 370, (3d Cir. 2000).

7

paying Groban for them," *id.*, and Groban "was concerned with protecting the purchase price . . . which it expected to receive from Union on resale," *id.* Accordingly, the district court held, the insurer's sales invoice controlled. The Second Circuit summarily affirmed. *See Groban* at 456 F.2d, 685.

AGCS attempts to distinguish *Groban* on two grounds. First, it notes, the purchaser there, Union, had instructed the reseller to provide insurance, suggesting that the purchaser had been concerned with protecting the goods at the amount it planned to pay. *See* AGCS Br. 1–2. But that distinction does not carry the day. The *Groban* court, although noting Union's request that the re-seller obtain insurance, did not state that that request—or the fact that the re-seller was listed as an insured—affected its construction of the decisive Policy term, "invoice value." And, regardless whether Union had asked Groban to obtain insurance, in the event of a loss, Groban would have had the same interest in protecting its profits from the sale to Union. Second, AGCS notes, *Groban* involved a "legitimate buyer," whereas World Fuel's re-sale contract was with a fraudster, "Battell," who never intended to pay for the MGO. *See* AGCS Br. 1; Tr. 22–26. But World Fuel was unaware that it was contracting with a fraudster. World Fuel's interest in protecting through insurance the profits it expected from the re-sale to "DLA" was no less because "DLA" later turned out to be a masquerade for an imposter.[3]

---

[3] In an alternative cast to this argument, AGCS asserts that World Fuel cannot recover "phantom profits" from a "fraudulent" contract, the implication being that World Fuel's profit margin on the "DLA" contract may have been inflated because "DLA" never intended to pay. But AGCS did not adduce, and has not come forward with, evidence that the price that "DLA" was to pay World Fuel exceeded industry norms. In any event, World Fuel's uncontradicted evidence is that it, not "Battell," set the MGO invoice price. *See* Dkt. 119, Ex. 2 at 2 (affidavit of World Fuel employee Mark Sarsfield). The Court declines AGCS's motion to strike Sarsfield's declaration, Dkt. 127, because World Fuel's opening papers timely stated that the "DLA" contract price was not "above-market," *see* Dkt. 105, at 5, and because its later submission of the Sarsfield affidavit was a fair response to AGCS's ensuing (and new) suggestion to the contrary. Had AGCS possessed evidence of above-market pricing, the Court would have received it, too.

8

*Groban* is significant to the construction of the AGCS/World Fuel Policy because parties to a commercial agreement that uses terms construed in reported decisions are assumed to negotiate against the backdrop of such case law. *See, e.g., CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77 (2d Cir. 2013). In the context of an insurance policy, such case law similarly informs the understandings imputed to the contracting parties. *See, e.g., Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618 (2d Cir. 2001). Notably, other than *Groban*, the Court has not found any case resolving the precise issue here—which invoice to use for loss valuation purposes where the insured was involved in back-to-back purchase and resale transactions involving different invoices and where the Policy was silent as to which invoice to use—as of the date October 1, 2013, *see* Decision at 4, that AGCS and World Fuel executed the Policy.[4] The Court therefore infers that AGCS and World Fuel, being on notice of the *Groban* precedent, intended that, in the event a like dispute arose, the non-specific term "[i]nvoice value" would be applied as in *Groban*.

Although none are dispositive, each party has made arguments why aspects of the Policy's text favors its reading. World Fuel notes that AGCS's Policy used the more precise term, "supplier's invoice," in a different provision. Specifically, clause 28 of the Policy provides that AGCS would cover any shortfall between what was loaded onto World Fuel's ship according to the "supplier's invoice" and what World Fuel actually received. Policy at 14. The Policy's use of that specific term, World Fuel argues, negatively implies that the use in the valuation provision of the more generic term "invoice" must refer to the other invoice, which

---

[4] The only other reported case involving valuation in the context of such back-to-back transactions by an insured is inapposite, because the policy at issue specified which invoice to use. *See D.B. Orban Canada, Inc. v. New York Marine Managers, Inc.*, 765 F. Supp. 140, 141–42 & n.4 (S.D.N.Y. 1991) (using re-sale invoice, where policy explicitly referred to the "Assured's sales invoice").

9

covers World Fuel's re-sale. There is a degree of force to that argument. But only so much: The Policy's reference, in a single place, to the "supplier's invoice" is modest, but far from conclusive, evidence that the contracting parties intended the term "invoice," where used in the valuation provision, to refer to the other (*i.e.*, the re-sale) invoice.

AGCS, for its part, notes that, in the valuation provision, the term "invoice value" is followed by the words "premium included." AGCS emphasizes that World Fuel's supply invoice included a premium while its re-sale invoice did not. Therefore, AGCS argues, the valuation provision must refer to the supply invoice. AGCS Br. 1. But AGCS is wrong, both linguistically and factually. Linguistically, the reference in the valuation provision to a premium does not connote that to qualify for use, an invoice must have a premium, such that if one of two invoices contained a premium and the other did not, the one with the premium would control the loss valuation inquiry. Fairly read, the reference to a premium merely means that, where the governing invoice includes a premium, the premium must also be included as part of the valuation. And factually, as World Fuel points out, its re-sale invoice *does*, in fact, contain a premium—the premium merely was not "broken out" as such in the same way that the premium was broken out in its supply invoice. *See* Dkt. 119, Ex. 2 at 1–3.[5]

Considering all arguments, the Court holds for World Fuel on this point. On the basis primarily of the *Groban* precedent, against the backdrop of which the parties are presumed to

---

[5] AGCS moves to strike World Fuel's evidence to this effect, Dkt. 127, but the Court declines to do so. It was appropriate for World Fuel to come forward with the evidence of this premium, after AGCS's brief was filed, to respond to AGCS's claim, raised for the first time in its brief, to the effect that the re-sale invoice was devoid of a premium. *See Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226–27 (2d Cir. 2000) ("[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party.") (internal quotation marks and citations omitted).

have negotiated, and secondarily based on the Policy's use in clause 28 of the more specific term "supply invoice," the Court holds that the term "invoice value" in the valuation provision refers to the value of World Fuel's re-sale invoice, not to its purchase invoice. Accordingly, under the Policy, World Fuel is entitled to damages measured by the higher invoice's value of $17,910,833.28.[6]

### C. Demurrage

In a related issue as to damages, AGCS argues that, although the valuation clause covers "all charges in the invoice," World Fuel cannot recover $96,750 in charges for "demurrage," which are liquidated damages owed to a ship-owner for the failure to load or unload cargo by the agreed time. *See* AGCS Br. 3. AGCS argues that, under the Policy, World Fuel was covered only for charges representing "physical loss or damage." *Id.*

That argument is quite unpersuasive. It is contrary to the text of the valuation clause, which provides for coverage of "all charges" and does not exclude demurrage. And AGCS's notion that only "physical loss or damage" is covered under the Policy does not accord with other provisions of the Policy, which covers such items as "sue and labor" expenses, Policy at 14, and "extra expenses incurred by the Assured forwarding tile goods," *id.* at 13, neither of which constitutes "physical damage." Similarly, the valuation clause awards the insured an additional 10% coverage over the invoice price, *id.* at 2–3, as well as "prepaid and/or guaranteed and/or advanced freight,"[7] *id.* at 2, neither of which represent exclusively "physical damage." The Court therefore declines to make the requested reduction.

---

[6] Although the Court reaches this conclusion by means of the interpretive tools utilized above, based on the evidence and arguments presented, it would have reached the same conclusion—in favor of the insured—had it held the Policy term "[i]nvoice value" ambiguous.

[7] "[F]reight" is defined as "[t]he compensation paid to a carrier for transporting goods," *Black's Law Dictionary* (10th ed. 2014).

11

## IV. What Prejudgment Interest Rate Applies?

The parties also dispute the applicable rate and accrual date of prejudgment interest. World Fuel argues for the New York statutory rate of 9% and an accrual date of March 2, 2014, while AGCS argues for the Treasury bill ("T-bill") rate, which would be about 0.33%, and an accrual date of June 7, 2014.

### 1. Interest Rate

Ordinarily, "[i]n a diversity case, state law governs the award of prejudgment interest." *Granite Ridge Energy, LLC*, 979 F. Supp. 2d at 391 (quoting *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008)). Thus, in insurance coverage cases brought under diversity jurisdiction and resolved under New York law, the New York statutory rate of 9% prejudgment interest applies. The inquiry is complicated in this case, however, because the case is properly here under both diversity and admiralty jurisdiction, the latter because the operative agreement is a marine insurance agreement. And, where "claims [are] permissibly brought in both admiralty and diversity, [t]he same substantive law pertains to the claim regardless of the forum, a type of 'reverse-Erie' to ensure the uniform application of admiralty law." *Dluhos v. The NEW YORK*, 162 F.3d 63, 73 (2d Cir. 1998) (internal quotation marks and citations omitted).

The Court therefore inquires into the substantive law that it used to resolve the parties' claims. This law was exclusively New York law.[8] Indeed, the Court's award of summary judgment for World Fuel was based on, and reflected, an extended review and analysis of doctrine under, New York insurance law. *See, e.g.,* Decision at 7–10, 12–39. In contrast, the

---

[8] As the Court explained in the May 17 Decision, there was no need to determine whether the Court was applying federal maritime law or New York's state law, because federal maritime law in the area of marine insurance ostensibly looks to state law (here, New York's "for principles governing marine insurance policy") Decision at 7–8 (quoting *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d. Cir. 1999)).


Court did not rely on any substantive principles of admiralty law in holding that World Fuel's loss was covered under its agreement with AGCS. *Id.* And, where New York law has supplied the rule of decision, New York law consistently has been held to govern the pre-judgment interest in the case. The Court therefore likewise applies the New York statutory rate of 9%. *See* N.Y. C.P.L.R. ¶¶ 5001, 5004; *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991); *U.S. Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 888 (2d Cir. 1988).

Consistent with this holding, in numerous cases in this District, collected by World Fuel in its brief, courts that applied insurance contracts to maritime shipments such as the one at issue here have applied, and held the prevailing party entitled to, the New York statutory prejudgment interest rate of 9%. *See, e.g.*, *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 178 F. Supp. 2d 346, 355 (S.D.N.Y. 2001) ("*Multifoods*") ("Pursuant to Section 5004 of the New York Civil Practice Law and Rules, Multifoods also is entitled to pre-judgment interest at the rate of 9% per annum beginning on the earliest date on which the cause of action accrued."), *aff'd in part, vacated in part on other grounds,* 309 F.3d 76 (2d Cir. 2002); *Farr Man Coffee Inc. v. Chester*, 1993 WL 248799, at *44 (S.D.N.Y. June 28, 1993) ("Under New York law, then, plaintiffs are entitled to prejudgment interest in the amount of 9% per annum on the sum awarded."), *aff'd,* 19 F.3d 9 (2d Cir. 1994); *J.K. Walkden, Ltd. v. Lord & Taylor*, 2000 WL 36266046, at *1 (S.D.N.Y. Nov. 28, 2000).

AGCS seeks to distinguish these cases on the ground that they did not apply substantive admiralty law to the underlying dispute. AGCS Br. 6. But the same is so here: Admiralty law, to the extent relevant, did no more than adopt New York law as the rule of decision. *See supra*, note 8. AGCS also claims that these cases did "not involve a marine insurance contract." *Id.* at 4–5. But that is wrong. *Multifoods* and *Farr Man Coffee* each involved an "open cargo"

13

insurance contract akin to the Policy in this case; Indeed, *Multifoods* involved a strikingly similar policy. *See* 178 F. Supp. 2d. at 348–350. The Court has, in fact, found no case in which courts used New York substantive insurance law to resolve damages claims involving marine cargo contracts but then eschewed the mandatory New York statutory prejudgment interest rate of 9%.

For avoidance of doubt, the Court would have reached this same conclusion—*i.e.*, it would have applied the New York statutory rate for prejudgment interest—even if it had determined that, based on admiralty jurisdiction, it had the discretion to select a different prejudgment interest rate. In admiralty cases, the Court has broad discretion to set the prejudgment interest rate. *See Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982) ("Although it is an abuse of discretion to deny prejudgment interest in admiralty cases except under extraordinary circumstances, the district court has broader discretion to determine when interest commences and what rate of interest to apply") (internal citations omitted)). When a district court exercises this discretion, "the award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992).

Applying this standard, the principle that the Court would have found most influential is that of treating this case commensurately with insurance cases resolved under New York law— the class of cases which this case most closely resembles. The nexus between this case and substantive federal maritime law is more formal than real. Indeed, while the facts of this case are memorable because of the audacious perfidy of fraudster "Battell," this case is otherwise a

quotidian contract dispute resolved, like so many other insurance coverage claims, under principles of New York law. World Fuel's claim of coverage turned on principles of New York law which the New York courts (and New York federal courts sitting in diversity) routinely apply. Indeed, but for the fact that AGCS preemptively brought this case as a declaratory judgment action, World Fuel would naturally have brought this case as a damages action either in the New York state courts or in this Court based on diversity jurisdiction. Had World Fuel prevailed in such a case, it would have been entitled, as a matter of law, to a 9% prejudgment interest rate.

Under these circumstances, equity is accomplished by treating the parties here—the prevailing insured and the vanquished insurer—as they would have been had the case been resolved as a conventional insurance coverage case governed by New York law. Therefore, even if the Court had discretion to determine the rate of pre-judgment interest, the Court would not have deviated from the New York statutory rate of 9%. This rate is consistent with the other factors, identified above, guiding the Court's discretion, including fairly compensating the prevailing party.

### 2. Accrual Date

The parties agree that the Court has discretion to determine the date upon which the pre-judgment interest began to accrue. *See* WFS Rep. Br. 5; AGCS Br. 5. "New York law provides that the prevailing party in a breach of contract dispute is entitled to prejudgment interest, 'to be computed from the earliest ascertainable date the cause of action existed,'" *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 393 (S.D.N.Y. 2013) (quoting N.Y. C.P.L.R. § 5001(a, b)), but "grants courts wide discretion in determining a reasonable date from which to award prejudgment interest." *Id.* at 393 (citing *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir.1994)) (internal quotation marks omitted).

15

The Policy requires AGCS to pay for a loss within "thirty (30) days after satisfactory proof of loss and proof of interest has been filed with [AGCS]." Policy at 21. The parties agree that World Fuel filed a claim with AGCS under the Policy on January 31, 2014. *See* AGCS Br. 5; WFS Rep. Br. 5. World Fuel argues that this filing started the clock with regard to the accrual of prejudgment interest, such that the first day on which payment by AGCS was due was March 2, 2014. WFS Rep. Br. at 5. AGCS, on the other hand, notes that it repudiated World Fuel's initial claim, and argues that the clock should instead start on May 8, 2014, after World Fuel submitted its "final" claim to AGCS, making payment first due on June 7, 2014. AGCS Br. 5. AGCS concedes, however, that the "earliest" date upon which it might be appropriate to start the clock for prejudgment interest is March 2, 2014, the same date specified by World Fuel. *Id.*

In light of the command of New York law impose to apply prejudgment interest based on "the earliest ascertainable date the cause of action existed," the Court hereby uses its discretion under New York law[9] to set the accrual date for prejudgment interest for March 2, 2014.

## CONCLUSION

For the foregoing reasons, the Court finds that the valuation clause in the Policy between World Fuel and AGCS refers to the "re-sale" invoice in the amount of $17,910,833.28, rather than the "supply invoice," and that World Fuel is entitled to prejudgment interest at the New York statutory rate of 9%, starting on March 2, 2014. The Court directs the parties to submit, by one week from today, a proposed judgment, consistent with these parameters.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 127 and 134.

---

[9] Again, for avoidance of doubt, the Court would have similarly used its discretion under admiralty law, *see Indep. Bulk Transp.*, 676 F.2d at 25, to decide on this same date of March 2, 2014.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 11, 2016
       New York, New York